**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| KALSHIEX LLC,<br><br>        Plaintiff,<br><br>    vs.<br><br>KEITH ELLISON, in his official capacity as Attorney General of Minnesota; TIM WALZ, in his official capacity as Governor of Minnesota; and JON ANGLIN, in his official capacity as Director of the Minnesota Alcohol and Gambling Enforcement Division,<br><br>        Defendants. | Case No. 26-cv-2778<br><br>COMPLAINT FOR PERMANENT INJUNCTION AND DECLARATORY RELIEF |

## <u>INTRODUCTION</u>

1.      This action challenges the State of Minnesota's clear violation of the Supremacy Clause with respect to the regulation of event contracts—as in, contracts providing for a payment depending on whether or to what extent a particular event occurs. The federal Commodity Exchange Act (CEA) grants the Commodity Futures Trading Commission (CFTC) "exclusive jurisdiction" over event contracts when they are "traded or executed on a contract market" that has been federally "designated" for that purpose. 7 U.S.C. § 2(a)(1)(A).  Nonetheless, Minnesota has enacted SF 3432, which impermissibly usurps the CFTC's exclusive jurisdiction by banning certain event contracts, including those traded on federally designated contract markets (or "DCMs").  Minn. Stat. § 609.7615.

2.    As a result, on August 1, 2026, when SF 3432 goes into effect, Plaintiff KalshiEX LLC ("Plaintiff" or "Kalshi") will be deemed a felon in Minnesota for offering certain event contracts on its federally authorized DCM that are entirely *lawful* under federal law—as confirmed by the federal agency with exclusive jurisdiction to make that determination. The Supremacy Clause does not tolerate that result. Indeed, the CFTC has already filed suit in this Court seeking injunctive relief against Minnesota's unconstitutional attempt to circumvent federal law and impose its own regulations. *See* Compl., *United States v. Minnesota, et al.*, No. 26-cv-02661 (LMP/DTS) (D. Minn. May 19, 2026), Dkt. No. 1.

3.    Plaintiff Kalshi seeks injunctive and declaratory relief to prevent Minnesota officials from enforcing SF 3432 or any of Minnesota's other laws against Kalshi based on its operation of a federally regulated DCM.

4.    The conflict is obvious. The CEA grants the CFTC "exclusive jurisdiction" over instruments, including "swaps," traded on DCMs. 7 U.S.C. § 2(a)(1)(A). The CEA then defines a "swap" to include a "contract" for a "payment . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." *Id.* § 1a(47)(A)(ii). The CEA also expressly grants the CFTC—*and only the CFTC*—the power to bar certain "event contracts" from DCMs if the CFTC determines that trading in those contracts is not in the "public interest." *Id.* § 7a-2(c)(5)(C). The CFTC currently permits Kalshi—and other prediction market operators—to offer event contracts pursuant to federal law that SF 3432 purports to ban. And, elsewhere in the federal code, Congress

has made clear that transactions executed on DCMs are *not* bets or wagers for purposes of federal law regulating the transmission of bets or wagers in interstate commerce. *See* 31 U.S.C. § 5362(1)(E) (providing that the term "bet or wager" "does not include" transactions conducted on "a registered entity . . . under the Commodity Exchange Act").

5. SF 3432 ignores these Congressional commands. It flatly prohibits operating a "[p]rediction market," which it defines as "a system that allows consumers to place a wager on the future outcome of a specified event that is not determined or affected by the performance of the parties to the contract for: (1) an athletic event or game of skill . . . ; (2) any game played with cards, dice, equipment, or [similar]; (3) war, state or national emergencies, [and similar events]; (4) any event or events happening to a natural person . . . ; (5) a federal, state, or local election, or [similar event]; (6) legal actions . . . ; (7) . . . death, assassination, [or similar events]; (8) events in popular culture . . . [or] (9) whether a person will make a particular statement." Minn. Stat. § 609.7615, subd. 1(e). The law then defines a "[w]ager" to include any contract in which the parties "agree to a gain or loss by one to the other of money, property, or benefit." *Id.*, subd. 1(f).

6. Although any state effort to regulate transactions on a DCM would be impermissible under federal law, SF 3432 is notable for the breadth of contracts that it purports to ban. It goes well beyond what other states have argued (largely unsuccessfully) remains subject to state regulation—such as contracts referencing sports, elections, or popular culture—and includes vague and amorphous categories such as "events happening to a natural person," "legal actions," or "whether a person will make a particular

3

statement," and defines "wager" in a manner that could encompass all manner of ordinary contracts.

7.      The net result of SF 3432's provisions is a bar on the operation of any market in Minnesota if that market offers any of the categories of event contracts that SF 3432 purports to ban.  In other words, SF 3432 not only bans the trading of certain event contracts—many of which the CFTC has expressly stated are permissible on DCMs—it bans the operation of any market that offers SF 3432's prohibited categories of event contracts, even if that platform also offers event contracts that are *permissible* under SF 3432.  Kalshi is authorized to operate a DCM under federal law, and the CEA gives the discretion to make the determination as to which contracts can be traded on a DCM to the CFTC *exclusively*; Minnesota has no authority to invade the CFTC's province in this respect.  Minnesota's new law purports to assert concurrent state jurisdiction over the trading of event contracts on DCMs in contravention of 7 U.S.C. § 2(a)(1)(A), to usurp the discretion expressly granted to the CFTC to determine what event contracts may be listed, *id.* § 7a-2(c)(5)(C), and to impose criminal penalties on Kalshi in Minnesota for acting in accordance with federal law.

8.      This is not the first time Minnesota has indicated its intention to contravene express provisions of the CEA.  Even before it enacted SF 3432, Minnesota joined a series of amicus briefs arguing that the trading of event contracts on DCMs is unlawful even

4

under Minnesota's existing gaming statutes.[1]  Multiple courts have recognized that states'

efforts to regulate event contracts traded on a DCM under existing state gaming statutes

violate the CFTC's exclusive authority to do the same as set forth in the CEA.  For example,

the Third Circuit recently upheld a district court's determination that Kalshi is entitled to a

preliminary injunction against New Jersey's efforts to enforce its gaming laws against

Kalshi, explaining that, because "Congress gave the CFTC exclusive jurisdiction over

trades on DCMs," the CEA "preempts [state] law from reaching into Kalshi's CFTC-

licensed DCM." *KalshiEX LLC v. Flaherty*, 172 F.4th 220, 231 (3d Cir. 2026).  The district

court recognized that Kalshi would be irreparably harmed by the Hobson's choice

presented by attempted state regulation of DCMs, as "leaving it subject to state

enforcement or obligating it to shift its business practices [are] consequences that are not

cleanly undone." *KalshiEX LLC v. Flaherty*, No. 25-cv-2152, 2025 WL 1218313, at \*7

(D.N.J. Apr. 28, 2025).  The Third Circuit agreed.  172 F.4th at 231-32.

9.      A district court in the Ninth Circuit reached the same conclusion in issuing a

preliminary injunction, barring Arizona officials from enforcing state gambling laws

against Kalshi and other similar exchanges.  *See, e.g.*, *KalshiEX LLC v. Johnson*, --- F.

Supp. 3d ---, No. CV-26-01715, 2026 WL 1223373 (D. Ariz. May 5, 2026).  Other courts

have agreed.  *See Flaherty*, 2025 WL 1218313, at \*6 (holding "Kalshi's sports-related

---

[1] *See generally* Br. of Amici Curiae, *KalshiEX LLC v. Flaherty*, No. 25-1922 (3d Cir. June 17, 2025), Dkt. No. 29; Br. of Amici Curiae, *KalshiEX LLC v. Martin*, No. 25-1892 (4th Cir. Dec. 22, 2025), Dkt. No. 41; Br. of Amici Curiae, *KalshiEX LLC v. Assad*, No. 25-7516 (9th Cir. Jan. 30, 2026), Dkt. No. 48.1; Br. of Amici Curiae, *N. Am. Derivatives Exch., Inc. v. Nevada*, Nos. 25-7187, 25-7516, 25-7831 (9th Cir. Mar. 10, 2026), Dkt. No. 76.1.

event contracts fall within the CFTC's exclusive jurisdiction" and "at the very least field preemption applies"); *KalshiEX LLC v. Orgel*, No. 3:26-cv-00034, 2026 WL 474869, at *7 (M.D. Tenn. Feb. 19, 2026) ("Kalshi is likely to succeed on the merits because sports event contracts are 'swaps' and conflict preemption applies.").[2]

10.     The same result is warranted here, where Kalshi's harms are—if anything—even more severe because it faces the threat of enforcement under both Minnesota's existing gaming laws, Minn. Stat. §§ 609.75 *et seq.*, and under the newly enacted SF 3432. *See*, *e.g.*, Emma Greenman, *Legislative Update – Mid-Session Update*, Minn. H.R. (Apr. 17,                    2026),                    https://www.house.mn.gov/ members/Profile/News/15552/41475 (Representative Greenman, an author of the prediction market ban, explicitly stated that she was working on "regulating prediction markets like Kalshi and Polymarket").  That SF 3432 makes operation of a prediction market a felony, with no possibility of lesser civil penalty, underscores the severity of the risk of irreparable harm to Kalshi.

11.     The obvious conflict with the CEA is not the only fatal defect in SF 3432. The law also violates the First Amendment by criminalizing speech that promotes the trading of event contracts on DCMs such as Kalshi.  *See* Minn. Stat. § 609.7615, subd. 3 (making it a felony to "advertise[ ] or market[ ] financial or technological products that

---

[2] While some courts have denied preliminary relief to Kalshi, Kalshi has appealed those decisions to vindicate its right to operate free from state interference. *See KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025), *appeal pending*, No. 25-1892 (4th Cir.); *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014 (D. Nev. 2025), *appeal pending*, No. 25-7516 (9th Cir.); *KalshiEX LLC v. Schuler*, No. 2:25-cv-1165, 2026 WL 657004 (S.D. Ohio Mar. 9, 2026), *appeal pending*, No. 26-03196 (6th Cir.).

promote transactions prohibited under this section"). No court has ever sustained a state's flat bar on advertising conduct that accords with federal law, and this Court should not be the first.

12. By enacting SF 3432, Minnesota has taken an extraordinary step in challenging the CFTC's exclusive jurisdiction to regulate DCMs, like Kalshi, pursuant to the CEA. Minnesota not only contends that existing state gaming laws are not preempted by the CEA—something that contradicts the plain text and other indicia of Congressional intent. It also apparently deems itself unencumbered by the Supremacy Clause and federal law when enacting new legislation that purports to criminalize the operation of a 50-state federal derivatives exchange that is operating in conformance with federal law, as confirmed by its federal regulator.

13. If Kalshi continues to operate its nationwide DCM in Minnesota, there is a grave risk that state officials will bring an enforcement action against Kalshi under existing gaming laws, prior to SF 3432 taking effect, and will seek additional criminal penalties against Kalshi under SF 3432, as soon as it becomes effective. Either action would impose substantial financial and reputational harms on the company, as a direct result of Kalshi's engagement in conduct that is federally authorized and approved.

14. The Supremacy Clause is designed to prevent this intolerable situation by making clear that—where federal and state law conflict—state law must give way. Shutting down Kalshi's ability to offer event contracts in Minnesota would irreparably impair Kalshi's viability as a 50-state derivatives exchange, and require it to implement complex and costly technological solutions to limit access to Kalshi's offerings in

Minnesota—costs that would not be recoverable when Kalshi ultimately prevails in the action. Enforcement by Minnesota under either existing laws, or SF 3432, would also impair Kalshi's existing contracts with consumers and business partners, subject Kalshi's users to uncertainty and loss, undermine confidence in the integrity of Kalshi's platform, threaten Kalshi's prospective business relationships, jeopardize Kalshi's status as a CFTC-approved exchange, and infringe upon Kalshi's First Amendment rights. An injunction is necessary to stave off these dire consequences from state enforcement actions that obviously violate federal law and the Constitution itself.

## JURISDICTION AND VENUE

15. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under the Supremacy Clause of the United States Constitution and the First Amendment. The federal questions presented are whether Minnesota's recently enacted SF 3432 and existing Minnesota laws (such as Minn. Stat. §§ 609.75 *et seq.*), which may be applied to prohibit or regulate trading event contracts on DCMs, are preempted by the CEA, 7 U.S.C. §§ 1 *et seq.*, and whether SF 3432's prohibition on speech violates the First Amendment.

16. The Eleventh Amendment imposes no bar to this Court's jurisdiction in this suit for prospective declaratory and injunctive relief against state officials. Under the Eleventh Amendment, as construed in *Ex parte Young*, 209 U.S. 123 (1908), "a private party can sue a state officer in his official capacity to enjoin a prospective action that would violate federal law." *281 Care Comm. v. Arneson*, 638 F.3d 621, 632 (8th Cir. 2011).

8

17.     Venue is proper under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2).  Defendants perform their duties in and thus reside in this District.  A substantial part of the events giving rise to the claim occurred in this District.

## PARTIES

18.     Plaintiff Kalshi is a financial services company with its principal place of business in New York.  Kalshi operates a derivatives exchange and prediction market where users can buy and sell financial products known as event contracts.  Its exchange market is federally regulated by the CFTC pursuant to the CEA, 7 U.S.C. §§ 1 *et seq.*

19.     Defendant Keith Ellison is sued in his official capacity as Attorney General of Minnesota.

20.     Defendant Tim Walz is sued in his official capacity as the Governor of Minnesota.

21.     Defendant Jon Anglin is sued in his official capacity as Director of the Minnesota Alcohol and Gambling Enforcement division.

22.     Together, Defendants would be responsible for enforcing any demand for Kalshi to comply with Minnesota state law that is preempted by federal law.

## FACTUAL ALLEGATIONS

A.     **An Event Contract—Like Other Derivatives—Is a Recognized Financial Tool to Mitigate Risk.**

23.     Derivatives contracts are financial tools used to mitigate risk.  Event contracts are a quintessential example of a derivatives contract.  They identify a future event with several possible outcomes, a payment schedule for the outcomes, and an

9

expiration date. Most commonly, event contracts involve a binary question: Every "yes" position has an equal and opposite "no" position. For example, a derivatives contract might center around whether a magnitude 8 earthquake will take place in California before January 1, 2027. A purchaser may trade on either the "yes" or the "no" position on the contract. If an earthquake does take place in Los Angeles County before the end of the calendar year, then the "yes" positions would be paid out.

24.    Event contracts are typically traded on an exchange—like the nationwide DCM operated by Kalshi—on which traders exchange positions with other traders in the marketplace. Importantly, event contracts do not reflect a "bet" against the "house." Because traders do not take a position against the exchange itself, traders' ability to hedge risk requires counterparties willing to assume risk in the hope of seeing a return. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 358 (1982) ("The liquidity of a futures contract, upon which hedging depends, is directly related to the amount of speculation that takes place."). Kalshi's exchange links traders seeking to hedge or seeking returns based on the uncertainty associated with financially significant events.

25.    The value of an event contract on a DCM like Kalshi is determined by market forces. An event contract's price will fluctuate between the time of its creation and the expiration date in accordance with changing market perceptions about the likelihood of the event's occurrence. During that period, individuals can buy and sell the contract at its fluctuating prices. The ultimate value of an event contract is determined at its expiration date. If the underlying event occurs, the holder of the "yes" position is entitled to its full

10

value.  But if the underlying event does not occur, the holder of the "no" position gets the payment.

26.    Traders price event contracts by reference to available information at any given time.  If new information comes to light portending an increase in the likelihood of the event's occurrence, then the event contract's price will increase.  The market prices of event contracts thus reflect probabilistic beliefs about whether the underlying event will occur.  Returning to the earthquake example, a "yes" contract that trades at 30 cents reflects that the market believes that there is a 30% chance of an earthquake this year.  The 30% figure can be informed by data points the market deems significant, such as the time since the last earthquake in the area and the frequency of fault line tremors in preceding months surrounding Los Angeles County.

27.    Event contracts are a valuable means to hedge against event-driven volatility.  Event contracts reflect real-time risk assessment and thus provide a nuanced and finely tuned opportunity for traders to mitigate their exposure to real-world events in an uncertain market.  There is no other widely available financial instrument with this unique capability to capture the risks of an event with potential economic consequences, which is a benefit not only to those that wish to hedge risk or seek return, but also to market observers and other economic actors.

28.    To give just some of many examples, this past February, researchers at the Federal Reserve published a paper, in which the "results suggest that Kalshi markets provide a high-frequency, continuously updated, distributionally rich benchmark that is

11

valuable to both researchers and policymakers."[3]   Findings in that paper included that "Kalshi markets are well-behaved and broadly consistent with those from more established financial instruments," and that "in several episodes, they allocate probability mass in ways that may reflect the range of plausible macroeconomic outcomes better than traditional financial derivative or survey-based forecasts."[4]  Further, Kalshi's "median and mode have a perfect forecast record on the day before the [Fed Open Market Committee] meeting, which represents a statistically significant improvement over the fed funds futures forecast,"[5] and, for headline consumer price index forecasts, "Kalshi provides a statistically significant improvement over the Bloomberg consensus forecast."[6]  And, "Kalshi provides real-time, distributional forecasts for macroeconomic variables such as GDP, core CPI, and unemployment—markets for which options data have historically been unavailable."[7]

29.    As another example, Kalshi recently announced a partnership with Tradeweb, a leading global operator of electronic marketplaces for rates, credit, equities, and money markets, which facilitates more than $2.6 trillion in notional value of instruments traded per day.[8]  The partnership is designed to expand institutional access to

---

[3] Anthony M. Diercks, Jared Dean Katz & Jonathan H. Wright, *Kalshi and the Rise of Macro Markets* 1, Fin. & Econ. Discussion Series Paper 2026-010, Bd. of Governors of the Fed. Rsrv. Sys. (Feb. 12, 2026), https://www.federalreserve.gov/econres/feds/kalshi-and-the-rise-of-macro-markets.htm.
[4] *Id.* at 2-3.
[5] *Id.* at 3.
[6] *Id.*
[7] *Id.*
[8] *Tradeweb and Kalshi Announce Strategic Partnership to Expand Institutional Access to Prediction Markets*, Tradeweb (Feb. 19, 2026), https://www.tradeweb.com/newsroom/media-center/news-releases/tradeweb-and-kalshi-announce-strategic-partnership-to-expand-institutional-access-to-prediction-markets.

data from Kalshi's market and to facilitate trading by those same institutional investors on Kalshi's platform.[9]

30.    Other examples abound:  Late last year, the real estate investment firm Arrived announced its plans to utilize Kalshi's event contracts to hedge the risk of a government shutdown impacting its business.[10]  And a range of entities use Kalshi's sports event contracts for hedging financial risk associated with sports.  For example, Game Point Capital is a sports-focused insurance firm that works with college athletic departments, pro teams, and sponsors to insure risk related to performance bonuses, coach salary buyouts, postseason and ticket revenue, and other areas of economic exposure.[11]  Game Point Capital uses Kalshi to hedge, and it intends to do so for $30 million in risk annually.[12]

---

[9] *See* Katherine Doherty and Sridhar Natarajan, *Wall Street Bond-Trading Hub Tradeweb Strikes Deal with Kalshi*, Bloomberg (Feb. 19, 2026), https://www.bloomberg.com/news/articles/2026-02-19/bond-trading-hub-tradeweb-strikes-prediction-markets-deal-with-kalshi.

[10]    *See* Ryan Frazier, LinkedIn, https://www.linkedin.com/posts/activity-7386091007588749312-rhxN [https://perma.cc/CQN6-JK3M]; *see also* Michael J. de la Merced, *Kalshi, a Prediction Market, Raises $1 Billion in a New Round*, N.Y. Times DealBook (Dec. 2, 2025), https://www.nytimes.com/2025/12/02/business/dealbook/kalshi-prediction-market-billion.html [https://perma.cc/VUY8-HCDT].

[11] *Services*, Game Point Cap., https://www.gamepointcapital.com/services; *see also* Paul Steinbach, *UConn Insured Basketball Coach Bonuses and Saved Nearly $3M*, Athletic Bus. (Apr. 23, 2024), https://www.athleticbusiness.com/operations/budgeting/article/15669200/ uconn-insured-basketball-coach-bonuses-and-saved-nearly-3m (Game Point Capital wrote insurance contract that saved university nearly $3 million in bonus payments to coaches related to NCAA tournament performance).

[12] Andrew Ross Sorkin et al., *Hedging, not betting, on sports via prediction markets*, N.Y. Times DealBook (Feb. 10, 2026), https://www.nytimes.com/2026/02/10/business/dealbook/epstein-lutnick-wasserman-starmer.html.

31.     Other market participants have recognized the hedging utility of sports event contracts as well.  In an April 2026 submission to the CFTC on event contracts and prediction markets, Susquehanna International Group explained that media companies and advertisers use sports-related event contracts to hedge risks tied to viewership, game outcomes, point spreads, and totals, and that businesses are already using these markets to hedge real economic risks.[13]  Similarly, Underdog Sports, a fantasy sports company, uses Kalshi as a tool to "hedge against volatility" on its own platform.[14]

32.     Event contracts are also a valuable means of communicating information to the public because contract prices reflect prevailing market opinions and conditions. Prediction markets thus serve as sensitive information-gathering tools that can provide insights for stakeholders—including businesses, individuals, governments, and educational institutions.    This is not theoretical.    Kalshi has recently announced partnerships with CNN and CNBC, which make use of its market data in their reporting.[15]

---

[13] *See* Comment Letter from Caitlin Starbuck, Global Head of Compliance, Susquehanna International Group, LLP to Commodity Futures Trading Comm'n (Apr. 30, 2026), https://comments.cftc.gov/PublicComments/ViewComment.aspx?id=115523.

[14] *See* Brett Smiley, *Underdog Sports Preparing To Use Kalshi, Prediction Markets For Its Own Risk Management*, InGame (Oct. 20, 2025), https://www.ingame.com/underdog-kalshi-pm-risk-management.

[15] *See* James Faris, *Prediction giant Kalshi strikes a new media partnership with CNBC, days after its CNN deal*, Bus. Insider (Dec. 4, 2025), https://www.businessinsider.com/kalshi-cnbc-deal-cnn-data-integration-partnership-2025-12; R.T. Watson, *Kalshi inks exclusive CNBC deal as prediction markets surge into mainstream media*, The Block (Dec. 4, 2025), https://www.theblock.co/post/381415/kalshi-exclusive-cnbc-deal-prediction-markets-surge-mainstream-media.

33.    Kalshi has recently launched a platform, Kalshi Research, to share market data with academics and promote research derived from the same.[16]  Data generated through prediction markets can also help to set rates and prices for assets whose value depends on the occurrence or non-occurrence of the underlying event.  *See* 7 U.S.C. § 5(a) (derivatives contracts, including event contracts, "are affected with a national public interest by providing" both a means for hedging risk and "disseminating pricing information through trading in liquid, fair and financially secure trading facilities").

**B.    The CEA Establishes an Exclusive Federal Scheme for Regulating Event Contracts Traded on DCMs.**

34.    The CEA establishes a comprehensive federal scheme for regulating the trading of derivatives—including event contracts.

35.    Under that scheme, the public can only trade event contracts and other derivatives on a board of trade like Kalshi that the CFTC has designated as a contract market, or DCM.  7 U.S.C. §§ 2(e), 6(a)(1), 7(a); 17 C.F.R. § 38.3(a).  To be designated as a DCM, an entity must first submit an application to the CFTC detailing how the entity complies with the Core Principles of the CEA.  17 C.F.R. § 38.3(a)(2).  Among other things, the proposed contract market must show that it can and will (1) comply with all CFTC requirements imposed by rule or regulation, (2) establish, monitor, and enforce compliance with the rules,[17] (3) list only contracts that are not readily susceptible to

---

[16] *See Kalshi launches new research arm*, Kalshi News (Dec. 22, 2025), https://news.kalshi.com/p/kalshi-launches-research-arm-prediction-markets.
[17] In fact, Kalshi's internal systems recently registered suspicious activity on the account of Minnesota Senator (and major proponent of Minnesota's ban on prediction markets)

manipulation, (4) have the capacity and responsibility to prevent manipulation, price distortion, and disruptions through market surveillance, compliance, and enforcement, and (5) adopt position limitations for each contract to reduce the threat of market manipulation. 17 C.F.R. §§ 38.100, 38.150, 38.200, 38.250, 38.300.  Proposed exchanges must provide detailed information demonstrating their capacity to abide by the CEA.   17 C.F.R. § 38.3(a)(2).   The CFTC then reviews the application and renders a decision on the purported market's designation within 180 days of submission.  17 C.F.R. § 38.3(a)(1).

36.    The CEA expressly grants the CFTC "exclusive jurisdiction" over derivatives traded on DCMs—including event contracts.   7 U.S.C.  § 2(a)(1)(A). Specifically, the statute provides that the CFTC "shall have exclusive jurisdiction" that covers "accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option' [or other specified instruments]), and transactions involving swaps or contracts of sale of a commodity for future delivery" where

Matt Klein and suspended his account because of the improper conduct.  *See Minnesota DFL senator facing backlash after betting on his own political race*, CBS News (Apr. 23, 2026),   https://www.cbsnews.com/minnesota/news/dfl-senator-matt-klein-prediction-market-bet-political-race.   After conducting an investigation consistent with Kalshi's obligations as a federally regulated DCM, Kalshi found that Klein had purchased an event contract on his own primary, violating Kalshi's internal policy which prohibits users from trading on events where they have a direct personal stake.  *See* Ubah Ali, *Minnesota DFL Senator Facing Backlash After Betting on His Own Political Race*, CBS News, https://www.cbsnews.com/minnesota/news/dfl-senator-matt-klein-prediction-market-bet-political-race (updated Apr. 23, 2026).  Kalshi suspended Klein from its exchange for five years and required him to pay a fine.  This is but one of many examples where Kalshi subjected its users to disciplinary action because the users attempted to engage in prohibited transactions on the exchange.  *See Kalshi Targets Insider Trading On Its Platform*, Yahoo Fin., https://finance.yahoo.com/markets/options/articles/kalshi-targets-insider-trading-platform-132100230.html (updated Apr. 23, 2026).

16

the derivative is "traded or executed on a contract market designated pursuant to section 7." *Id.*

37.     The CEA then defines "swap" to cover a wide range of instruments including event contracts.  It specifies that a "swap" includes "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery . . . dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence."  7 U.S.C. § 1a(47)(A)(ii).  And lest there be any doubt, it includes a catch-all defining "swap" to cover any instrument "that is, or in the future becomes, commonly known to the trade as a swap." *Id.* § 1a(47)(A)(iv).

38.     The term "commodity" is given a similarly broad meaning, which includes occurrences.  The CEA includes a special category known as "excluded commodit[ies]" (because they are excluded from certain statutory restrictions on trading) that covers intangibles like an interest rate or "an occurrence, extent of an occurrence, or contingency . . . beyond the control of the parties to the relevant contract" and "associated with a financial, commercial, or economic consequence." *Id.* § 1a(19)(A)(iv).  The CEA therefore makes clear that "event contracts" are "agreements, contracts, transactions, or swaps in excluded commodities" that are based on an "occurrence, extent of an occurrence, or contingency." *Id.* § 7a-2(c)(5)(C)(i).

39.     While the CEA grants the CFTC "exclusive jurisdiction" to regulate instruments like event contracts when they are traded on a DCM, it includes a savings clause and various other provisions that preserve states' power to regulate *off*-DCM

transactions.  For example, immediately after Section 2(a) grants the CFTC "exclusive jurisdiction" over derivatives trading "on a contract market designated pursuant to" 7 U.S.C. § 7, the statute provides that "[e]xcept as hereinabove provided, nothing contained in this section shall . . . supersede or limit the jurisdiction . . . of any State."  7 U.S.C. § 2(a)(1)(A).  The clear implication is that the CEA "supersede[s]" state authority regarding trading on DCMs, but not off.

40.     Both the "exclusive jurisdiction" provision and this savings clause were introduced to the statute in 1974 after decades of debate about whether and to what extent states should be able to apply their laws—including their gambling laws—to trading on DCMs.  When the CEA was first enacted in 1936, states often attempted to apply their gaming laws to trading on designated markets, and the Supreme Court interpreted some of the language in the original CEA to authorize this practice to continue, thereby permitting concurrent state and federal regulation of derivatives markets.  Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 670-693 (1982).

41.     By 1974, however, Congress recognized that federal regulation would only be workable if it "prevent[ed] any possible conflicts over jurisdiction."  *Review of Commodity Exchange Act and Discussion of Possible Changes: Hearings Before the H. Comm. on Agric.*, 93d Cong., 1st Sess. 128 (1973).  It therefore both eliminated the language the Supreme Court had interpreted to allow concurrent jurisdiction and added the "exclusive jurisdiction" provision.  S. Rep. No. 93-1131, at 31 (1974).  Moreover, when the House tried to soften the exclusive-jurisdiction provision by adding the savings clause, the Senate insisted on amending that clause to ensure it applied only "except as hereinabove

provided." *Id.* The language ensured that "where the jurisdiction of the [CFTC] is applicable, it supersedes State as well as Federal agencies." *Id.* at 23.

42. Other provisions of the CEA similarly grant the states some enforcement power while protecting the CFTC's exclusive authority to regulate trading on DCMs. For example, in 1978, Congress added Section 13a-2, entitled "Jurisdiction of States." That section provides states with some ability to bring suits to enforce the CEA against entities "*other than a contract market*" or other designated trading facility, as well as preserving the states' authority to bring state court proceedings regarding "general civil or criminal antifraud" laws. 7 U.S.C. § 13a-2(1), (7) (emphasis added). Similarly, in 1982, Congress added what is now Section 16(e)(1). That provision reiterates that the CEA generally does not preempt other federal or state laws for transactions "not conducted on or subject to the rules of a registered entity," such as a DCM. *Id.* § 16(e)(1)(B)(i). Section 16(e)(2), added in 2000, goes on to establish certain narrow circumstances in which state "gaming" and "bucket shop[ ]" laws are preempted even with respect to off-DCM transactions. *Id.* § 16(e)(2).

43. The CEA thus sets out a highly reticulated federal scheme for regulating event contracts and other derivatives traded on DCMs like Kalshi, and it grants the CFTC "exclusive jurisdiction" over event contracts while preserving state authority to regulate transactions that occur outside of a DCM.

44. Congress confirmed the same understanding in the Unlawful Internet Gambling Enforcement Act of 2006 ("UIGEA"). Although UIGEA generally prohibits the use of the internet to transmit wagers between states "where such bet or wager is unlawful,"

31 U.S.C. § 5362(10)(A), Congress provided that the term "bet or wager" "does not include" transactions conducted on "a registered entity . . . under the Commodity Exchange Act," *id.* § 5362(1)(E)(ii).  UIGEA thus underscores Congress's understanding that state gaming laws do not reach trading on DCMs.  *See Blue Lake Rancheria v. Kalshi Inc.*, No. 25-cv-06162, 2025 WL 3141202, at *6 (N.D. Cal. Nov. 10, 2025) (Kalshi's "internet contracts are not bets or wagers under the UIGEA and therefore do not constitute 'unlawful internet gambling'").

**C.   Minnesota's SF 3432 Expressly Bans Commodities Subject to the Exclusive Jurisdiction of the CFTC and Prohibits Kalshi from Advertising Its Federally Regulated Products in the State.**

45.   For almost a year, Minnesota officials have signaled their view that—despite the CEA's exclusive jurisdiction provision—*states* should have the exclusive authority to regulate event contracts on DCMs.

46.   As courts across the country address related preemption issues regarding state efforts to regulate prediction markets, Minnesota officials have supported other states' efforts to regulate Kalshi and other DCMs, in contravention of federal law, by signing amicus briefs in the United States Court of Appeals for the Third Circuit on June 17, 2025, the Fourth Circuit on December 22, 2025, and in the Ninth Circuit on January 30, 2026 and March 10, 2026, which claim that Kalshi is violating comparable state laws.  *See generally supra* n.1.  Those amicus briefs argue that states, not just the CFTC, have the power to regulate Kalshi's sports event contracts, and that such contracts constitute illegal sports gambling under the signatory states' laws.  And although those cases were focused particularly on Kalshi's sports event contracts, Minnesota's legal position—that its state

20

laws are not preempted by the CEA—could apply equally to an effort to regulate any of Kalshi's contracts.

47.     Additionally, Defendant Attorney General Ellison signed a letter to CFTC Chairman Michael Selig that challenged the CFTC's authority, pursuant to federal law, over sports event contracts.  Comment Letter from Att'y Gens. to Commodity Futures Trading              Comm'n              (Apr.              30,              2026), https://comments.cftc.gov/PublicComments/ViewComment.aspx?id=115653&SearchText=.  In that letter, the Defendant stated that "the CFTC lacks exclusive jurisdiction" over sports events contracts and that the CFTC should reject its own authority in favor of letting states regulate sports events contracts.  *Id.* at 1.

48.     Then, earlier this month, Minnesota went *much* further, adopting first-of-its-kind state legislation purporting to ban huge categories of event contracts altogether, and making it a felony for a DCM like Kalshi to even offer event contracts.

49.     Minnesota's new law, originally introduced as SF 4511, was introduced to the state legislature on March 17, 2026 and referred to the Committee for Judiciary and Public Safety later that same day.  *See* S.F. 4511, 94th Leg., Reg. Sess. (Minn. 2026), https://www.revisor.mn.gov/bills/94/2026/0/SF/4511.

50.     The Bill was subsequently amended on April 30, 2026, before it was passed in the Minnesota Senate the same day.  *See, e.g.*, *id.*

51.     Throughout May, the Minnesota Senate held conferences on the Bill, and it became part of SF 4760, an omnibus public safety bill, which was repassed as amended by

both chambers on May 12, 2026. *See* S.F. 4760, 94th Leg., Reg. Sess. (Minn. 2026), https://www.revisor.mn.gov/bills/94/2026/0/SF/4760.

52.    On May 18, 2026, Defendant Governor Walz signed SF 4760 into law. SF 4760 was then repealed and replaced by SF 3432, a similarly problematic statute, which was signed into law on May 26, 2026, and becomes effective on August 1, 2026. *See* S.F. 3432, 94th Leg., Reg. Sess. (Minn. 2026), https://www.revisor.mn.gov/bills/94/2026/0/SF/3432.

53.    SF 3432 makes certain event contracts unlawful in Minnesota even when they are traded on a DCM subject to the CFTC's exclusive jurisdiction. When the law takes effect on August 1, 2026, Kalshi will be subject to potential criminal penalties for operating its federal derivatives exchange.

54.    SF 3432 is no more than a targeted attack on federal DCMs, as its drafters have made clear that Kalshi and other DCMs are "nothing more than gambling" that "will dramatically cut into the revenue of Minnesota[]." *See* John Marty, *Minnesota Senate Passes Legislation to Ban Prediction Markets*, Minnesota Senate DFL Caucus (Apr. 30, 2026), https://senatedfl.mn/minnesota-senate-passes-legislation-to-ban-prediction-markets.

55.    The law accomplishes its impermissible aims in three main ways.

56.    First, SF 3432 modifies an existing exception in Minnesota's gaming laws that excludes "contract[s] for the purchase or sale for future delivery at a future date of securities or other commodities" from Minnesota's definition of "bets." Minn. Stat. § 609.75, subd. 3(2). Under SF 3432, that exception has been amended and now contains

22

its own massive exception "as provided in section 609.7615." This change was designed to "prohibit[ ] prediction markets-related activities" and ban prediction markets such as Kalshi from operating in Minnesota. S.F. 3432, 94th Leg., Reg. Sess. (Minn. 2026), https://www.revisor.mn.gov/bills/94/2025/0/SF/3432. Under the law, DCMs would now be prohibited from trading certain restricted contracts, including sports, political, and entertainment event contracts. The legislation also bans other broad categories of event contracts, such as those that reference "an event or events happening to a natural person or group of people," all manner of "legal action[s]," "public health" events and many other categories—many of which could encompass even the most ordinary of derivatives contracts offered on a DCM. *See, e.g.*, Minn. Stat. § 609.7615, subd. 1(e)(1).

57. Second, the law provides that "[a] person is guilty of a felony if the person" "creates," "operates," or provides a variety of other support for "a prediction market." *Id.*, subd. 2. "Prediction market," in turn, is defined as a "system that allows consumers to place a wager on the future outcome of a specified event." *Id.*, subd. 1(e). It then defines "[w]ager" as a "contract . . . whereby the parties to the contract agree to a gain or loss by one to the other of money, property, or benefit." *Id.*, subd. 1(f). The events that constitute prohibited offerings include athletic events, whether a person will make a particular statement, elections, legislative action, events in popular culture, legal actions, games of skill, war or other human-made disasters, and events happening to natural people. As a result, it is a felony to operate any market that offers these event contracts, and there is no exemption for federally regulated DCMs.

58.     Third, Section 609.7615, subd. 3 contains an additional provision barring any marketing or advertising of products promoting prohibited event contracts.  That provision states that a person is "guilty of a felony" if he "advertises or markets financial or technological products that promote transactions prohibited under this section."  *Id.*, subd. 3.  This improper exercise of authority infringes upon Kalshi's constitutionally protected First Amendment rights and cannot stand.

59.     Ultimately, the State, through SF 3432, creates distinct felonies for complying with federal law and exercising First Amendment rights.

**D.     Minnesota's Unlawful Efforts to Regulate Event Contracts Traded on DCMs Directly Harm Kalshi, A Federally Regulated DCM That Lawfully Offers Event Contracts.**

60.     Kalshi is a CFTC-regulated exchange and prediction market where users can trade on the outcome of real-world events.  In 2020, the CFTC designated Kalshi as a contract market, affirming that its platform complied with the CEA.  Since then, Kalshi has been fully regulated as a financial exchange under federal law, alongside entities like the Chicago Mercantile Exchange and the Intercontinental Exchange.

61.     Kalshi specializes in event contracts, offering a secure and federally approved exchange where individual, retail, and institutional participants can hedge their risks on event-based outcomes.

62.     Kalshi offers many kinds of event contracts related to an array of substantive areas like economics, finance, climate, technology, health, crypto, popular culture, and sports.  For example, Kalshi's platform currently allows users to trade on the level of US GDP growth in Q2 2026, the closing price of the S&P 500 at the end of 2026, whether

24

India will meet its 2030 climate goals, whether the market share for electric vehicles will be above 50% in 2030, or when the Strait of Hormuz will open.  Kalshi also offers contracts on congressional votes, weather events, technological benchmarks, markers of cultural influence, and Federal Reserve interest rate decisions.

63.     Prior to making a contract available for trade on its platform, Kalshi self-certifies to the CFTC, pursuant to section 7a-2(c)(1) of the CEA, that the offering complies with the CEA and CFTC regulations.  Those certifications contain extensive information, including in confidential appendices not available to the public, for the CFTC's review.

64.     The CFTC also has the ability to require Kalshi to submit a "Demonstration of [C]ompliance," which is "a written demonstration, containing supporting data, information and documents" that a DCM is required to file upon request from the CFTC to explain how the DCM "is in compliance with one or more core principles as specified in the request."  17 C.F.R. § 38.5(b).  The CFTC did just that with respect to Kalshi's first sports event contracts, and Kalshi responded with lengthy memoranda detailing the listing's compliance with applicable rules and regulations, and the CFTC's jurisdiction over sports event contracts traded on DCMs.  *Orgel*, 2026 WL 474869, at *5.

65.     The CFTC took no further action and has since allowed thousands of Kalshi's sports event contracts to be listed, traded, and closed, exactly as other derivatives contracts are listed, traded, and closed on the DCMs the CFTC oversees.

66.     The CFTC has repeatedly confirmed that Kalshi's contracts are lawful under federal law.  It has filed amicus briefs making clear that "the transactions conducted on a CFTC-registered DCM qualify as swaps under the CEA" and that "the CEA expressly bars

state laws from regulating or prohibiting these transactions that are conducted on CFTC-regulated DCM."  Amicus Brief of CFTC at 1, 20, 26, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. No. 38.2.  It has similarly brought five lawsuits against states that have sought to subject DCMs to state gambling laws,[18] and has obtained a preliminary injunction against state enforcement in the U.S. District Court for the District of Arizona.  *Johnson*, --- F. Supp. 3d ---, No. CV-26-01715, 2026 WL 1223373, at *9 (enjoining state enforcement action against exchange because exchange and CFTC "are likely to prevail on their claim that the CEA's grant of 'exclusive jurisdiction' preempts the State's enforcement of its gambling laws against DCM operators offering event contracts").  And it recently brought suit to challenge SF 3432's predecessor, SF 4760, as an intrusion on its exclusive jurisdiction to regulate trading on DCMs.  *United States v. Minnesota*, No. 0:26-cv-02661 (D. Minn. May 19, 2026), Dkt. No. 1.

67.    Defendants' newly enacted legislation purports to ban huge swaths of event contracts that Kalshi offers pursuant to federal law and under the supervision of the CFTC.

68.    When the new law goes into effect on August 1, Kalshi will therefore face an impossible choice: comply with the preempted state law by ceasing to offer its fully lawful event contracts in Minnesota or risk criminal penalties.

---

[18] *See generally United States v. Arizona*, 2:26-cv-02246 (D. Ariz. Apr. 2, 2026), Dkt. No. 1 ("Ariz. Compl."); *United States v. Connecticut*, 3:26-cv-00498 (D. Conn. Apr. 2, 2026), Dkt. No. 1 ("Conn. Compl."); *United States v. Illinois*, 1:26-cv-03659 (N.D. Ill. Apr. 2, 2026), Dkt. No. 1 ("Ill. Compl."); *United States v. New York*, No. 1:26-cv-3404 (S.D.N.Y. Apr. 24, 2026), Dkt. No. 1 ("NY Compl."); *United States v. Wisconsin*, No. 2:26-cv-749 (E.D. Wis. Apr. 28, 2026), Dkt. No. 1 ("Wis. Compl.").

69. Either way, Kalshi faces profound harms: Complying with Minnesota's law would bring Kalshi *out* of compliance with federal law, as the CFTC's longstanding regulations require "impartial access," meaning that Kalshi is forbidden from discriminating against its customers based on geography. 17 C.F.R. § 38.151(b). Moreover, restricting access will be costly and burdensome, and will threaten Kalshi's relationship with its customers and the public.

70. On the other hand, if Kalshi refuses to comply with the Minnesota law, it could face *criminal* charges that would inflict irreparable harm on the company and its reputation.

71. Moreover, while the law will not go into effect until August 1, Kalshi is already profoundly harmed. The law brands Kalshi as a felon in the eyes of Minnesota merely for engaging in lawful conduct, which by itself inflicts severe reputational harms. And in order to comply with SF 3432 by its effective date, Kalshi would need to start taking steps now to accommodate Minnesota's unlawful commands.

72. Kalshi also faces enforcement risk right now. Minnesota's new law demonstrates that state officials are so hostile to Kalshi that they might bring an enforcement action against Kalshi under Minnesota's existing gaming laws, even before SF 3432 takes effect, just as other states have done after voicing similar hostility to Kalshi.

**REQUISITES FOR RELIEF**

73. As a result of Defendants' threatened conduct and Minnesota's existing laws and newly enacted SF 3432, described above, there is a strong likelihood that Defendants will take action, including, but not limited to, seeking to enforce preempted state law in

27

violation of the Supremacy Clause of the U.S. Constitution, which will subject Kalshi and its customers to irreparable harm.

74.    An actual and substantial controversy exists between Plaintiff and Defendants as to their respective legal rights and duties.  Defendants' conduct alleged herein, including threats to Kalshi, has already resulted in, and will continue to result in, irreparable injury to Kalshi, including but not limited to economic hardship, lost business opportunities, impairment of existing contractual relationships, and an infringement upon Kalshi's First Amendment rights.

75.    Kalshi has no plain, speedy, or adequate remedy at law to address the wrongs described herein.  Kalshi therefore seeks declaratory and injunctive relief restraining Defendants from enforcing Minnesota law that interferes with the operation and function of Kalshi's DCM and Kalshi's advertising and promotion of its lawful products described herein.

## COUNT I

### (Supremacy Clause—Preemption by Commodity Exchange Act)

76.    Plaintiff incorporates all prior paragraphs by reference.

77.    The Supremacy Clause, Article VI, Clause 2, of the U.S. Constitution, provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

78.     The Supremacy Clause mandates that federal law preempts state law in any field over which Congress has expressly or impliedly reserved exclusive authority to the federal government, or where state law conflicts or interferes with federal law.

79.     Congress expressly preempted state law by giving the CFTC "exclusive jurisdiction" to regulate futures trading on approved exchanges, including the trading of event contracts on DCMs like Kalshi.  7 U.S.C. § 2(a)(1)(A).

80.     Through the passage of SF 3432 and its likely enforcement, Defendants are impermissibly intruding on the CFTC's exclusive authority to regulate futures trading on CFTC-regulated exchanges.  Indeed, federal law authorizes the CFTC to "determine" whether event contracts involving certain categories should be restricted as "contrary to the public interest," 7 U.S.C. § 7a-2(c)(5)(C)(i)—authority that is completely incompatible with parallel state regulation of the same putative subject matter.  Defendants' newly enacted statute attempts to completely bar some of the same categories of contracts that Congress provides shall be left to the discretion of the CFTC.  *Id.*  This statutory scheme, permitting the CFTC to determine whether specified contracts violate the public interest, would be completely undermined if states could ban those categories of contracts entirely.

81.     In addition, federal law occupies the entire field of regulating trading on designated contract markets, and Defendants' newly enacted law and its enforcement are both expressly and impliedly field-preempted under the Supremacy Clause.  As the Third Circuit recently held in concluding that state laws are field preempted, the CEA's text "preempts state laws that directly interfere with swaps traded on DCMs," and because

29

Kalshi's event contracts are swaps traded on a CFTC-licensed DCM, "the CFTC has exclusive jurisdiction." *Flaherty*, 172 F.4th at 225-26.

82.     SF 3432 is also preempted because it conflicts with federal law and policy. The legislation expressly bans event contracts that federal law and the CFTC have authorized, which would plainly frustrate the CFTC's exclusive authority to regulate its designated exchanges.  Congress passed the 1974 amendments to the CEA to bring futures markets regulation "under a uniform set of regulations." *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992). "As Congress recognized in enacting the 1974 Act, a contract market could not operate efficiently, and perhaps not at all, if varying and potentially contradictory legal standards governed its duties to investors." *Id.* The Seventh Circuit thus explained that "[w]hen application of state law would directly affect trading on or the operation of a futures market, it would stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' and hence is preempted." *Id.* at 1156-57 (citation omitted).  Minnesota's law not only affects markets under the jurisdiction of the CFTC; it also expressly acknowledges that it is regulating "commodities."  Minn. Stat. § 609.75, subd. 3(2).

83.     This conflict with the CEA is even clearer when considering that 49 other states and the District of Columbia might equally attempt to subject Kalshi to their own state laws, producing the patchwork of state-by-state regulation Congress sought to prevent.  As the Third Circuit recently held, state regulation of Kalshi's event contracts "would create an obstacle to executing the [CEA] because such state enforcement would prohibit Kalshi, which operates a licensed DCM under the exclusive jurisdiction of the

30

CFTC, from offering its sports-related event contracts," resulting in "exactly the patchwork that Congress replaced wholecloth by creating the CFTC." *Flaherty*, 172 F.4th at 230. Moreover, complying with Defendants' newly enacted law, which requires Kalshi to cease offering certain event contracts in Minnesota or face criminal charges, would conflict with the federal law governing DCMs, and would thus imperil Kalshi's CFTC approval. Furthermore, federal law requires Kalshi to offer impartial access to its exchange, therefore compliance with Minnesota law would jeopardize Kalshi's compliance with federal obligations to which it is subject. For that reason, SF 3432 and its enforcement are conflict-preempted under the Supremacy Clause.

84.     Additionally, a state law stands as an "obstacle" to a federal regulatory scheme if Congress chooses a specific enforcement method to achieve federal goals and a state law adopts a different method of enforcement, *Forest Park II v. Hadley*, 336 F.3d 724, 733 (8th Cir. 2003) (citation omitted), that hampers "the careful balance struck by Congress," *Arizona v. United States*, 567 U.S. 387, 406 (2012). Where Congress grants federal officials broad enforcement discretion, a state regime that allows for state prosecutions of the same actions "contradict[s] the policy decisions of Congress, and the policy decisions made with the discretion that Congress grants to federal . . . officials." *Iowa Migrant Movement for Just. v. Bird*, 157 F.4th 904, 923 (8th Cir. 2025). Under federal law, once Kalshi was approved as a CFTC-designated contract market, Kalshi was authorized to list its event contracts for trading by self-certifying that these contracts comported with federal law. The CFTC had the authority to review that self-certification if it concluded Kalshi's contracts fell within a category enumerated in the Special Rule and

31

were "contrary to the public interest," 7 U.S.C. § 7a-2(c)(5)(C)(i), but chose not to do so. The CFTC's Enforcement Division has authority to investigate and initiate enforcement actions seeking an array of penalties in federal court or administrative proceedings, but, again, it chose not to do so. Congress thus gave the CFTC a variety of tools for enforcing federal law against federally designated contract markets and entrusted the CFTC with discretion to pursue the penalties it deems most appropriate. Subjecting federally regulated exchanges to state laws like Minnesota's would "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Iowa Migrant Movement*, 157 F.4th at 927.

85.     Furthermore, Defendants' newly enacted law and their enforcement of it conflict with the CFTC Core Principles on which Kalshi's designation as a CFTC-approved market depends. The CFTC's Core Principle 2 requires Kalshi to "provide its members, persons with trading privileges, and independent software vendors with *impartial access* to its markets and services." 17 C.F.R. §§ 38.150, 38.151(b) (emphasis added). Cutting off Minnesota residents from Kalshi's platform—including residents with ongoing investments—would be in considerable tension with that principle and, as the CFTC itself has recognized, "*would be impossible* because a DCM is required by federal law to provide 'impartial access' to all eligible participants nationwide." Mot. for Prelim. Inj. at 18, *KalshiEX LLC v. Johnson*, No. 2:26-cv-1715 (D. Ariz. Apr. 8, 2026), Dkt. No. 49 (emphasis added). In addition, Core Principle 4 requires Kalshi to "establish and maintain risk control mechanisms to prevent and reduce the potential risk of price distortions and *market disruptions*." 17 C.F.R. § 38.255 (emphasis added). Abruptly closing Kalshi's

32

event contracts to anyone located in Minnesota could constitute exactly the sort of market disruption the CFTC has directed Kalshi to prevent.  Depending on the CFTC's interpretation of its Core Principles, it could well be that Kalshi's "compliance with both federal and state regulations is a physical impossibility"—the paradigmatic case for preemption. *Iowa Migrant Movement*, 157 F.4th at 919 (citation omitted).

86.     Defendants may not enforce Minnesota's newly enacted law SF 3432, or any related anti-gambling laws including Minn. Stat. §§ 609.75 *et seq.*, against Kalshi because Kalshi is a federally regulated exchange that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 *et seq.*, and SF 3432 expressly infringes upon that exclusive oversight.

## COUNT II

## (First Amendment—Speech Protection)

87.     Plaintiff incorporates all prior paragraphs by reference.

88.     The First Amendment protects the right to speak about lawful goods and services, including by advertising them. *See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 761-762 (1976).

89.     Kalshi's event contracts and its operations in Minnesota are lawful under federal and non-preempted state law.

90.     Despite the lawfulness of these offerings, Minnesota law makes it a felony to "advertise[] or market[] financial or technological products that promote [the] transactions" of event contracts.  Minn. Stat. § 609.7615, subd. 3.

33

91.     Kalshi's event contracts and its operations are lawful under federal law.  The statute thus targets speech that promotes federally lawful, federally regulated activity.  *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 564 (1980).

92.     A flat prohibition on advertising activity that is lawful under federal law cannot survive First Amendment review.  Any such restriction must, at a minimum, be narrowly tailored to advance a substantial government interest.  *See id.* at 566.  No court has ever found those conditions met where, as here, a State purports to bar all advertising of lawful conduct.  *See id.* at 566 n.9.  And while states have far more leeway to restrain speech promoting *unlawful* conduct, that principle is inapplicable here where the CEA preempts the Minnesota law that purports to outlaw prediction markets.

93.     Prohibiting Kalshi and other DCMs from advertising their event contract offerings does not advance any substantial government interest.  Kalshi's offerings are not gambling; they are the lawful trading of federally regulated derivatives subject to the CFTC's exclusive jurisdiction.  To the extent SF 3432's drafters invoked concerns about gambling, banning advertising of federally lawful derivatives trading does nothing to assuage those concerns.

94.     Even assuming a substantial interest, the statute is plainly not narrowly tailored.  Minnesota regulation currently permits advertising for actual gambling.  *See* Minn. R. 7861.0260, subd. 3.

95.     A blanket criminal prohibition on the promotion of lawful federally regulated derivatives trading is therefore far more extensive than any conceivably legitimate interest could require.

96. The First Amendment prohibits Minnesota from enforcing its wide sweeping bar on Kalshi's advertising of its federally regulated and lawful offering of event contracts.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Kalshi requests that judgment be entered in its favor and against Defendants as follows:

1. Enter a judgment declaring that the use of Minn. Stat. §§ 299L.03, 609.75 *et seq.*, 609.7615, including as amended and adopted by SF 3432, in a manner to effectively regulate Plaintiff's designated contract market violates the Supremacy Clause of the United States Constitution as applied to Plaintiff and its affiliates, and a declaratory judgment under 28 U.S.C. §§ 2201-2202 saying the same;

2. Enter a judgment declaring that the use of Minn. Stat. §§ 609.7615, subd. 3, as adopted by SF 3432, in a manner to prohibit Plaintiff from advertising its lawful products in Minnesota violates the First Amendment as applied to Plaintiff and its affiliates, and a declaratory judgment under 28 U.S.C. §§ 2201-2202 saying the same;

3. Enter a temporary restraining order, preliminary injunction, and permanent injunction prohibiting Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing Minn. Stat. §§ 609.75 *et seq.* or any other Minnesota law that attempts to effectively regulate Plaintiff's exchange, against Plaintiff and its affiliates;

4. Enter a temporary restraining order, preliminary injunction, and permanent injunction prohibiting Defendants, their officers, agents, servants, employees, and all

35

persons in active concert or participation with them who receive actual notice of the injunction, from enforcing Minn. Stat. Ann. §§ 609.7615 against Plaintiff and its affiliates;

5.     Any other relief within this Court's discretion that it deems just and proper.

DATED: May 27, 2026.

Respectfully submitted,

**GREENE ESPEL PLLP**

/s/ Holley C. M. Horrell
Holley C. M. Horrell, Reg. No. 0399636
Alison V. Zoschak, Reg. No. 0506030
Kshithij Shrinath, Reg. No. 0505164
222 S. Ninth Street, Suite 2200
Minneapolis, MN 55402
Telephone: (612) 373-0830
hhorrell@greeneespel.com
azoschak@greeneespel.com
kshrinath@greeneespel.com

and

Neal Kumar Katyal (*pro hac vice* forthcoming)
Joshua B. Sterling (*pro hac vice* forthcoming)
Colleen E. Roh Sinzdak (*pro hac vice* forthcoming)
William E. Havemann (*pro hac vice* forthcoming)
Anastasia Pastan (*pro hac vice* forthcoming)
**MILBANK LLP**
1101 New York Avenue NW
Washington, DC 20005
Telephone: 202-835-7500
Facsimile: 202-263-7586

Grant R. Mainland (*pro hac vice* forthcoming)
Andrew L. Porter (*pro hac vice* forthcoming)
Matthew J. Laroche (*pro hac vice* forthcoming)
Katherine Kelly Fell (*pro hac vice* forthcoming)

**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: 212-530-5000
Facsimile: 212-530-5219

*Attorneys for Plaintiff KalshiEX LLC*