**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| KALSHIEX LLC,<br><br>         Plaintiff,<br><br>    v.<br><br>KEITH ELLISON, in his official capacity as Attorney General of Minnesota; TIM WALZ, in his official capacity as Governor of Minnesota; and JON ANGLIN, in his official capacity as Director of the Minnesota Department of Public Safety, Alcohol and Gambling Enforcement Division,<br><br>         Defendants. | Case No. 26-cv-2778 (KMM/DTS)<br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF A PRELIMINARY INJUNCTION**<br><br>**<u>EXPEDITED HANDLING REQUESTED</u>** |

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND .......................................................................................................... 5

    A.    The CEA's Statutory Scheme. ................................................................. 5

    B.    Kalshi's Federal Registration as a CFTC-Regulated Designated
        Contract Market. ................................................................................ 10

    C.    Minnesota's First-of-Its-Kind Statute Purporting to Ban Certain
        Event Contracts. ................................................................................ 11

ARGUMENT ............................................................................................................ 14

    A.    Kalshi Is Likely to Succeed Because Minnesota's Efforts to Regulate
        Kalshi's Event Contracts Are Preempted by the CEA and Its
        Regulations. ....................................................................................... 14

        1.    The CEA Expressly Preempts Minnesota's Efforts to
            Regulate Event Contracts Traded on DCMs. .................................. 15

        2.    Field Preemption Also Applies to State Laws Regulating
            Event Contracts on DCMs. ............................................................ 22

        3.    Minnesota Laws Are Conflict Preempted as Applied to
            Kalshi. ........................................................................................ 23

    B.    Kalshi Is Also Likely to Succeed on Its First Amendment Challenge. ....... 26

    C.    Kalshi Will Suffer Irreparable Harm Without a Preliminary
        Injunction. ......................................................................................... 26

    D.    The Balance of the Equities and Public Interest Favor a Preliminary
        Injunction. ......................................................................................... 29

CONCLUSION ......................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*,
  977 F.2d 1147 (7th Cir. 1992) .......................................................... 10, 19, 24

*Arizona v. United States*,
  567 U.S. 387 (2012)........................................................................ 22, 25, 26

*Associated Builders & Contractors v. Mich. Dep't of Lab. & Econ. Growth*,
  543 F.3d 275 (6th Cir. 2008) .................................................................... 29

*Baker Elec. Coop. Inc. v. Chaske*,
  28 F.3d 1466 (8th Cir. 1994) ................................................................... 29

*Blue Lake Rancheria v. Kalshi Inc.*,
  2025 WL 3141202 (N.D. Cal. Nov. 10, 2025) .......................................... 18

*Blue Moon Ent., LLC v. City of Bates City*,
  441 F.3d 561 (8th Cir. 2006) ................................................................... 29

*BNSF Ry. Co. v. Hiett*,
  22 F.4th 1190 (10th Cir. 2022) ................................................................ 19

*Botsford v. Blue Cross & Blue Shield of Mont., Inc.*,
  314 F.3d 390 (9th Cir. 2002) ................................................................... 24

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*,
  447 U.S. 557 (1980)................................................................................. 26

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*,
  511 F.3d 535 (6th Cir. 2007) ................................................................... 28

*Crosby v. Nat'l Foreign Trade Council*,
  530 U.S. 363 (2000)........................................................................ 14, 23, 26

*Dataphase Sys., Inc. v. C L Sys., Inc.*,
  640 F.2d 109 (8th Cir. 1981) ................................................................... 14

*Dickson v. Uhlmann Grain Co.*,
  288 U.S. 188 (1933)................................................................................... 7

*Entergy, Ark., Inc. v. Nebraska*,
  210 F.3d 887 (8th Cir. 2000) ................................................................... 28

*Felton v. Jives*,
   2024 WL 4263223 (D. Minn. Sep. 23, 2024) ............................................................. 28

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
   458 U.S. 141 (1982) ..................................................................................................... 15

*Freightliner Corp. v. Myrick*,
   514 U.S. 280 (1995) ..................................................................................................... 19

*FTC v. Ken Roberts Co.*,
   276 F.3d 583 (D.C. Cir. 2001) ............................................................................... 19, 21

*Garrett v. City of Escondido*,
   465 F. Supp. 2d 1043 (S.D. Cal. 2006) ....................................................................... 28

*Gibson v. Ark. Dep't of Corr.*,
   265 F.3d 718 (8th Cir. 2001) ....................................................................................... 27

*Hines v. Davidowitz*,
   312 U.S. 52 (1941) ................................................................................................. 15, 24

*Hughes v. Talen Energy Mktg., LLC*,
   578 U.S. 150 (2016) ............................................................................................... 15, 18

*Ingersoll-Rand Co. v. McClendon*,
   498 U.S. 133 (1990) ..................................................................................................... 23

*INS v. Cardoza-Fonseca*,
   480 U.S. 421 (1987) ..................................................................................................... 22

*Int'l Trading, Ltd. v. Bell*,
   556 S.W.2d 420 (Ark. 1977) ........................................................................................ 19

*KalshiEX LLC v. CFTC*,
   2024 WL 4164694 (D.D.C. Sep. 12, 2024) ................................................................. 10

*KalshiEX LLC v. CFTC*,
   2024 WL 4512583 (D.C. Cir. Oct. 16, 2024) .............................................................. 19

*KalshiEX LLC v. Flaherty*,
   2025 WL 1218313 (D.N.J. Apr. 28, 2025) ..................................................................... 4

*KalshiEX, LLC v. Flaherty*,
   172 F.4th 220 (3d Cir. 2026) .............................................................................. *passim*

iv

*KalshiEX LLC v. Johnson*,
2026 WL 1223373 (D. Ariz. May 5, 2026) ........................................................ *passim*

*KalshiEX LLC v. Martin*,
793 F. Supp. 3d 667 (D. Md. 2025) ........................................................................ 4

*KalshiEX LLC v. Orgel*,
2026 WL 474869 (M.D. Tenn. Feb. 19, 2026) ........................................ 4, 23, 27, 29

*La. Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986) ............................................................................................ 22

*Leist v. Simplot*,
638 F.2d 283 (2d Cir. 1980) ................................................................................ 19

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982) ............................................................................................ 22

*Mississippi v. Louisiana*,
506 U.S. 73 (1992) .............................................................................................. 15

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992) ............................................................................................ 27

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
579 U.S. 115 (2016) ............................................................................................ 19

*Rice v. Bd. of Trade of Chi.*,
331 U.S. 247 (1947) ......................................................................................... 7, 21

*United Healthcare Ins. Co. v. AdvancePCS*,
316 F.3d 737 (8th Cir. 2002) .............................................................................. 29

*United States v. New York*,
708 F.2d 92 (2d Cir. 1983) .................................................................................. 28

*Valle del Sol Inc. v. Whiting*,
732 F.3d 1006 (9th Cir. 2013) ............................................................................. 27

*Xiong v. Minn. State High Sch. League*,
917 F.3d 994 (8th Cir. 2019) .............................................................................. 29

*Ex parte Young*,
209 U.S. 123 (1908) ............................................................................................ 27

v

**Statutes**

7 U.S.C. § 1a ............................................................................................ 2, 6, 9, 16

7 U.S.C. § 2 ...................................................................................................... *passim*

7 U.S.C. § 6 ................................................................................................... 6, 22

7 U.S.C. § 7 ............................................................................................... 6, 22, 25

7 U.S.C. § 7a-2 ................................................................................................ *passim*

7 U.S.C. § 13a-2 ............................................................................................ 8, 9, 18

7 U.S.C. § 16 ................................................................................................ 8, 9, 18

31 U.S.C. § 5362 ............................................................................................. 2, 18

Minn. Stat. §§ 609.75 *et seq.* ................................................................................. 4

Minn. Stat. § 609.75 subd. 2 ..................................................................................... 17

Minn. Stat. § 609.75 subd. 3 ............................................................................ 4, 12, 16

Minn. Stat. § 609.7615 ............................................................................................ 1

Minn. Stat. § 609.7615 subd. 1 .......................................................................... 2, 3, 13, 16, 17

Minn. Stat. § 609.7615 subd. 2 ............................................................................... 2, 12

Minn. Stat. § 609.7615 subd. 3 ................................................................................ 13, 26

**Other Authorities**

17 C.F.R. pt. 16 .................................................................................................... 3

17 C.F.R. pt. 38 ................................................................................................... 23

17 C.F.R. § 1.31 .................................................................................................. 22

17 C.F.R. § 38.3 ................................................................................................... 6

17 C.F.R. § 38.100 ............................................................................................... 22

17 C.F.R. § 38.151 .......................................................................................... 14, 25, 27

17 C.F.R. § 38.255 ............................................................................................... 27

17 C.F.R. § 38.450.................................................................................................... 3

17 C.F.R. § 38.950.................................................................................................. 22

17 C.F.R. § 38.1101................................................................................................ 23

17 C.F.R. § 40.2..................................................................................................... 23

120 Cong. Rec. 30464 (1974).................................................................................. 21

Amended Complaint, *United States v. Minnesota*,
No. 0:26-cv-02661 (KMM/DTS) (D. Minn. May 19, 2026), Dkt. No. 23 ............. 1, 19

Amicus Brief of CFTC, *N. Am. Derivatives Exch., Inc. v. Nevada*,
No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. No. 38.2 ..........................................*passim*

*Banned Markets*, Kalshi, https://kalshi.com/policy-center/banned-
markets?utm_source=chatgpt.com (last visited May 27, 2026) ................................ 13

Brief of Amici Curiae, *KalshiEX LLC v. Flaherty*,
No. 25-1922 (3d Cir. June 17, 2025), Dkt. No. 29 ...................................................... 11

Brief of Amici Curiae, *KalshiEX LLC v. Hendrick*,
No. 25-7516 (9th Cir. Jan. 30, 2026), Dkt. No. 48.1 .................................................. 11

Brief of Amici Curiae, *KalshiEX LLC v. Martin*,
No. 25-1892 (4th Cir. Dec. 22, 2025), Dkt. No. 41-1.................................................. 11

Brief of Amici Curiae, *N. Am. Derivatives Exchange, Inc. v. Nevada*,
Nos. 25-7187, 25-7516, 25-7831 (9th Cir. Mar. 10, 2026), Dkt. No. 76.1................. 12

Commodity Futures Modernization Act of 2000, Pub. L. No. 106-554, app.
E, § 103, 114 Stat. 2763A-377................................................................................. 8, 9

*Commodity Futures Trading Commission Act: Hearings Before the S.
Comm. on Agric. & Forestry on S. 2485, S. 2578, S. 2837, and H.R.
13113*, 93d Cong., 2d Sess. (1974) .............................................................................. 21

Emma Greenman, *Legislative Update - Mid-Session Update*, Minn. House
of Representatives (Apr. 17, 2026), https://perma.cc/T9XF-N5HF .............................. 4

*Exclusive*, American Heritage Dictionary (5th ed. 2022) ................................................ 15

Further Definition of "Swap,"
77 Fed. Reg. 48208 (Aug. 13, 2012)............................................................................. 9

H.R. Rep. No. 93-975 (1974) ....................................................................... 21, 22

H.R. Rep. No. 93-1383 (1974) (Conf. Rep.) .................................................... 8, 21

H.R. Rep. No. 97-565, pt. 1 (1982) ..................................................................... 8

H.R. Rep. No. 106-711, pt. 2 (2000) .................................................................... 9

Order, *KalshiEX LLC v. Johnson*,
    No. 2:26-cv-01715 (D. Ariz. Apr. 10, 2026), Dkt. No. 65 .......................................... 21

Prediction Markets,
    91 Fed. Reg. 12516, 12517 n.5 (Mar. 16, 2026)........................................................ 20

Prediction Markets Advisory,
    CFTC Letter No. 26-08 (Mar. 12, 2026) .................................................................. 20

*Review of Commodity Exchange Act and Discussion of Possible Changes:*
    *Hearings Before the H. Comm. on Agric.*, 93d Cong., 1st Sess. (1973)........................ 7

S. Rep. No. 93-1131 (1974)................................................................................. 7, 8

## PRELIMINARY STATEMENT

This Court's intervention is urgently needed to prevent a clear violation of the Supremacy Clause with respect to the regulation of event contracts—that is, contracts providing for a payment depending on whether or to what extent a particular event occurs. The federal Commodity Exchange Act ("CEA") grants the Commodity Futures Trading Commission ("CFTC") "exclusive jurisdiction" over event contracts when they are "traded or executed on a contract market" that has been federally "designated" for that purpose. 7 U.S.C. § 2(a)(1). Nonetheless, last week Minnesota enacted SF 3432 (an only slightly amended version of SF 4760), a first-of-its-kind state law that criminalizes trading in certain event contracts, Minn. Stat. § 609.7615—including contracts traded on federally designated contract markets ("DCMs").

As a result, on August 1, 2026, when SF 3432 goes into effect, Plaintiff KalshiEX LLC ("Plaintiff" or "Kalshi") will be deemed a felon for offering event contracts on its federally authorized DCM—even though the CEA expressly contemplates that event contracts may be traded on DCMs and even though the federal agency with exclusive jurisdiction over those contracts has repeatedly explained that they are lawful. The Supremacy Clause does not tolerate that result. Indeed, the CFTC has already filed suit in this Court seeking injunctive relief against Minnesota's unconstitutional attempt to circumvent federal law. *See* Amended Compl., *United States v. Minnesota*, No. 0:26-cv-02661 (KMM/DTS) (D. Minn. May 19, 2026), Dkt. No. 23. Kalshi similarly seeks an expedited preliminary injunction under Rule 65 to prevent state officials from enforcing

1

SF 3432 or any other Minnesota law that would be used to regulate transactions on Kalshi's federally regulated DCM, against Kalshi.

The conflict between federal and state law is obvious. The CEA provides the CFTC with "exclusive jurisdiction" over "swaps" and other instruments traded on DCMs. 7 U.S.C. § 2(a)(1). The CEA then provides that event contracts constitute swaps, defining "swap" to include a "contract" for a "payment ... that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." *Id.* § 1a(47)(A)(ii). The CEA also expressly grants the CFTC—and only the CFTC—the power to bar certain "event contracts" from DCMs if the CFTC determines that trading in those contracts is not in the "public interest." *Id.* § 7a-2(c)(5)(C). And in a separate statute regulating internet gambling, Congress made clear that event contracts traded on DCMs should not be mistaken for wagers, providing that the term "bet or wager" "does not include" transactions conducted on "a registered entity ... under the Commodity Exchange Act." 31 U.S.C. § 5362(1)(E)(ii).

Minnesota's new law disregards all of these congressional commands. SF 3432 imposes a flat bar on operating a "prediction market," Minn. Stat. § 609.7615, subd. 2, which it defines as "a system that allows consumers to place *a wager* on the future outcome of a specified event" within nine broad categories of events, including "any event or events happening to a natural person or group of people." *Id.*, subd. 1(e). The law then defines a "wager" to include *any* contract in which the parties "agree to a gain or loss by one to the other." *Id.*, subd. 1(f) (emphasis added). The net result is a bar on the operation of markets

for trading certain broad categories of event contracts, including federally regulated DCMs. In other words, while federal law grants the CFTC exclusive jurisdiction over event contracts traded on DCMs, Minnesota's new law purports not only to assert concurrent state jurisdiction over the trading of those contracts on DCMs, but also to bar certain of them outright, on pain of *criminal* penalties, even though the CFTC has concluded they are entirely lawful.

As the Third Circuit recently held, preliminary injunctive relief is appropriate where—as here—a state threatens to enforce its laws against a DCM in violation of the CFTC's exclusive authority. *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 231 (3d Cir. 2026). In *Flaherty*, the Third Circuit explained that because "Congress gave the CFTC exclusive jurisdiction over trades on DCMs," Kalshi is likely to succeed in establishing "that the [CEA] preempts [state] law from reaching into Kalshi's CFTC-licensed DCM." *Id.* And *Flaherty* further recognized that Kalshi would suffer irreparable harm from the Hobson's choice presented by state regulation. *Id.* at 231-32. On one hand, if Kalshi were to refuse to obey preempted state law, it would face criminal liability. But if Kalshi were to obey preempted state law, it would fall out of compliance with federal regulations requiring it to provide impartial access nationwide, would suffer substantial business and reputational harm from shuttering contracts in Minnesota, and would incur expenses that it could not recoup even if it ultimately prevails.

A district court in the Ninth Circuit recently reached the same conclusion in issuing a preliminary injunction barring Arizona officials from enforcing state gambling laws against federally regulated exchanges like Kalshi. *See KalshiEX LLC v. Johnson*, 2026

3

WL 1223373 (D. Ariz. May 5, 2026). Other courts have similarly concluded that Kalshi is entitled to injunctive relief. *See KalshiEX LLC v. Orgel*, 2026 WL 474869, at *7 (M.D. Tenn. Feb. 19, 2026) ("Kalshi is likely to succeed on the merits because sports event contracts are 'swaps' and conflict preemption applies."); *KalshiEX LLC v. Flaherty*, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025) (holding that "Kalshi's sports-related event contracts fall within the CFTC's exclusive jurisdiction," and that "at the very least field preemption applies" to prevent states from regulating trading on DCMs like Kalshi).[1]

The same result is warranted here where Kalshi's harms are—if anything—more acute because Kalshi faces the threat of enforcement not just under Minnesota's existing gaming laws, *see* Minn. Stat. §§ 609.75 *et seq.* (defining and criminalizing, among other things, making bets and engaging in sports bookmaking), but also under the state's brand new law that expressly targets DCMs like Kalshi. *See, e.g.*, Emma Greenman, *Legislative Update – Mid-Session Update*, Minn. House of Representatives (Apr. 17, 2026), https://perma.cc/T9XF-N5HF (Representative Greenman, an author of the prediction market ban, explicitly stating that she was working on "regulating prediction markets like Kalshi and Polymarket"). Moreover, the new law does not stop at banning Kalshi and other DCMs from offering certain event contracts in Minnesota. It also bars Kalshi from advertising its event contracts in the state, Minn. Stat. § 609.7615(3)—layering a First Amendment harm on top of all the other harms.

---

[1] While some district courts have held otherwise, *see, e.g.*, *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025), *appeal pending*, Case No. 25-1892 (4th Cir.), none had the benefit of the Third Circuit's decision in *Flaherty*.

Kalshi therefore respectfully requests that this Court issue a briefing schedule coordinated with *United States v. Minnesota* and consistent with the stipulation entered by the parties at Docket Number 20, thereby providing expedited proceedings to ensure that a preliminary injunction is in place before the new law takes effect on August 1, 2026.[2]

## BACKGROUND

### A.      The CEA's Statutory Scheme.

The CEA broadly grants the CFTC "exclusive jurisdiction" over the wide range of commodities derivatives that can be traded on a DCM.  7 U.S.C. § 2(a)(1)(A).  Specifically, the statute provides that the CFTC "shall have exclusive jurisdiction" that covers "accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option' [or other specified instruments]), and transactions involving swaps or contracts of sale of a commodity for future delivery" where the derivative is "traded or executed on a contract market designated" under the CEA.  *Id.*

The CEA also broadly defines the various derivatives and commodities it covers. As most relevant here, the statute defines "swap" to cover a range of instruments including "any agreement, contract, or transaction ... that provides for any purchase, sale, payment, or delivery ... dependent on the occurrence, nonoccurrence, or the extent of the occurrence

---

[2] Kalshi originally intended to seek a temporary restraining order ("TRO") in addition to a preliminary injunction to ensure that state officials do not attempt to enforce existing state laws against Kalshi based on its operation of its federally regulated and licensed DCM, as certain other states have attempted to do.  But after conferring with counsel for Defendants, Kalshi agreed to forgo seeking a TRO on the understanding that no such state enforcement action is currently planned and Defendants will provide Kalshi with advance notice if they decide to bring an enforcement action against Kalshi in state court.

of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). And lest there be any doubt of the breadth of Congress's intentions, it included a catch-all defining "swap" to cover any instrument "that is, or in the future becomes, commonly known to the trade as a swap." *Id.* § 1a(47)(A)(iv).

The term "commodity" is given a similarly broad meaning, covering virtually everything except onions and box-office receipts. In particular, Congress created a category deemed "excluded commodit[ies]" (because they are excluded from certain statutory restrictions on trading) that covers intangibles like an interest rate or "an occurrence, extent of an occurrence, or contingency ... beyond the control of the parties to the relevant contract" and "associated with a financial, commercial, or economic consequence." *Id.* § 1a(19)(A)(iv).

Congress gave the CFTC a correspondingly broad set of powers for exercising its "exclusive jurisdiction" over trading on DCMs. Notably, Congress empowered the CFTC to authorize DCMs for trading derivatives in accordance with a set of statutory requirements. 7 U.S.C. §§ 6(a), 7(a); 17 C.F.R. § 38.3(a). And it enacted a "Special Rule" permitting the CFTC to bar certain "event contracts"—including contracts involving "gaming," "terrorism," "assassination," and "war"—if it determines those contracts are contrary to the "public interest." 7 U.S.C. § 7a-2(c)(5)(C). Importantly, this rule provides the CFTC with discretion. *See id.* (noting the CFTC "may determine" that such agreements are against the public interest). It is up to the CFTC, and the CFTC only, to determine whether these contracts are against the public interest.

While the CEA grants the CFTC broad and exclusive authority to regulate trading *on* DCMs, it simultaneously preserves states' power to regulate off-market conduct. Immediately after § 2(a) grants the CFTC "exclusive jurisdiction" over derivatives trading "on a contract market designated pursuant to" 7 U.S.C. § 7, the statute provides that "[e]xcept as hereinabove provided, nothing contained in this section shall … supersede or limit the jurisdiction ... of any state." *Id.* § 2(a)(1)(A).

Both the "exclusive jurisdiction" provision and this savings clause were introduced to the statute in 1974 after decades of debate about whether and to what extent states should be able to apply their laws—including their gambling laws—to trading on DCMs. When the CEA was first enacted in 1936, states often applied their gaming laws to futures trading, which states viewed as "gambling in grain." *Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198 (1933). Even after the CEA's 1936 enactment, the Supreme Court interpreted the statute to continue to allow state regulation, thereby permitting concurrent state and federal regulation of derivatives markets. *See Rice v. Bd. of Trade of Chi.*, 331 U.S. 247, 255 (1947).

But by 1974, Congress recognized that federal regulation would only be workable if it "prevent[ed] any possible conflicts over jurisdiction." *Review of Commodity Exchange Act and Discussion of Possible Changes: Hearings Before the H. Comm. on Agric.*, 93d Cong., 1st Sess. 128 (1973). Congress therefore both eliminated the statutory language the Supreme Court had interpreted to allow concurrent jurisdiction and added the "exclusive jurisdiction" provision. S. Rep. No. 93-1131, at 31 (1974). Moreover, when the House tried to soften the exclusive jurisdiction provision by adding the savings clause, the Senate

insisted on amending that clause to ensure it applied only "except as hereinabove provided." *Id.* The language ensured that "where the jurisdiction of the [CFTC] is applicable, it supersedes State as well as Federal agencies." *Id.* at 23. As the Conference Report explained, Congress's intent was to "preempt the field insofar as futures regulation is concerned." H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.).

Congress revisited and refined the states' role in subsequent amendments. For example, in 1978, Congress added § 13a-2, entitled "Jurisdiction of States." That section provides states with some authority to bring suits to enforce the CEA against entities "other than a contract market" or other designated trading facility, as well as preserving the states' authority to bring state court proceedings regarding "general civil or criminal antifraud" laws. 7 U.S.C. § 13a-2(7).

Similarly, in 1982, Congress added what is now § 16(e)(1). That provision underscores the CFTC's exclusive jurisdiction over trading on DCMs while reiterating that the CEA generally does not preempt other federal or state laws for transactions "not conducted on or subject to the rules of a registered entity," such as a DCM. *Id.* § 16(e)(1)(C). That amendment reflects Congress's recognition that the 1974 amendments already "bestowed on the CFTC exclusive jurisdiction to regulate futures trading" on DCMs, "thereby preempting any State regulatory laws." H.R. Rep. No. 97-565, pt. 1, at 44 (1982). Then, in 2000, Congress amended the CEA to "exclude[]" certain instruments from the requirement that they be traded on-DCMs. Commodity Futures Modernization Act of 2000, Pub. L. No. 106-554, app. E, § 103, 114 Stat. 2763A-377 (2000). In what is now § 16(e)(2), Congress specified that state "gaming" and "bucket shop" laws *are*

8

preempted even with respect to these exempted—i.e., off-DCM—transactions. *Id.* As the Committee Report explained, the then-"current" CEA already "supersede[d] and preempt[ed]" state laws "in the case of transactions conducted on a registered entity" such as a DCM, and the new preemption provision clarified that the CEA likewise "supersedes and preempts State gaming and bucket shop laws" as to exempted off-DCM transactions. H.R. Rep. No. 106-711, pt. 2, at 71 (2000); *see* 7 U.S.C. § 1a(40) (defining "registered entity" to include DCMs).

In 2010, Congress added "swaps" to the instruments in the CFTC's exclusive jurisdiction. It also made the second part of § 16(e)—as well as all of § 13a-2—applicable to "swaps." 7 U.S.C. § 2(d). And it provided that all "swaps"—including tradeable event contracts—must be entered into and traded on federally regulated facilities such as DCMs. *Id.* § 2(e).[3] The upshot is that, with limited exceptions, the CEA preserves states' authority to apply their laws, including their "gaming" laws to off-market transactions, 7 U.S.C. § 16(e)(2), but states cannot intrude on the CFTC's "exclusive jurisdiction" over trading on DCMs, including trading in event contracts.

---

[3] Some states have erroneously suggested that this provision somehow means that—if event contracts count as "swaps"—then all sports gambling must occur on DCMs, depriving states of any authority to regulate traditional gaming. But the CFTC has long defined "swap" to refer exclusively to instruments capable of being traded on an exchange. Further Definition of "Swap," 77 Fed. Reg. 48208, 48247-48 (Aug. 13, 2012). That definition accords with the basic boundaries of the Commodities *Exchange* Act, and necessarily excludes unexchangeable contracts like bets at a sportsbook.

**B.      Kalshi's Federal Registration as a CFTC-Regulated Designated Contract Market.**

In 2020, the CFTC certified Kalshi as a DCM, affirming that its platform complies with the CEA's regulatory requirements.  *KalshiEX LLC v. CFTC*, 2024 WL 4164694, at *4 (D.D.C. Sep. 12, 2024).  Because Kalshi is a DCM, its event contracts are subject to the CFTC's "exclusive jurisdiction."  7 U.S.C. § 2(a)(1)(A).  Kalshi's status as a DCM also "imposes upon it a duty of self-regulation, subject to the Commission's oversight," requiring Kalshi to "enact and enforce rules to ensure fair and orderly trading, including rules designed to prevent price manipulation, cornering and other market disturbances." *Am. Agric. Movement*, *Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1150-51 (7th Cir. 1992).

Kalshi offers event contracts related to economics, finance, health, cryptocurrencies, popular culture, and sports.  Compl. ¶ 62.  For example, Kalshi offers event contracts on when the Strait of Hormuz will reopen, or what the S&P will close at on a given day.  *Id.* Shortly after Kalshi self-certified its first sports event contract in January 2025, the CFTC requested that Kalshi submit a demonstration of compliance with the CEA for those contracts, pursuant to 17 C.F.R. § 38.5(b).  Compl. ¶ 64.  Kalshi responded with lengthy memoranda detailing its listings' compliance with applicable rules and regulations.  *Id.* The CFTC took no further action and has since allowed thousands of Kalshi's sports event contracts to be listed, traded, and closed.  *Id.* ¶ 65.

Indeed, the CFTC has repeatedly explained that all of Kalshi's event contracts are entirely lawful under federal law—including in its recent suit against SF 3432.  In an amicus brief filed in the Ninth Circuit in an appeal involving state efforts to regulate trading

10

on DCMs, including Kalshi, the CFTC stated that "[s]tates cannot invade the CFTC's exclusive jurisdiction ... by re-characterizing swaps trad[ed] on DCMs as illegal gambling"; that allowing states to regulate event contracts "is inconsistent with the text, structure, and history of the CEA"; and that the states' theory presents "a fundamental threat to Congress's statutory design" that would create "a seismic shift in the longstanding status quo between CFTC and state authority." *See* Amicus Brief of CFTC at 2, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. No. 38.2 ("CFTC Amicus Br."). Since then, the CFTC has filed preemption suits against five states in addition to Minnesota that have threatened to enforce state law against DCMs,[4] and has secured a preliminary injunction against Arizona, *KalshiEX LLC v. Johnson*, No. 2:26-cv-1715, 2026 WL 1223373 (D. Ariz. May 5, 2026).

**C.    Minnesota's First-of-Its-Kind Statute Purporting to Ban Certain Event Contracts.**

For almost a year, Minnesota officials have signaled their view that—despite the CEA's exclusive jurisdiction provision—Kalshi should be subject to state gaming laws. As courts across the country have confronted state efforts to regulate Kalshi, Minnesota officials have endorsed these efforts by signing amicus briefs against Kalshi.[5] Those

---

[4] *United States v. Arizona*, No. 2:26-cv-2246 (D. Ariz. Apr. 2, 2026); *United States v. Illinois*, No. 1:26-cv-3659 (N.D. Ill. Apr. 2, 2026); *United States v. Connecticut*, No. 3:26-cv-498 (D. Conn. Apr. 2, 2026); *United States v. New York*, No. 1:26-cv-3404 (S.D.N.Y. Apr. 24, 2026); *United States v. Wisconsin*, No. 2:26-cv-749 (E.D. Wis. Apr. 28, 2026).

[5] *See generally* Brief of Amici Curiae, *KalshiEX LLC v. Flaherty*, No. 25-1922 (3d Cir. June 17, 2025), Dkt. No. 29; Brief of Amici Curiae, *KalshiEX LLC v. Martin*, No. 25-1892 (4th Cir. Dec. 22, 2025), Dkt. No. 41-1; Brief of Amici Curiae, *KalshiEX LLC v. Hendrick*,

amicus briefs argue that states, not the CFTC, have the sole power to regulate Kalshi's sports event contracts, and that such contracts constitute illegal sports gambling under the signatory states' laws. *Id.* And although those cases were focused particularly on Kalshi's sports event contracts, the positions advanced by the amicus briefs could apply to all of Kalshi's contracts.

On May 26, 2026, Minnesota went even further than the states whose anti-Kalshi enforcement efforts it has been supporting, enacting a new law aimed specifically at prohibiting the trading of most event contracts. SF 3432 accomplishes that goal in several ways.

*First*, SF 3432 modifies a longstanding exception in Minnesota's gaming laws that excluded "a contract for the purchase or sale at a future date of securities or other commodities" from Minnesota's definition of "bets." Minn. Stat. § 609.75, subd. 3(2). Under SF 3432, that exception was modified in several ways, and now contains its own massive exception "as provided in section 609.7615"—making Minnesota's gaming laws applicable to many event contracts traded on federally designated exchanges.

*Second*, § 609.7615(2) provides that "[a] person is guilty of a felony if the person" "creates," "operates," or provides a variety of other support for "a prediction market." The section defines "prediction market" as a "system that allows consumers to place a wager on the future outcome of a specified event," including "an athletic event or game of skill";

---

No. 25-7516 (9th Cir. Jan. 30, 2026), Dkt. No. 48.1; Brief of Amici Curiae, *N. Am. Derivatives Exchange, Inc. v. Nevada*, Nos. 25-7187, 25-7516, 25-7831 (9th Cir. Mar. 10, 2026), Dkt. No. 76.1.

"any game played with cards, dice, [or] equipment"; "war, state or national emergencies, human made disasters"; "terrorism"; "any event or events happening to a natural person or group of people"; "a federal, state, or local election, or the specific decisions of the federal, state, or local government"; "legal actions"; "assassination"; "events in popular culture"; and "whether a person will make a particular statement." *Id.* subd. 1(e).[6] Section 609.7615 then defines "[w]ager" as a "contract ... whereby the parties to the contract agree to a gain or loss by one to the other of money, property, or benefit." *Id.* subd. 1(f). As a result, it is a felony to operate any market that offers event contracts related to the exceptionally broad array of events described in § 609.7615(2), and there is *no* exemption for federally regulated DCMs.

*Third*, § 609.7615(3) contains an additional provision barring any marketing or advertising of products promoting prohibited event contracts. That provision states that a person is "guilty of a felony" if he "advertises or markets financial or technological products that promote transactions prohibited under this section."

SF 3432 goes into effect on August 1, 2026, but its harmful effects on Kalshi are immediate. For Kalshi to comply with SF 3432, it would have to begin expensive and burdensome adjustments now to ensure that it is ready to cut off all access to its event

---

[6] While Kalshi contests the improper attempt by Minnesota to usurp the CFTC's authority by banning any federally regulated contracts, Kalshi notes that it does not offer contracts regarding many of these categories, including war and assassinations. *See Banned Markets*, Kalshi, https://kalshi.com/policy-center/banned-markets?utm_source=chatgpt.com (last visited May 27, 2026). In fact, Kalshi is currently involved in litigation regarding its refusal to offer contracts that pay out upon death. *See Golan v. KalshiEX LLC*, No. 1:26-cv-02394-ER (S.D.N.Y. 2026).

13

contracts for Minnesota residents on August 1, 2026. *See* Decl. of Xavier Sottile ("Sottile Decl.") ¶¶ 26-32. And Kalshi cannot cut off access to Minnesota residents without violating longstanding federal regulations that require DCMs to offer "impartial access" to their markets. 17 C.F.R. § 38.151. The CFTC has consistently explained that this regulation requires uniform, *nationwide* markets, and that compliance with state-by-state bans is an "impossibility" for DCMs. CFTC Amicus Br. at 26-27.

Kalshi therefore has no choice but to respectfully request that this Court enter an expedited preliminary injunction.

**ARGUMENT**

As the Third Circuit and multiple district courts have held, Kalshi is entitled to preliminary injunctive relief preventing Minnesota officials from enforcing state laws to prevent Kalshi from offering event contracts on its federally regulated DCMs.

To obtain such relief, the moving party must demonstrate: (1) it is likely to succeed on the merits; (2) it faces a threat of irreparable harm absent relief; (3) the balance of equities tips in its favor; and (4) the injunction is in the public interest. *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). Kalshi readily satisfies each element.

**A. Kalshi Is Likely to Succeed Because Minnesota's Efforts to Regulate Kalshi's Event Contracts Are Preempted by the CEA and Its Regulations.**

A "fundamental principle of the Constitution" is that "Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). Federal law can preempt state law expressly in the statutory text. Federal law can also

14

exclusively occupy an entire field of regulation (either expressly or impliedly), known as field preemption. *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982). A state law may also be conflict preempted, which occurs where compliance with both state and federal law is impossible or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

*Every* form of preemption applies to SF 3432 and any other state law that purports to regulate or prohibit trading event contracts on DCMs. Accordingly, Kalshi is very likely to succeed on the merits of its challenge.

1.  The CEA Expressly Preempts Minnesota's Efforts to Regulate Event Contracts Traded on DCMs.

a.  The plain text of the CEA expressly preempts state law by barring states from regulating event contracts offered or traded on a DCM. Section 2(a) grants the CFTC "exclusive jurisdiction" "with respect to accounts, agreements[,] ... and transactions involving *swaps* or contracts of sale of a commodity for future delivery" so long as those instruments are "traded ... on a contract market designated pursuant" to the CEA. 7 U.S.C. § 2(a) (emphasis added). As the Supreme Court has explained, the "plain meaning of 'exclusive'" "necessarily denies jurisdiction" to other entities not named in that provision. *Mississippi v. Louisiana*, 506 U.S. 73, 77-78 (1992); *see also Exclusive*, American Heritage Dictionary (5th ed. 2022) ("Not divided or shared with others"; "sole"). A grant of "exclusive jurisdiction" to a federal agency preempts state efforts to intrude on the same "regulatory turf." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016).

Event contracts fall within the CFTC's exclusive jurisdiction. They are expressly included within the definition of "swaps," which covers "*any* contract ... that provides for *any* ... payment" based on the "occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." *Id.* § 1a(47)(A)(ii) (emphases added). And even if event contracts were not swaps, they would still be within the CFTC's exclusive jurisdiction when traded on DCMs because § 2(a) broadly covers all "agreements" that are "traded or executed on a contract market designated pursuant" to the CEA—a category that easily covers event contracts when they are initiated and traded on DCMs. That result is reinforced by § 1a(19), which defines one of the categories of commodities regulated by the CFTC to include "an occurrence … beyond the control of the parties to the relevant contract, agreement, or transaction" and "associated with a financial, commercial, or economic consequence."

SF 3432 overtly intrudes on the CFTC's "exclusive jurisdiction" with respect to event contracts traded on DCMs. Minnesota's recently enacted law creates a giant exception for "prediction markets" in the longstanding provision of Minnesota law that excludes derivatives from the state's definition of "bet." Minn. Stat. § 609.75, subd. 3(2). Then SF 3432 makes it a felony to operate—or even advertise—a prediction market, while defining the terms "prediction market" and "wager" to include any "system that allows consumers" to enter into a "contract ... agree[ing] to a gain or loss" based "on the future outcome of a specified event that is not determined or affected by the performance of the parties to the contract" for nine broad categories of events. Minn. Stat. § 609.7615, subd. 1(e), (f). The law thereby forbids operating (or even advertising) markets for trading

16

numerous categories of event contracts, using language closely tracking the CEA provisions governing such contracts.[7]

That dooms SF 3432 because its bar on trading certain event contracts is in direct and irreconcilable conflict with Congress's instruction that the CFTC has "exclusive jurisdiction" over event contracts initiated or traded on DCMs.  The CFTC's "jurisdiction" over event contracts on DCMs could hardly be deemed "exclusive" if states could not only regulate such contracts, but bar them completely.

If there were any doubt as to the exclusive jurisdiction of the CFTC, it would be resolved by Congress's "Special Rule" governing event contracts.   7 U.S.C. § 7a-2(c)(5)(C).  That statutory provision specifies that the CFTC "may" prohibit certain "event contracts" from DCMs if the CFTC deems those contracts contrary to the "public interest." *Id.*  Here, Minnesota's law bars many of the same categories of contracts that the Special Rule explicitly leaves to the discretion of the CFTC to either prohibit or permit.  Minn. Stat. § 609.7615, subd. 1(e).  Minnesota cannot usurp the power that Congress granted to the CFTC to decide whether event contracts may be traded on DCMs.

The CEA's provisions specifically governing state enforcement further support the point.  Section 2(a)'s savings clause makes clear that the CEA does not "supersede" state authority—"*except* as hereinabove provided" in the provision granting CFTC "exclusive

---

[7] Nor does the law stop there.  SF 3432 also makes it a crime to, among other things, "intentionally facilitate[]" or even "provide[] data, information," or "supportive services to" a prediction market.  Minn. Stat. § 609.7615, subd. 2(3), (4), (5).  As a result, the Minnesota law could turn banks and sports leagues into felons, merely for doing business with federally designated exchanges.

jurisdiction" over trading on DCMs.  7 U.S.C. § 2(a)(1)(A) (emphasis added).  The clear implication is that state authority over trading on DCMs is "supersede[d]" by that grant of "exclusive jurisdiction."  Section 13a-2, in turn, authorizes states to enforce the CEA—but not against DCMs.  And § 16(e)(2) sets out limited circumstances in which state "gaming" laws are preempted even with respect to *off*-DCM transactions, a provision that would make no sense if states had carte blanche to apply their gaming laws to trading on DCMs.

Moreover, SF 3432 is directly contrary to a related provision in the Unlawful Internet Gaming Enforcement Act of 2006 ("UIGEA").  That statute generally prohibits the use of the internet to transmit wagers between states "where such bet or wager is unlawful," 31 U.S.C. § 5362(10)(A), but—in direct contrast to SF 3432—UIGEA provides that the term "bet or wager" "does not include" transactions conducted on "a registered entity ... under the Commodity Exchange Act," *id.* § 5362(1)(E).   UIGEA therefore underscores Congress's understanding that, under the CEA, state gaming laws do not reach trading on DCMs.  *See Blue Lake Rancheria v. Kalshi Inc.*, 2025 WL 3141202, at *6 (N.D. Cal. Nov. 10, 2025) (Kalshi's "internet contracts are not bets or wagers under the UIGEA and therefore do not constitute 'unlawful internet gambling' even if the contracts are received, placed or transmitted from persons" where gambling is unlawful under local law).

b.      Precedent confirms that the CEA expressly preempts state efforts to regulate instruments traded on DCMs.  The Supreme Court has repeatedly instructed that state law is preempted where—as here—a federal agency's jurisdiction is "exclusive."  *See Hughes*, 578 U.S. at 163.  Courts have found that statutes containing language similar to the CEA's "exclusive jurisdiction" provision preempt parallel state law regulation.  *See Freightliner*

18

*Corp. v. Myrick*, 514 U.S. 280, 287 (1995); *BNSF Ry. Co. v. Hiett*, 22 F.4th 1190, 1194 (10th Cir. 2022).  And courts have similarly recognized that, in the face of such an "express preemption clause," there is no "presumption against pre-emption."  *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016).

Even more to the point, courts of appeals have expressly and consistently held that the CEA displaces state authority over trading on DCMs.  Writing for the Second Circuit almost half a century ago, Judge Friendly explained that the CEA "preempts the application of state law" regarding trading on federal exchanges.  *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980); *see also Int'l Trading, Ltd. v. Bell*, 556 S.W.2d 420, 424 (Ark. 1977) (exclusive jurisdiction clause "is a clear indication that Congress intended no regulation in this field except under the authority of the act"); *Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992) (state law is preempted when it "would directly affect trading on or the operation of a futures market"); *FTC v. Ken Roberts Co.*, 276 F.3d 583 (D.C. Cir. 2001).

That accords with the consistent position of the CFTC, which has made it abundantly clear that it views prediction markets as subject to its exclusive jurisdiction, including by filing suit last month to enjoin SF 3432.  *See* Amended Compl., *United States v. Minnesota*, No. 26-cv-02661 (KMM/DTS) (D. Minn. May 19, 2026), Dkt. No. 23.  In 2024, the CFTC informed the D.C. Circuit that "due to federal preemption, event contracts never violate state law when they are traded on a DCM."  Brief for Appellant at *27, *KalshiEX LLC v. CFTC*, 2024 WL 4512583 (D.C. Cir. Oct. 16, 2024).  Earlier this year, the CFTC reiterated that view, observing that "commodity derivatives markets require

19

nationally uniform rules … to prevent the type of fragmented oversight" that would result from state enforcement. CFTC Amicus Br. at 1. It further explained that event contracts, including sports event contracts, "fall comfortably within" the CEA and under its regulatory authority. *Id.* at 19.

Then, on March 12, 2026, the CFTC issued an Advance Notice of Proposed Rulemaking Related to Prediction Markets reinforcing the agency's position that prediction markets are subject to its exclusive jurisdiction. *See* Prediction Markets, 91 Fed. Reg. 12516, 12517 n.5 (Mar. 16, 2026) (noting that § 2(a)(1)(A) "expressly extends the CFTC's 'exclusive jurisdiction' to encompass 'transactions involving swaps or contracts of sale of a commodity for future delivery ... traded or executed on a contract market designated pursuant to [CEA § 5, 7 U.S.C. § 7]'"); *see also* Prediction Markets Advisory, CFTC Letter No. 26-08, at 1 (Mar. 12, 2026) (providing DCMs with guidance regarding their responsibilities as to the listing of event contracts that may carry risk of manipulation).

The CFTC has also pursued affirmative litigation to vindicate its exclusive jurisdiction. In addition to its suit against Minnesota, the CFTC and the U.S. Department of Justice have recently initiated litigation against Arizona, Connecticut, Illinois, New York, and Wisconsin to prevent them from applying state gambling laws to event contracts traded on CFTC-regulated DCMs. *See supra* n.4. Those suits have already begun to bear fruit. A federal court in the District of Arizona recently granted the CFTC's motion for a preliminary injunction barring Arizona state gaming regulators from enforcing laws materially similar to Minnesota's new law and its existing gaming laws. Order at 4, *Johnson*, No. 2:26-cv-01715 (D. Ariz. Apr. 10, 2026), Dkt. No. 65. The court "agree[d]

20

with and adopt[ed] the view that if 'event contracts are swaps under the [CEA], ... the scope of field preemption [is] the regulation of trading on a DCM.'" *Id.* at 3 (citation omitted).

c.      The CFTC's position aligns with the statutory history.  When Congress added the "exclusive jurisdiction" provision in the 1974 Act, one of its major "aim[s]" was to "avoid unnecessary, overlapping and duplicative regulation" by the states.  *Ken Roberts Co.*, 276 F.3d at 588.  As one sponsor explained, "different State laws would just lead to total chaos." *Commodity Futures Trading Commission Act: Hearings Before the S. Comm. on Agric. & Forestry on S. 2485, S. 2578, S. 2837, and H.R. 13113*, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark).  Congress thus placed "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned."  H.R. Rep. No. 93-975, at 82 (1974); *see* H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.) ("Under the exclusive grant of jurisdiction to the Commission, the authority in the Commodity Exchange Act (and the regulations issued by the Commission) would preempt the field insofar as futures regulation is concerned.").

Moreover, to "assure that Federal preemption is complete," the Senate deleted the provision the Supreme Court had previously interpreted to preserve the states' authority over futures trading.  120 Cong. Rec. 30464 (1974) (statement of Sen. Curtis); *see also Rice*, 331 U.S. at 255.  "Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987) (citation modified).  Congress's decision to omit the provision that had been interpreted to permit concurrent state jurisdiction over trading on DCMs is therefore

21

powerful evidence of Congress's intent to preempt parallel state regulation through the "exclusive jurisdiction" provision.

2. Field Preemption Also Applies to State Laws Regulating Event Contracts on DCMs.

Field preemption also applies to SF 3432 (and any other Minnesota law purporting to regulate trading on DCMs) because Congress plainly intended "to foreclose any state regulation in the *area*" of trading on DCMs. *Arizona v. United States*, 567 U.S. 387, 401 (2012). That intent is reflected not only by the plain text, precedent, and history discussed above, but also by the comprehensive nature of the regulatory scheme to which DCMs are subject. *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 368-69 (1986).

As the Supreme Court has found, the CEA establishes "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982) (quoting H.R. Rep. No. 93-975, at 1 (1974)). An exchange may only offer derivatives after undergoing an extensive review process and receiving the CFTC's designation as a DCM. 7 U.S.C. §§ 2(e), 6(a), 7(a); 17 C.F.R. § 38.100. Once an exchange is designated as a DCM, the CFTC exercises "exclusive jurisdiction" over the derivatives traded on the market. 7 U.S.C. § 2(a)(1)(A). DCMs are subject to an extensive framework of CFTC oversight involving recordkeeping requirements, 17 C.F.R. §§ 38.950, 1.31; reporting obligations, *id.* § 38.450, pt. 16; liquidity standards, *id.* § 38.1101(a)(2); and penalties, *id.* pt. 38. Congress elected to allow DCMs to list contracts by self-certifying that they comply with the CEA's requirements. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a)(2). Congress then

22

gave the CFTC back-end authority to conduct a review of a contract if it believes the contract may run afoul of any statute or regulation. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.2(c). Violations can result in civil and criminal penalties, which the CFTC may pursue at its discretion.

In enacting this comprehensive scheme for regulating DCMs, Congress left no room for concurrent state regulation. For that reason, the Third Circuit recently held that New Jersey's efforts to regulate Kalshi's event contracts were field preempted. *Flaherty*, 172 F.4th at 228.

3.     Minnesota Laws Are Conflict Preempted as Applied to Kalshi.

As multiple federal courts have held regarding similar state laws, Minnesota's SF 3432 (and any other Minnesota law that may be applied to prohibit or regulate trading event contracts on DCMs) is also conflict preempted as applied to Kalshi. *See Johnson*, 2026 WL 1223373, at *7-8; *Flaherty*, 172 F.4th at 229-31; *Orgel*, 2026 WL 474869, at *9-10. For at least three reasons, it would be "impossible" for Kalshi "to comply with both state and federal law," and Minnesota's law stands "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in the CEA. *Crosby*, 530 U.S. at 372-73.

*First*, a state law is conflict preempted when it is "at odds with the goal of uniformity that Congress sought to implement." *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 142 (1990); *see also Botsford v. Blue Cross & Blue Shield of Mont., Inc.*, 314 F.3d 390, 395 (9th Cir. 2002) (finding conflict preemption where "[t]he application of different state standards would disrupt the nationally uniform administration" provided by federal

statute). In such circumstances, state-by-state regulation would erect "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines*, 312 U.S. at 67.

State laws regulating DCMs conflict with Congress's intent to bring futures markets "under a uniform set of regulations." *Am. Agric. Movement*, 977 F.2d at 1156. "[A] contract market could not operate efficiently, and perhaps not at all, if varying and potentially contradictory legal standards governed its duties to investors." *Id.* Accordingly, the Seventh Circuit has held that where—as here—a state law "would directly affect trading on or the operation of a futures market," it "stand[s] 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' and hence is preempted." *Id.* at 1156-57 (citation modified). The Third Circuit recently agreed that allowing a state "to enforce its gambling laws" against Kalshi "would create an obstacle to executing the [CEA] because such state enforcement would prohibit Kalshi" from offering event contracts in the state, resulting in "exactly the patchwork that Congress replaced wholecloth by creating the CFTC." *Flaherty*, 172 F.4th at 230.

*Second*, it would be impossible for a DCM to comply with SF 3432 or any other Minnesota regulation regarding event contracts without violating federal law. Under the CEA, DCMs are required to adhere to CFTC regulations, and the CFTC's longstanding "impartial access" rule requires a DCM to "provide its members, persons with trading privileges, and independent software vendors with impartial access to its markets and services." 17 C.F.R. § 38.151(b). The CFTC itself has confirmed that this regulation demands that all users *nationwide* receive the same access to DCMs, such that compliance

24

with state-by-state restrictions is "impossible."  CFTC Amicus Br. at 26-27 (noting that "a DCM is required by federal law to provide 'impartial access' to all eligible participants nationwide").  A DCM violates that obligation if it refuses to provide access to certain event contracts to some of its customers based on their geography.  *See id.* (explaining that a DCM "cannot fulfill its federal mandate" if it imposes geographical restrictions).

And the problem extends beyond impartial access.  Applying state gaming laws such as SF 3432 on a state-by-state basis would force a single federally licensed exchange to operate multiple, separate liquidity pools with different prices for the same contracts—one for Minnesota, another for Nevada, another for Maryland, and so on.  Such fragmentation is susceptible to manipulation and raises serious market surveillance challenges, both of which undermine the CFTC's core principles for DCMs.  *See* 7 U.S.C. § 7(d)(3) (contracts must not be "readily susceptible to manipulation"); *id.* § 7(d)(4) (DCMs must "prevent market disruption").  As CFTC counsel recently warned:  "[W]e would have 50 state regulations that all have different interpretations of what a swap is or is not," and "the CFTC is not equipped, nor are our regulated entities, nor [are] the market participants, to go and comply and try and figure out how those state regulations fit with the CEA."  Decl. of Andrew L. Porter Ex. 1 at 12:18–13:2.

*Third*, a state law stands as an "obstacle" where it hampers "the careful balance struck by Congress."  *Arizona*, 567 U.S. at 406.  Where Congress "entrust[s]" the federal government with "discretion" over violations of federal law, a state regime that allows for state prosecutions of the same actions is "preempted by federal law."  *Id.* at 407-10.  Otherwise, a state could bring charges "even in circumstances where federal officials in

25

charge of the comprehensive scheme determine that prosecution would frustrate federal policies." *Id.* at 402. Congress authorized the CFTC to review various categories of event contracts and to bar them if "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). The CFTC declined to initiate such review. Compl. ¶ 84. Allowing states to impose their own judgments would nullify the CFTC's exclusive right to engage in public-interest review. *See Crosby*, 530 U.S. at 380.

**B.      Kalshi Is Also Likely to Succeed on Its First Amendment Challenge.**

Minnesota Statute § 609.7615(3) unconstitutionally imposes a complete bar on "advertis[ing] or market[ing] financial or technological products that promote transactions" of event contracts on prediction markets. Because advertising is a form of speech, this kind of flat bar violates the First Amendment unless it is narrowly tailored to advance a substantial government interest. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557 (1980). And no court has ever found those conditions met where—as here—a state purports to bar *all* advertising of conduct that fully accords with the exclusive federal law governing it. This Court should not be the first.

**C.      Kalshi Will Suffer Irreparable Harm Without a Preliminary Injunction.**

Defendants' actions present Kalshi with a Hobson's choice giving rise to irreparable harm—either "continually violate [state] law and expose [itself] to potentially huge liability," or "suffer the injury of obeying the law during the pendency of the proceedings." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). As the Third Circuit recently held, Kalshi and its users would suffer irreparable harm absent an injunction

26

preventing state enforcement efforts. *See Flaherty*, 172 F.4th at 231-32; *see also Johnson*, 2026 WL 1223373, at *8-9; *Orgel*, 2026 WL 474869, at *10-11.

*First*, if Kalshi chooses to continue offering certain event contracts, Kalshi and its officers face the harms associated with potential criminal or civil enforcement. This includes felony liability that carries a potential prison term. When brought under a preempted state statute, such enforcement actions constitute "irreparable injury." *Morales*, 504 U.S. at 382; *see Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013).

*Second*, compliance with preempted Minnesota law would subject Kalshi to the existential risk of losing its DCM designation. Abruptly terminating Kalshi's event-based contracts in Minnesota would risk violating the CFTC Core Principles to which Kalshi is subject, including the obligation to provide "impartial access" to its markets, 17 C.F.R. § 38.151(b), and the obligation to reduce the risk of "market disruptions," *id.* § 38.255; *see* CFTC Amicus Br. at 26-27 (noting a DCM "cannot fulfill its federal mandate" if it complies with state-by-state regulation).

*Third*, Kalshi has over 90,000 users in Minnesota with millions of dollars in open contracts. Sottile Decl. ¶ 25. Compliance would require Kalshi to forgo a significant portion of this business. Moreover, attempting to implement IP geofencing capabilities to exclude Minnesota users would impose burdensome costs. *Id.* ¶¶ 26-27. Because the Eleventh Amendment permits only *injunctive relief* against state officials enforcing unconstitutional state law, *see Ex parte Young*, 209 U.S. 123, 155-56 (1908); *Gibson v. Ark. Dep't of Corr.*, 265 F.3d 718, 720 (8th Cir. 2001), Kalshi would have no clear way of seeking damages if it ultimately prevailed. *See Entergy, Ark., Inc. v. Nebraska*, 210 F.3d

887, 899 (8th Cir. 2000) (holding irreparable harm established where an action to recover damages would be barred by sovereign immunity); *United States v. New York*, 708 F.2d 92, 93 (2d Cir. 1983) (per curiam) (holding irreparable harm established where an action to recover damages would be barred by the Eleventh Amendment).

*Fourth*, complying with Minnesota's laws would harm Kalshi's users. Compliance could require Kalshi to terminate contracts involving Minnesota users and liquidate their positions either at their original price or their most recent trading price. Sottile Decl. ¶¶ 34-39. Either scenario could result in substantial losses for Kalshi users—not just in Minnesota, but also their counterparties in other states. People "located in Minnesota" are inevitably transacting with persons located in other states, meaning the harms from an enforcement action would be suffered nationwide—including in states where federal courts have preliminarily enjoined enforcement of state laws against Kalshi. *Id.* ¶ 38. Such "impair[ment of] existing contractual obligations" constitutes irreparable harm. *Garrett v. City of Escondido*, 465 F. Supp. 2d 1043, 1051-52 (S.D. Cal. 2006); *see Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007) (explaining "likely interference with customer relationships" resulting from breach of contract constitutes irreparable harm). And it would result in a loss of "goodwill" among Kalshi's users that could not easily be regained even if Kalshi ultimately prevails—a distinct irreparable harm. *Felton v. Jives*, 2024 WL 4263223, at *3 (D. Minn. Sep. 23, 2024); *see also United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002).

*Fifth*, SF 3432's unconstitutional advertising ban violates Kalshi's First Amendment rights. "The loss of First Amendment freedoms, even for the period required to litigate a facial challenge, may constitute an irreparable injury." *Blue Moon Ent., LLC v. City of Bates City*, 441 F.3d 561, 565 (8th Cir. 2006).

A preliminary injunction is needed to prevent Kalshi from suffering all of this irreparable harm.

### D. The Balance of the Equities and Public Interest Favor a Preliminary Injunction.

The balance of equities and public interest weigh in favor of a preliminary injunction because "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1004 (8th Cir. 2019) (citation omitted). And as multiple courts have now held, states have no legitimate interest in enforcing their preempted or otherwise invalid laws against Kalshi. *Flaherty*, 172 F.4th at 231-32; *Johnson*, 2026 WL 1223373, at *9; *Orgel*, 2026 WL 474869, at *11.

Further, the failure to issue an injunction would "reach beyond the parties involved directly in the suit and impact the public's right[s]." *Associated Builders & Contractors v. Mich. Dep't of Lab. & Econ. Growth*, 543 F.3d 275, 278 (6th Cir. 2008) (citation omitted); *see Baker Elec. Coop. Inc. v. Chaske*, 28 F.3d 1466, 1474 (8th Cir. 1994) (weighing the impact of denial of injunctive relief on the public). Ceasing operations in Minnesota would harm Kalshi's users and impose intractable technological difficulties. Sottile Decl. ¶¶ 23-39. Abrupt cessation would make it difficult to inform users in Minnesota of their rights

29

and obligations regarding ongoing event contracts and cut off their access to positions on Kalshi's exchange. *Id.* ¶¶ 33-39. The harms would be suffered by counterparties nationwide, including in Arizona, Tennessee, and New Jersey, where similar enforcement actions have been enjoined. *Id.* ¶ 38. The balance of the equities and public interest therefore firmly favor preliminary relief.

## **CONCLUSION**

For the foregoing reasons, the Court should issue a preliminary injunction.

DATED: June 1, 2026

Respectfully submitted,

**GREENE ESPEL PLLP**

/s/ Holley C. M. Horrell
Holley C. M. Horrell, Reg. No. 0399636
Alison V. Zoschak, Reg. No. 0506030
Kshithij Shrinath, Reg. No. 0505164
222 S. Ninth Street, Suite 2200
Minneapolis, MN  55402
hhorrell@greeneespel.com
azoschak@greeneespel.com
kshrinath@greeneespel.com
(612) 373-0830

and

Neal Kumar Katyal (*pro hac vice*)
Joshua B. Sterling (*pro hac vice*)
Colleen E. Roh Sinzdak (*pro hac vice*)
William E. Havemann (*pro hac vice*)
Anastasia Pastan (*pro hac vice*)
**MILBANK LLP**
1101 New York Avenue NW
Washington, DC 20005
Telephone: 202-835-7500
Facsimile: 202-263-7586

Grant R. Mainland (*pro hac vice*)
Andrew L. Porter (*pro hac vice*)
Matthew J. Laroche (*pro hac vice*)
Katherine Kelly Fell (*pro hac vice)*
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: 212-530-5000
Facsimile: 212-530-5219

*Attorneys for Plaintiff KalshiEX LLC*

31