**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| KALSHIEX LLC,<br><br>      Plaintiff,<br><br>  vs.<br><br>KEITH ELLISON, in his official capacity as Attorney General of Minnesota; TIM WALZ, in his official capacity as Governor of Minnesota; and JON ANGLIN, in his official capacity as Director of the Minnesota Department of Public Safety, Alcohol and Gambling Enforcement Division,<br><br>      Defendants. | Case No. 26-cv-2778 (KMM/DTS) |

**<u>DECLARATION OF XAVIER SOTTILE</u>**

I, Xavier Sottile, declare as follows:

1.     I am the Head of Markets at KalshiEX LLC.  In that role, I am responsible for the generation of new markets.  I received an undergraduate degree in economics from Yale University in 2020.  Before joining Kalshi, I worked at the U.S. House of Representatives, Bridgewater Associates, and the Yale Program on Financial Stability.

2.     My duties include devising proposed new contracts and shepherding those proposals from inception to completion.  I also facilitate the process by which our markets undergo the regulatory review cycle under the purview of the Commodity Futures Trading Commission ("CFTC" or the "Commission").  This involves everything from personally notifying the CFTC of contracts that Kalshi has self-certified under Section 5c(c) of the Commodity Exchange Act (the "CEA") and Section 40.2(a) of the CFTC regulations to

maintaining records pursuant to their requirements, certifying that Kalshi's contracts comply with the Act, and communicating with Commission staff over the substance of contract filings.

3.      The facts set forth herein are within my personal knowledge, and if called as a witness, I could and would competently testify to them.

4.      I offer this Declaration to provide additional information about Kalshi's business and to describe the extraordinary harm that Kalshi and its users will incur unless the Court prevents Minnesota officials from enforcing preempted Minnesota law against Kalshi.  Without an injunction, Kalshi will be forced into an impossible choice.  It must either decline to comply with Minnesota law, subjecting itself and its representatives to the risk of criminal liability, or it must attempt to comply with Minnesota law and exit the market, thereby subjecting itself and its users to a host of harms that could not be repaired even if Kalshi ultimately succeeds in this case.  This Declaration reflects my preliminary analysis of Kalshi's harms.  Other unanticipated harms are possible, and even likely, given the nature of potential enforcement and the uncharted territory into which it would lead.

## A.      Kalshi's Event Contracts

5.      Since Kalshi's designation as a CFTC-regulated contract market in 2020, the company has offered event contracts nationwide.  As Head of Markets, I have assiduously complied with federal regulations with regard to all of our contracts.  We have done our best to run the company according to our understanding of the regulatory framework under which we have been governed for more than five years.

6.     Pursuant to section 7a-2(c)(1) of the CEA, Kalshi self-certifies all contracts that are available on its exchange.  Those certifications contain extensive information, including in confidential appendices not available to the public, for the CFTC's review.

7.     While the CFTC could subject these contracts to a 90-day review under 17 C.F.R. § 40.11(c) to determine whether they fall under certain enumerated categories and are "contrary to the public interest," the CFTC has not currently initiated such a review of any of Kalshi's contracts.

8.     On January 31, 2025, the CFTC requested, pursuant to 17 C.F.R. § 38.5(b), that Kalshi submit a demonstration of compliance for two sports-event contracts with the CEA, and Kalshi responded with a memo that detailed the listings' compliance with all applicable rules and regulations.

9.     Kalshi also provided the CFTC with a memorandum from its outside counsel addressing, among other things, the CFTC's authority to regulate trading of sports-event contracts on designated contract markets ("DCMs").

10.     The CFTC took no further action with respect to Kalshi's self-certifications of sports-event contracts.

**B.     Harms Resulting from Noncompliance**

11.     If Kalshi declines to comply with Minnesota's new legislation, SF 3432, and continues to offer event contracts in the state of Minnesota, the company and its representatives risk criminal jeopardy in Minnesota.

12.     I am deeply concerned that Minnesota will bring an enforcement action against Kalshi, its representatives, and possibly even its contractual counterparties, once

3

SF 3432 takes effect.  That fear becomes all the more distressing given that Kalshi's only other alternative is compliance with SF 3432, which would bring about a whole host of other harms to Kalshi and its users, as I describe below.

**C.     Harms Resulting from Compliance**

13.    Choosing to comply with SF 3432 would introduce a new set of barriers and challenges that by themselves would subject Kalshi and its users to irreparable harm. Minnesota's new legislation would ban prediction markets, including Kalshi, if they include certain event contracts on their exchange, irrespective of whether these contracts are legal under federal law.  Complying with Minnesota law would therefore require Kalshi to limit access to its exchange based on a user's geographic location.

14.    Kalshi's harms from complying with that demand can be categorized as follows: (a) harms from jeopardizing Kalshi's CFTC designation (b) harms imposed by technical barriers to compliance, (c) harms to Kalshi's users from ceasing operations in Minnesota, and (d) economic and reputational harm to Kalshi from ceasing event-based contracts in Minnesota.  I describe each of these categories in more detail below.

**I.     Harms to Kalshi Resulting from the Risk of CFTC Decertification**

15.    Ceasing to offer event contracts in Minnesota would jeopardize Kalshi's status as a CFTC-designated contract market.  It is difficult to overstate how harmful this would be to Kalshi.

16.    As the Head of Markets at Kalshi, I oversee the entire regulatory review process for Kalshi's contract markets.  In that role, I am responsible for ensuring that each

of Kalshi's contracts complies with the nearly two dozen CFTC Core Principles that govern event contracts traded on CFTC-regulated exchanges. Complying with Minnesota law could be understood to put Kalshi out of compliance with these Core Principles, imperiling Kalshi's designation as a contract market under the CFTC's purview.

17. CFTC Core Principle 4 charges designated contract markets with the "responsibility to prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process." 17 C.F.R. § 38.250. Immediately liquidating or pausing traders' positions could be understood to lead to the very sort of price distortion and market manipulation that the CFTC regulations guard against. Pausing trades could cause "disruption[] of the delivery or cash-settlement process" and immediate liquidation could cause "price distortion."

18. CFTC Core Principle 2 requires that designated contract markets provide their "members, persons with trading privileges, and independent software vendors with impartial access to its markets and services." 17 C.F.R. § 38.151(b). Pursuant to this regulation, "[a]ccess criteria" must be "impartial, transparent, and applied in a non-discriminatory manner." *Id.* Discrimination based on geographic location would conflict with this requirement, but that is exactly what Kalshi would have to do to comply with the Minnesota gambling laws. Traders who execute positions in Minnesota would be barred from accessing Kalshi's exchange and placing positions on Kalshi's contracts, whereas traders in any other state would have unlimited access to the platform.

19.     Violation of these Core Principles could subject Kalshi to the panoply of enforcement mechanisms that the CFTC has at its disposal.  Those tools range from civil monetary penalties to restitution to criminal liability.

20.     Violating these principles could even jeopardize Kalshi's federal-contract-market status with the CFTC.  The CFTC is authorized to suspend or revoke Kalshi's designation if Kalshi fails to comply with federal regulations.  Kalshi has spent the better part of the last decade working to gain federal registration as a contract market under the CFTC and has scrupulously endeavored to comply with CFTC regulations to maintain that registration.  Losing our federal license would be catastrophic for the company, even if Kalshi were to ultimately succeed in this suit against the state authorities in the long term.

21.     CFTC enforcement is not a mere theoretical risk.  The CFTC affirmed in a recent amicus brief that DCMs are "required" to "provide 'impartial access' to all eligible participants nationwide,"—a mandate impossible to fulfill "[i]f a state bans [Kalshi's] contract[s]."  Amicus Brief at 26, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. No. 38-2.

22.     Compliance with Minnesota law thus places Kalshi in a regulatory Catch-22: Either it complies with Minnesota law and risks CFTC sanctions, or it continues operations in Minnesota and subjects itself to state criminal liability.

## II.     Harms Resulting from Technical Barriers to Compliance

23.     Complying with SF 3432 would require Kalshi to undertake technological changes that would subject Kalshi to irreparable costs it could not recoup even if it ultimately prevails in this case.

24.    Like the Chicago Mercantile Exchange and the Intercontinental Exchange, Kalshi's standard processes do not distinguish between users or trades on the basis of geographic location.  Instead, Kalshi is subject to federal law, which does not apply different standards to users of different states.

25.    As of May 26, 2026, there are more than 90,000 verified users on Kalshi that have registered with a Minnesota address.  While the precise numbers are not public, these accounts have millions of dollars' worth of open positions on Kalshi markets that have not yet been settled.

26.    Ceasing operating in Minnesota would present intractable technical difficulties. To explain why, it is helpful to describe Kalshi's operation as an exchange as opposed to, for example, a sportsbook.  A sportsbook operates by taking bets from gamblers on games where the house has a statistical advantage.  In other words, gamblers bet against the "house," and when the house loses, it must pay the gambler.  Sportsbooks therefore maintain a high level of liquidity so that they can pay out those bets.  Sportsbooks set the prices at which their customers can transact, building in a margin (a "vig") to keep the odds stacked in their favor.  Sportsbooks ban successful bettors, or sharply limit the amount that they can wager.  And sportsbooks control whether bettors can "cash out" their trades (at prices worse than prevailing betting lines would imply).

27.    Kalshi does not operate in this way.  Instead, it manages a federally regulated contract market and facilitates trades between different users on the platform.  Kalshi does not set odds, but instead lets users trade at prevailing market prices.  Traders do not bet against the house, but rather enter into contracts with other traders on an exchange.  Kalshi

has no interest in whether any given trade is successful or not; it charges a fee for each trade, which is set by a publicly disclosed formula. It does not ban or limit successful traders. It allows traders to exit their position (at the prevailing market price) at any time before a contract settles, including by placing limit orders.

28.    As a designated contract market, Kalshi has the authority to cancel trades when necessary to mitigate market-disrupting events caused by malfunctions on its platform or errors in orders submitted by traders. However, due to the fully collateralized and short-term nature of trading on Kalshi, the circumstances in which this authority may be exercised are limited, and there is generally no cancellation or adjustment of an erroneous trade except in extraordinary circumstances.

29.    Closing positions at this magnitude could cause Kalshi to suffer staggering financial harm, because Kalshi may be unable to compensate all of its Minnesota traders for the cancelled trades. Pursuant to the CEA, Kalshi operates through federally regulated clearinghouses that collateralize open positions. 7 U.S.C. § 7a-1. But Kalshi is fully collateralized with the understanding that every event contract between two users will pay out $1 in total, and there are situations in which users' buying and selling of contracts causes the value of a given contract to exceed $1.

30.    If Kalshi were required to close all open positions held by Minnesota residents on event contracts, it may need to declare a market emergency, void contracts, and restore all the involved users to their original position. But there is a significant risk that Kalshi will be unable to restore all Minnesota residents who have entered into event contracts to their original position.

31.     The following example is illustrative.  USER A buys a contract from USER B.  USER A pays 90 cents, and USER B pays 10 cents.  Then the contract changes in value.  USER B sells his side to USER C, and USER C pays 90 cents for it.  USER B cashes out his 80-cent profit.  There is currently $1 in collateral in the clearinghouse (which will satisfy the ultimate $1 obligation to USER A or USER C at the conclusion of the contract period), but closing the open positions to their original value would mean that Kalshi owes USER A and USER C 90 cents each, or $1.80 total.

32.     Because Kalshi is fully collateralized up to $1 per contract, and any given contract may exceed $1 in value as the market's prediction on an event fluctuates before the event occurs (as illustrated in the preceding paragraph), Kalshi would be financially liable for any excess value above $1—in the example above, 80 cents per contract.  However, Kalshi may lack sufficient funds to cover that difference in value, which could be substantial.  As such, Kalshi would be forced to take on a significant (and unrecoverable) financial liability, and the forced exit of the positions (some of which would be more valuable at present than the opening price they would be cashed out at, causing a loss to traders) would severely damage Kalshi's reputation among users as a trustworthy and secure exchange, and could also lead to significant litigation claims.

### III.    Irreparable Harms to Kalshi's Users

33.     Ceasing operations in Minnesota would impose irreparable harm on Kalshi's users—both in Minnesota and elsewhere.

9

34.     SF 3432 could be understood to require Kalshi to immediately void all contracts entered into by individuals located in Minnesota and refund the original cost of customers' positions on their open contracts.

35.     Unilaterally settling traders' positions based on the original cost of the positions could lead to significant losses for users.  A trader who bought a contract during a market dip and is forced to exit at the original contract price would lose all gains she earned over her holding period for the contract.

36.     Voiding contracts would also cause a massive disruption to users' investment-based expectations.   Traders on Kalshi take positions based on their expectations for future events, and expect to be able to alter their investments as facts on the ground change.  Due to the unique market sensitivity of event contracts, traders capitalize on the opportunity to enter and exit their positions during the pendency of the contract.  Traders also deploy well-recognized strategies like limit orders and portfolio-wide loss mitigation strategies.  Investors may invest in a contract expecting to sell if the contract price falls below a certain value or expecting to reinvest more if the investment proves especially sound.  And while some contracts operate on short timelines, many of Kalshi's contracts are long-term.  For example, one of Kalshi's event contracts allows traders to place positions on whether the electric vehicle market share will rise above 30% by 2030.  Traders who have placed a position on this contract may be mitigating their risk on other investments by placing a position that effectively balances out the investment portfolio.  As the market for electric vehicles changes, so does the price of the event contract.  A trader may make an investment at 45 cents on the electric vehicle contract and

10

institute a limit order to sell the contract when the price dips below 30 cents because 30 cents is the break-even point on the investment.

37.     Voiding all Minnesota-based trades would completely upend this investment strategy and destroy traders' expectations.  If Kalshi were to void all trades in Minnesota, traders would no longer be able to take action on their existing contracts in accordance with their investment models.  The flexible investment opportunity on which Kalshi users relied when entering into these contracts would be lost, and they may be forced to incur a loss even if their ultimate evaluation of the event was correct.  A Kalshi user that entered into a contract on "Will the Fed have an emergency meeting in 2026," for example, would not be able to exit that contract even if facts on the ground change dramatically in the meantime.  This is an economics-based event contract that is currently offered through the Kalshi exchange, and as of the date of this submission, values the odds of an emergency meeting at roughly 13.9%.[1]  But if trades are voided and a meeting does occur, trades with a "yes" position will have been cashed out at a level significantly below the ultimate value of the contract.

38.     Voiding all Minnesota-based trades would not solely affect Minnesota-based users and transactions; it would wreak havoc on the entire Kalshi ecosystem.  Again, exchanges do not operate like sportsbooks where gamblers bet against the house.  Instead, exchanges facilitate contracts between individual traders on the market.  Traders on either

---

[1]   KalshiEX, *Will the Fed have an emergency meeting in 2026?*, https://kalshi.com/markets/kxfedmeet/fed-emergency-meeting/kxfedmeet-27.

side of a contract are often from different states, given that Kalshi does not distinguish between the geographic location of traders. If Minnesota traders' positions are voided, then their trading counterparts in other states will likewise be limited in whether and how often they can enter and exit their positions on the Kalshi exchange. This could wreak havoc on hundreds of thousands of dollars in open interest currently on the exchange from open transactions.

39.     If, rather than outright voiding open contracts and restoring Minnesota users to their *original* positions, Kalshi instead attempted to close out contracts at their *current* prices, that would create a new set of intractable problems. Where the price of a contract has dropped since it was purchased, liquidating contracts at current prices would force Minnesota users to incur substantial losses even if they intended to wait out the drop on the belief that the contract's price would rebound. And again, because Kalshi's users in Minnesota contract not with Kalshi, but with users that are almost always located in other states, liquidating positions at current prices would either force Kalshi to liquidate positions for users both inside and outside of Minnesota—resulting in effectively extraterritorial regulation—or else incur the massive costs described above associated with liquidating only one side of two-sided transactions for tens of thousands of users.

### IV.     Economic and Reputational Harms to Kalshi

40.     Compliance with Minnesota law would also cause economic and reputational harm to Kalshi. Losses on both fronts would be irreparable even if Kalshi ultimately wins this case.

41.    Kalshi has over 90,000 verified users in Minnesota with millions of dollars invested on the exchange.  The market uncertainty created by abruptly closing its contracts in Minnesota could lead many users to leave the platform—even users outside of Minnesota.  Traders must have confidence in the integrity of the market to invest in it, but market confidence would be deeply shaken by complying with Minnesota law. Even if Kalshi were to prevail in this lawsuit, regaining that market confidence would be difficult. Kalshi has expended enormous resources to advertise its platform, onboard traders, and maintain their business.  Losing those traders would mean that many of those efforts were for naught.  Thus, compliance would impose significant and irrevocable economic harm on the company.

42.    The possibility of state litigation also endangers Kalshi's established partnerships and relationships.  One of Kalshi's banner partners, Robinhood, has already chosen not to list Kalshi's event contracts in some states because of state cease-and-desist letters that make similar demands to those that Minnesota seeks from Kalshi here.  This is a massive disruption for Kalshi given Robinhood had agreed to list Kalshi's contracts to its millions of active users, but chose to deviate from that plan in direct response to demands similar to the ones Minnesota issued here.  Other partners that help us comply with CFTC regulations by facilitating our digital investment platform and helping detect improper trading behavior may also seek to limit their exposure given the uncertainty of the application of state law to Kalshi.

43.    The effects of complying with Minnesota law are not limited to the state but instead threaten to open a Pandora's box of regulation for the 49 other states that may wish

13

to impose their local laws on Kalshi's exchange.  In the absence of a preliminary injunction and temporary restraining order, partners and users alike will be hesitant to engage with Kalshi given this potential for state litigation.

44.    The risk of imminent enforcement of Minnesota law imposes irreparable harms that Kalshi cannot avoid.  If Kalshi does not comply with Minnesota law, the company risks criminal liability.  But if Kalshi attempts to comply with Minnesota law, it would incur burdensome costs, its users would be harmed, its federal registration would be imperiled, and user confidence in the integrity of its market would be shaken.  All of these harms are compounded by the real risk that other states will be emboldened to follow Minnesota's lead and Kalshi will have the possibility of being subjected to multiple, inconsistent regulatory schemes.  And there are serious questions about whether Kalshi could implement the technical solutions on an expedited timeline.  Kalshi has spent years cultivating its reputation and developing its user base.  Compliance with existing Minnesota law as well as SF 3432 would lead to economic and reputational harm that will be difficult to regain.

45.    Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

14

At New York, New York, this 1st day of June, 2026.


/s/ *Xavier Sottile*

Xavier Sottile