# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| THE UNITED STATES OF AMERICA and COMMODITY FUTURES TRADING COMMISSION, <br><br> Plaintiffs, <br><br> v. <br><br> STATE OF MINNESOTA, *et al.,* <br> , <br><br> Defendants. | Case No.: 26-cv-02661 (KMM/DTS) |
| KALSHIEX LLC d/b/a KALSHI, <br><br> Plaintiffs, <br><br> v. <br><br> KEITH ELLISON, *et al.,* | Case No.: 26-cv-02778 (KMM/DTS) |
| QCX LLC d/b/a/ POLYMARKET US, <br><br> Plaintiffs, <br><br> v. <br><br> KEITH ELLISON, *et al.,* | Case No.: 26-cv-02841 (KMM/DTS) |

**STATE DEFENDANTS' MEMORANDUM OF LAW
OPPOSING PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF CONTENTS ....................................................................................... 2

INTRODUCTION ............................................................................................... 5

BACKGROUND .................................................................................................. 6

I.      PREDICTION MARKETS SURGE AS PLATFORMS FOR BETTING AND
        WAGERING ............................................................................................... 6

II.     MINNESOTA'S PREDICTION MARKET STATUTE ....................................... 11

        A.      Minnesota Enacts The Prediction Market Statute, Which Criminalizes
                Certain Enumerated Activities On Prediction Markets. ........................11

        B.      The Legislative History Reflects A Clear Intent By The Minnesota
                Legislature To Target Problematic And Predatory Gambling Activities
                Which Impact Public Health And Welfare. ..............................................13

III.    THE CFTC'S JURISDICTION IS LIMITED TO REGULATING COMMODITY
        FUTURES, SWAPS, AND EVENT CONTRACTS ............................................ 14

IV.     THE CFTC CLAIMS EXCLUSIVE JURISDICTION OVER PREDICTION MARKETS
        AS A STEP TOWARDS AGGRESSIVE DEREGULATION. .............................. 18

V.      FORMER CFTC CHAIRMAN GARY GENSLER DENIES CFTC'S REWRITING OF
        HISTORY ................................................................................................. 19

ARGUMENT ..................................................................................................... 20

I.      PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR
        PREEMPTION CLAIMS. ............................................................................. 22

        A.      The CFTC Does Not Have Standing. ...................................................23

                1.      The Supremacy Clause does not automatically create a
                        concrete injury. ............................................................... 25

                2.      The injuries the CFTC describes are not particular to the
                        CFTC. ............................................................................. 27

                3.      The CFTC fails to show it will suffer an actual or imminent
                        injury. ............................................................................ 28

B.    Plaintiffs' Preemption Arguments Fail Because the Commodity Exchange Act Does Not Extend to All Gambling and Wagering Based on Future Events ...................................................................................29

    1.    Wagering on sporting events, political events, cultural events, or social events, are not commodity futures.................................... 30

    2.    Wagering on sporting events, political events, cultural events, lawsuits, or social events, are not "swaps" because they are not associated with a "potential financial, economic, or commercial consequence" of the nature intended by Congress. ...................................................................... 31

    3.    Established principles of statutory construction all weigh against Plaintiffs' self-serving definition of "swap."....................... 34

        a.    The associated-words and surplusage canons weigh against Plaintiffs' reading. ..................................................... 34

        b.    The statutory interpretation principle that the specific governs the general, and the canon against implied repeal, both preclude Plaintiffs' reading. .............................. 37

        c.    Plaintiffs' interpretation runs contrary to the Major Question Doctrine and the canon against interpreting statutes in a manner that would presume an intent to "hide elephants in mouseholes." .......................................... 39

C.    Even if the Commodity Exchange Act Applies, it Does Not Preempt Generally Applicable Criminal Statutes Such as Minnesota's Prediction Market Statute. ............................................................................42

    1.    The strong presumption agains preemption applies here.................. 42

    2.    Plaintiffs cannot establish either express or implied preemption ……………………………………………………………… 43

        a.    The Commodity Exchange Act does not expressly preempt Minnesota's Prediction Market Statute.................. 44

        b.    The Minnesota Prediction Market Statute is neither field nor conflict preempted by the Commodities Exchange Act. ....................................................................... 47

II.    PLAINTIFFS KALSHI AND POLYMARKET ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR 1ST AMENDMENT CLAIMS. ................................................ 51

III.    PLAINTIFFS HAVE NOT ESTABLISHED IRREPARABLE HARM. ................................. 53

IV.    THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST DO NOT FAVOR
        AN INJUNCTION. .............................................................................................. 56

CONCLUSION ..................................................................................................... 57

**INTRODUCTION**

States have inherent constitutional authority to enact laws that protect the public's health, safety, morals, and general welfare. Minnesota lawmakers, concerned about the unique threats presented by surging prediction market gambling, exercised the state's sovereign authority and enacted a new statute that goes into effect on August 1, 2026. The federal government and two multi-billion-dollar private companies, Kalshi and Polymarket, now seek to block Minnesota's law from going into effect, and in doing so, block Minnesota from exercising its core police powers.

The concern that app-based prediction markets are simply repackaging online gambling is far from controversial: thirty countries have banned Kalshi and Polymarket, and the CFTC previously prohibited some types of wagers on these platforms because they implicated "gaming" restrictions. When asked to comment on a recent prediction market scandal involving a servicemember betting on a military operation, President Trump himself remarked that "the whole world unfortunately has become somewhat of a casino."[1]

Despite President Trump seeming to acknowledge that simple truth—that many wagers offered on prediction markets turn the world into a casino—the Trump Administration is nonetheless actively fighting to deregulate the prediction market industry as quickly as it can. Plaintiffs' lawsuits, and their motions for preliminary injunction, are part of that agenda. Plaintiffs ask this Court to block Minnesota's statute because Plaintiffs

---

[1] PBS News, "Watch: Trump says he doesn't like prediction market bets on world conflicts, but 'it is what it is'" YouTube, Apr. 23, 2026 (available at https://perma.cc/EW4P-CR98 )

hope to bypass Congress, and bypass states' sovereignty, to clear the runway for predatory profit-making.

The Court should not clear that runway. Minnesota's statute falls squarely within Minnesota's sovereign power to protect public safety, health, and welfare, and Plaintiffs cannot meet their burden to establish likelihood of success on their preemption and First Amendment claims. Beyond the merits, Plaintiffs' motions fail for a host of other reasons, including lack of standing, failure to show irreparable harm, and the equities and public interest. The Commodities Exchange Act does not require this Court to override Minnesota's sovereign exercise of police powers within its state, and particularly not with the extraordinary remedy of a preliminary injunction. The motions should therefore be denied.

## BACKGROUND

### I.    PREDICTION MARKETS SURGE AS PLATFORMS FOR BETTING AND WAGERING

Prediction markets first emerged as experimental academic tools rather than mainstream profit-making ventures.[2] The app-based betting platforms at issue here (Polymarket and Kalshi) launched in 2020 and 2021, amid the COVID-19 pandemic. The CFTC soon initiated investigations and enforcement actions against both Polymarket and Kalshi.

---

[2] *See* Suzy Khimm, "Three economists grabbed a beer. A multibillion-dollar industry was born." NBC News, Feb. 13, 2026 (available at https://perma.cc/47ZL-3S95.)

6

Polymarket launched its app without registering with the CFTC or purporting to comply with the Commodities Exchange Act.[3] As part of the terms settling the enforcement case, Polymarket paid $1.4 million in fines and agreed to cease all operations in the United States by January 2022.[4] Unlike Polymarket, Kalshi did register with the CFTC. In 2023, the CFTC issued an enforcement order restricting Kalshi from offering wagers on election outcomes (the "2023 Election Wager Order.")[5] The 2023 Elections Wager Order concluded that election wagers not only violated many state laws prohibiting gambling on election outcomes, but were also prohibited because the wagers generally constituted "gaming" (synonymous, in this context, with "gambling") and were divorced from legitimate economic hedging functions that futures contracts were intended to serve.[6]

Kalshi sued the CFTC, challenging the prohibition against election wagers. The CFTC vigorously defended the position, arguing that election wagers violate state law, involve a form of gambling, have no "true economic purpose," and are contrary to the public interest because of their potential to undermine election integrity and public trust.[7] The district court ultimately ruled against the CFTC, finding that the Commodities

---

[3] *In re Blockratize,, Inc.*, CFTC No. 22-09 (Jan. 3, 2022 Order) at 2 (available at https://perma.cc/4K7N-ZYCU).

[4] *Id.* at 9-10.

[5] *In re the Certification by KalshiEX LLC of Derivatives Contracts with Respect to Political Control of the United States Senate and United States House of Representatives*, Sept. 22, 2023 Order (available at https://perma.cc/TT6X-TJ2X).

[6] *Id.* at 10, n.25.

[7] *See generally KalshiEX LLC v. CFTC,* No. 23-3257 at Dkt. 31 (D.D.C., Febr. 26, 2024)

Exchange Act did not empower the CFTC to review every type of event contract for "public interest" analysis, and that these particular election wagers fell outside the scope of transactions Congress expressly authorized the CFTC to review.[8] That ruling came out shortly before the November 2024 elections, and Kalshi immediately resumed election-related transactions.[9] The CFTC appealed the decision, but voluntarily dismissed the appeal shortly after President Trump's January 2025 inauguration.[10]

The combination of these two events (the late 2024 district court order construing the Commodity Exchange Act narrowly to limit CFTC's authority, and the early 2025 change in administration) ushered in an explosion of prediction market activity in 2025 and 2026.[11]   App-based prediction markets have surged in popularity and profits, raising significant concerns among regulators, lawmakers, and lobbyists on all sides of gambling policymaking.[12] The two largest prediction market platforms are Polymarket and Kalshi,

---

[8] *KalshiEX LLC v. CFTC,* No. 23-3257 at Dkt. 51 (D.D.C., Sept. 12, 2024).

[9] Dan Mangan, "Kalshi resumes taking bets on U.S. election after appeals court lifts freeze," CNBC, Oct. 2, 2024 (available at https://perma.cc/X9U5-LZRX).

[10] Dan Mangan, "U.S. commodities regulator seeks to drop appeal of Kalshi election bets offers," CNBC, May 5, 2025 (available at https://perma.cc/Y5BC-WKHP).

[11] Sharon LaFraniere and David Yaffe-Bellany, "How Prediction Markets and Crypto Firms Steamrolled a Watchdog Agency," The New York Times, May 24, 2026 (available at https://perma.cc/UG6B-LWTK).

[12] Addiction and public health professionals have expressed concern that prediction markets pose a particular risk of problem gambling and financially risky decision-making by young men. *See, e.g.,* Nizan Geselvich Packin and Sharin Rabinovitz, "Prediction markets as a public health threat," *Science,* Vol. 392, No. 6795, Apr. 16, 2026 (Middlecamp Decl., Ex. 2); *see also* Marshal Cohen and Elisabeth Buchwald, "'The ads got to me': (Footnote Continued on Next Page)

but other web-based companies have announced plans to add prediction market betting to their platforms, including Trump Media and Technology Group's social media company, Truth Social.[13]

Moreover, prediction markets have offered an increasing range of betting opportunities to the public that depend on the outcomes of, or happenings during, sporting, political, cultural, entertainment, and legal events. *See*, *e.g.*, *KalshiEX LLC v. Schuler*, No. 26-3196, 2026 WL 1295806, at *6 (6th Cir. Apr. 24, 2026) (describing Kalshi wagering offerings before denying its motion for injunction pending appeal).

As the platforms have exploded in volume and profit, over 30 countries have adopted outright bans or taken other steps to restrict prediction market platforms from operating within their borders.[14] Within the United States, a number of states have issued

---

College-age adults are rushing to prediction market sites. Addiction experts are alarmed." CNN, May 28, 2026 (available at: https://perma.cc/P7ZN-7GHL)*;* Kaitlyn Huamani, "Gamification and memes lure young people to sports wagering apps, prediction markets," ABC News, May 28, 2026 (available at https://perma.cc/48RZ-FB4P); Carlos Garcia, "Prediction markets have made betting easier than ever –and young men are paying the price," Fortune, Apr. 10, 2026 (Middlecamp Decl., Ex. 3); Kaitlyn Huamami and Nick Lichtenberg, "Gen Z's Joe Camel moment: how prediction markets learned to speak in memes," Fortune, May 28, 2026 (Middlecamp Decl., Ex. 4.)

[13] Lucien Bruggeman, "Trump's social media company to launch prediction betting marketplace," *ABC News,* Oct. 28, 2025 (available at https://perma.cc/GV4Q-FJGF).

[14] *See* Alvaro Sanchez, "Spain joins list of more than 30 countries that have banned Polymarket," *El Pais*, May 27, 2026 (available at https://perma.cc/N8AN-KBES ); *see also* Ashifa Kassam, "Spain blocks access to Polymarket and Kalshi as it launches gambling licence investigation," *The Guardian*, May 26, 2026 (available at https://perma.cc/539X-2FGS ); Beatriz Reis et al., "Brazil Blocks Polymarket, Kalshi Over 'Illegal Betting'," *Bloomberg,* Apr. 24, 2026 (available at https://perma.cc/R8N5-JTXM).

cease-and-desist letters to prediction market operators under state gambling and sports betting statutes.[15] Dozens of lawsuits have been filed seeking to address (1) whether prediction markets violate state gambling laws; (2) whether prediction markets unlawfully intrude on tribal gaming authority; and (3) whether and to what extent states and the federal government have authority to regulate prediction markets.[16]

Meanwhile, public reporting has highlighted significant scandals involving the online betting platforms and the attendant risks of insider trading, unethical self-dealing, and negative incentives that put democratic institutions at risk. For example, in April 2026, an enlisted military servicemember was accused of using classified military information to profit off a bet regarding a military operation, and at least three candidates for elected office (including one from Minnesota) were sanctioned for trying to profit off bets regarding their own campaigns.[17] As former SEC Commissioner Joseph Grundfest observed, "Two years ago, if you were a government official or military officer with knowledge of the plan to 'extract' Maduro from Venezuela, or of the attack on Iran, there were simply no markets on which you could easily attempt to trade on that very specific form of information.

---

[15] Tom Nightingale, "Arizona latest state to tell Kalshi to stop and get out," SBC Americas, May 22, 2025 (available at https://sbcamericas.com/2025/05/22/arizona-latest-state-to-tell-kalshi-to-stop-and-get-out/)

[16] Middlecamp Decl., Ex. 1 (Related Cases Index).

[17] Lauren McGaughy, Campbell Robertson, and Corina Knoll, "Kalshi Fines and Suspends 3 Political Candidates for Betting on Their Races," The New York Times, April 22, 2026 (Middlecamp Decl., Ex. 5.)

Today, you can make hundreds of thousands of dollars by misappropriating that information by trading event contracts."[18]

## II.   MINNESOTA'S PREDICTION MARKET STATUTE

### A.   Minnesota Enacts The Prediction Market Statute, Which Criminalizes Certain Enumerated Activities On Prediction Markets.

Against this backdrop, in May 2026, the Minnesota Legislature adopted a bipartisan public safety bill, which includes new criminal penalties for those operating, facilitating, or advertising certain types of prediction market wagers. Minnesota's law will be codified as Minnesota Statutes section 609.7615 (the "Prediction Market Statute.")[19]

The Prediction Market Statute makes it a felony to operate, facilitate, or advertise a defined scope of "prediction market" wagers within the state, in particular, wagering on:

(1)   an athletic event or game of skill, or portions thereof or individual performance statistics therein;

(2)   any game played with cards, dice, equipment, or any mechanical or electronic device or machine;

(3)   war, state or national emergencies, human-made disasters, mass shootings, acts of terrorism, or public health crises, or the ancillary effects thereof;

(4)   any event or events happening to a natural person or group of people;

(5)   a federal, state, or local election, or the specific decisions of the federal, state, or local government and the government's agencies,

---

[18] Joseph Grundfest, "Prediction markets are surging – here's what you need to know." *Stanford Report,* Apr. 28, 2026 (Middlecamp Decl., Ex. 6).

[19] The operative public safety bill and the new statute governing prediction markets reflects two stages of legislation adopted close in time to one another. S.F. 4760 was adopted first, and shortly thereafter, revisions were adopted through S.F. 3432.  A full-text copy of S.F.3432 is attached as Exhibit 9 to the Middlecamp Declaration.

employees, and officers, the primary underlying characteristic of which is not financial, commercial, or economic or the outcome is under the complete control of any person or the outcome is known by any person in advance. This prohibition applies to event contracts on the specific action or decision itself and does not apply to the resulting consequences of such actions or decisions;

(6)     legal actions, including but not limited to a civil or criminal suit, grand jury action, jury trial, settlement, plea, or conviction;

(7)     the death, assassination, or attempted killing of a person or group of persons, or mass casualty events;

8)     events in popular culture, including but not limited to awards and the date a piece of entertainment will be released; or

(9)     whether a person will make a particular statement.

*See* S.F. 3432, art. 6, § 3.

The Minnesota Legislature also took care to expressly exclude certain types of future event-based transactions *not* subject to the Prediction Market Statute's prohibition. In particular, the Prediction Market Statute does not restrict systems that offer:

(1)     a contract to insure, indemnify, guarantee or otherwise compensate another for a harm or loss sustained, even though the loss depends upon chance;

(2)     a contract for the purchase or sale for future delivery of securities or any physical commodities or any option on such futures contract, such securities or commodities, or on the prices thereof except as provided in section 609.7615;

\*\*\*

*See* S.F. 3432, art. 6, § 3, Subd. 4; *see also* S.F. 3432, art. 6, § 2. In other words, traditional insurance contracts are not restricted, nor are agricultural risk-hedging transactions that protect growers against certain economic or weather outcomes, nor are transactions involving securities or commodities.

**B.**      **The Legislative History Reflects A Clear Intent By The Minnesota Legislature To Target Problematic And Predatory Gambling Activities Which Impact Public Health And Welfare.**

Minnesota's Prediction Market Statute had strong bipartisan support. Representative Greenman characterized the legislation as being aimed at "protecting our young people, our communities, and our public decision-making from the shadowy gambling markets that we've seen explode in recent months."[20]   She noted both the problematic gambling risks to public welfare, and the risk to public trust in government decision-making, posed by some forms of prediction market wagering:

> …Without these protections, there's no 21-year-old age restriction, no money laundering protections, and no effort to deal with problem gambling. And as the Wall Street Journal reported, it's leading to a disturbing trend of teenage gambling. Gambling experts are actually quite concerned about particularly these prediction markets pulling in young gamblers and targeting teenagers.
>
> ***
>
> In addition to skirting our laws, these gambling markets are rife with shadowy self-dealing that threatens to corrupt sports, politics, and policymaking. You probably all heard that in the waning days of the Biden administration there were apparently officials betting on pardons. There was a special ops officer who just was caught betting on the Maduro raid. We are seeing reports like this every day. And this threatens to undermine the trust that people have in us, in our system, and in our decision making.[21]

---

[20] April 30, 2026 remarks by Rep. Emma Greenman, Minnesota House Floor Session (available at https://www.lrl.mn.gov/media/file?mtgid=1052396, pertinent remarks at 58:50-59:07).

[21] *Id.* at 1:02:27-1:03:44.

III.   THE CFTC'S JURISDICTION IS LIMITED TO REGULATING COMMODITY FUTURES, SWAPS, AND EVENT CONTRACTS

Commodity-based futures contracts originated in the agricultural context, and the history of federal commodity trading laws in the United States reflects that.[22] Between 1914 and 1922, Congress passed a series of laws aimed at regulating agricultural futures, including the Cotton Futures Trading Act, the Future Trading Act, and the Grain Futures Act. By that time, some lawmakers had already noted the parallels between futures trading and gambling, and they expressed concern about the economic risks posed to traders and farmers alike when prices could be driven by speculation alone rather than supply and demand.[23]

As Congress passed early commodity trading laws, some states had already adopted laws restricting futures trading outright as a form of illegal gambling.[24] In 1933, the Supreme Court considered the Grain Futures Act's preemptive effect on state gambling laws in *Dickson v. Uhlmann Grain Co*., 288 U.S. 188, 198 (1933). In *Dickson,* an Illinois corporation argued that "the transactions in question, being valid under the federal act, were necessarily valid under the [gambling] laws of Missouri." *Id.* at 192.  The Supreme Court rejected this argument, reasoning that the federal legislation set minimum

---

[22] The CFTC's official government website includes a timeline that describes the agricultural context of futures trading and regulation from 1848 through the creation of the CFTC in the 1970s, available at https://perma.cc/M4GL-WN2X.

[23] *See* John V. Rainbolt II, "Regulating the Grain Gambler and His Successors," *Hofstra Law Review,* Vol. 6, Issue 1 (1977) (Middlecamp Decl., Ex. 7) at pg. 6-7 (citing Senator Capper remarks at 61 Cong. Rec. 4765 (1921)).

[24] *Id.* at 6, fn. 23-24.

requirements for lawful trading of grain futures but did not supersede state gambling laws; in other words, meeting minimum federal requirements did not make the transactions legal in all jurisdictions. *Id.* at 198-99.

In response to calls for more and better regulation of an expanding futures trading market, Congress replaced the Grain Futures Act and the Future Trading Act with the Commodity Exchange Act in 1936.[25] At that time, regulatory authority was granted to the Secretary of Agriculture.[26] Among other requirements, the Commodity Exchange Act of 1936 required that any merchant seeking to engage in commodity futures transactions needed to register with the Secretary of Agriculture and be authorized as a "Futures Commission Merchant."[27]

Then, and now, much of the Commodity Exchange Act's framework has relied on the concept that exchanges can be urged to self-regulate, and that the federal government could withhold giving the necessary designation as a penalty if the participating merchants

---

[25] Commodity Exchange Act (June 15, 1936, ch. 545, §1, 49 Stat. 1491) (full text of available at: https://perma.cc/3E8M-PEFB).

[26] In 1947, responsibility for administering the Commodity Exchange Act was transferred to the Commodity Exchange Authority, an agency of the USDA. Those functions were thereafter transferred to the Commodity Futures Trading Commission in 1974. *See generally* The United States Government Manuel, "History of Agency Organizational Changes," at 80 (available at https://www.govinfo.gov/content/pkg/GOVMAN-2022-12-31/pdf/GOVMAN-2022-12-31.pdf).

[27] Commodity Exchange Act (June 15, 1936, ch. 545, §1, 49 Stat. 1491) at §6d. This was the predecessor to the law's current requirement that those seeking to engage in commodity training trading must register with the CTFC as a Designated Contract Market.

do not adequately enforce their own rules against cheating, fraud, manipulation, and the like.[28]

In 1974, Congress revised the Commodity Exchange Act and created the CFTC as the new executive agency responsible for strengthening commodity futures regulations. 7 U.S.C. §§1 et seq. The reforms were designed to address several concerns, including producers' concerns about the impact futures markets had on crop prices, and concerns related to a multi-million-dollar futures operation which had been revealed to be a Ponzi scheme.[29]

Decades later, in response to the 2008 financial crisis, Congress enacted the Dodd-Frank Act. *See* Pub. L. No. 111-203, pt. II, 124 Stat. 1376, 1658-754 (2010). Title VII of the Dodd-Frank Act expanded the regulatory frameworks for both the CFTC and the SEC to include "swaps"—the SEC was given authority over security-based swaps, the CFTC over other kinds of swaps, and the agencies were vested with joint authority over "mixed swaps." *See* 15 U.S.C. § 8302(b).

At the same time, Congress addressed the CFTC's regulatory authority over certain kinds of event contracts. Section 745 (b) of the Dodd-Frank Act added Section 5c(c)(5)(C) to the Commodities Exchange Act, under which the CFTC "may" determine that certain event contracts "based upon the occurrence, extent of an occurrence, or contingency" are "contrary to the public interest" if they involve one of five enumerated categories:

---

[28] Middlecamp Decl., Ex. 7 at 11.

[29] *Id.* at 13-16.

(1) activity that is unlawful under any Federal or State law; (2) terrorism; (3) assassination; (4) war; or (5) gaming.  In a short exchange between the late Senator Diane Feinstein and Senator Blanche Lincoln, Senator Lincoln (a co-sponsor of the bill) stated that the provision was intended to ensure that the CFTC ''has the power to prevent the creation of futures and swaps markets that would allow citizens to profit from devastating events and also prevent gambling through futures markets.''[30] Senator Lincoln went on to note, "It would be quite easy to construct an 'event contract' around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament. These types of contracts would not serve any real commercial purpose. Rather, they would be used solely for gambling."[31]

The next year, the CFTC adopted an events contract regulation, 17 C.F.R. § 40.11. That regulation took the authority granted by the statute, and announced to Designated Contract Markets that they should not even try to list contracts or transactions involving or relating to "terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law," or that is otherwise determined "to be contrary to the public interest" on their registered markets. 17 C.F.R. § 40.11. Neither the statute, nor the regulation, defined "gaming." However, in 2012, the CFTC issued an Order prohibiting political event contracts (defined as binary option contracts that pay out based on the results of

---

[30] Cong. Rec. Vol. 156, No. 105 (Senate, July 15, 2010) (available at https://perma.cc/UDW9-CETX) (remarks by Senator Lincoln at p. 5).

[31] *Id.*

U.S. federal elections.)[32] In that 2012 Order, the CFTC opined that the contracts "involve gaming and are contrary to the public interest."

In May 2024, the CFTC issued a Notice of Proposed Rulemaking proposing to amend 17 C.F.R. § 40.11 to clarify in further detail the types of event contracts prohibited from Designated Contract Markets, and the scope of the CFTC's definition of transactions involving "gaming."[33] But, in February 2026, the CFTC withdrew the proposed rule.[34]

## IV.   THE CFTC CLAIMS EXCLUSIVE JURISDICTION OVER PREDICTION MARKETS AS A STEP TOWARDS AGGRESSIVE DEREGULATION.

In an abrupt change from its prior positions, the CFTC took a dramatic step towards deregulating the prediction market industry in a June 10, 2026 Notice of Proposed Rule Making (hereafter "June 10 Notice").[35]  In the June 10 Notice, the CFTC asserts the same thing that it has asserted in this lawsuit: (1) that it has exclusive jurisdiction over commodity futures and swaps; (2) that the types of wagers hosted on prediction markets are "event contracts" that fall under that umbrella of exclusive authority; and (3) that the CFTC therefore has exclusive control over the determination of which types of "event contracts" should and should not be allowed on prediction markets based on a public interest analysis.

---

[32] *In re the Self-Certification by North American Derivatives Exchange, Inc.,* April 2, 2012 Order by the CFTC (available at https://perma.cc/C2Y4-36N8)

[33]   Fed.   Reg.   89,   No.   112   (June   10,   2024)   (available   at https://www.cftc.gov/sites/default/files/2024/06/2024-12125a.pdf).

[34]   Fed.   Reg.   91,   No.   25   (Feb.   6,   2026)   (available   at https://www.cftc.gov/sites/default/files/2026/02/2026-02454a.pdf).

[35] Fed. Reg. 91, No. 113 (June 12, 2026) (available at https://perma.cc/3NAU-9FBZ).

In the June 10 Notice, the CFTC specifically takes the position that the Commodities Exchanges Act vests in the CFTC the sole decision-making authority over whether prediction market apps can facilitate:

- Wagers based on elections;
- Sports betting of all kinds, including player injury contracts;[36]
- Wagers regarding the Nobel Prize and Academy Awards;
- Wagers regarding whether someone will be convicted of a crime, or how long they will be sentenced;
- A wager as to whether the TSA will implement enhanced screening procedures at a certain airport;
- A wager as to whether Putin will bomb Kyiv on a particular date; and [37]
- Wagers based on reality tv shows and pageants.[38]

In sum, the June 10 Notice illustrates the apparently unlimited scope of CFTC's claimed authority: any wager on a future outcome, whether contrary to public interest or not, is purportedly under the exclusive jurisdiction of the CFTC.

## V.   FORMER CFTC CHAIRMAN GARY GENSLER DENIES CFTC'S REWRITING OF HISTORY

Just one day after the CFTC issued the June 10 Notice, the former chairman of the CFTC, Gary Gensler, filed an amicus brief in a 6th Circuit appeal involving the same

---

[36] Although the CFTC anticipates it may prohibit pre-collegiate sports betting, or player injury bets, due to public interest concerns, the June 10 Notice does not suggest those fall outside of its exclusive jurisdiction or may be regulated by states.

[37] Here again, the June 10 Notice indicates the CFTC would likely disallow this wager as contrary to public interest but still presupposes that such a wager falls within the CFTC's exclusive jurisdiction.

[38] The June 10 Notice invites comments as to whether these types of events should be considered "gaming," but the CFTC's position presupposes exclusive authority over them.

19

preemption claims as these consolidated cases. [39] Mr. Gensler asserts that the CFTC's changed position (specifically with regard to sports betting and preemption) contradicts his personal experience and first-hand understanding of both the text and legislative history of the Commodities Exchange Act and the Dodd-Frank Amendments. He describes his experience working directly with Congress, including negotiating about the amendments to the Commodity Exchange Act, as well as his experience directly leading the CFTC's implementation of the Dodd-Frank Amendments. He explains that after the Dodd-Frank Amendments added "swaps," the CFTC did not seek expanded appropriations or support as it would have if it understood it was tasked with a dramatically expanded scope of work regulating sports betting. He summarized his first-hand view simply: "Congress did not displace historical state police powers over sports betting through Dodd-Frank and give it to a small federal regulatory agency with no expertise in gaming regulation."[40] He also observed, "If Dodd-Frank had preempted the states on sports betting, it would have been one of the biggest stories about Ddod-Frank at the time. But nobody ever mentioned it."[41]

## ARGUMENT

A preliminary injunction is an extraordinary remedy. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). When deciding whether to issue a preliminary injunction, the Court must consider four factors: "'(1) the threat of irreparable harm to the

---

[39] *KalshiEx, LLC v. Schuler, et al.*, 26-3196 at Dkt. 55 (6th Cir., June 11, 2026)("Former CFTC Chairman Gary Gensler's Brief as Amicus Curiae In Support of Defendants-Appellants) (Middlecamp Decl., Ex. 8).

[40] *Id.* at 27.

[41] *Id.* at 7.

movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.'" *Hotchkiss v. Cedar Rapids Cmty. Sch. Dist.*, 115 F.4th 889, 893 (8th Cir. 2024) (quoting *Dataphase Sys., Inc. v. C.L. Sys, Inc.*, 640 F.2d 109, 114 (8th Cir. 1981)). No single factor is dispositive; the court must balance all factors before issuing an injunction. *Ng v. Bd. of Regents of Univ. of Minn.*, 64 F.4th 992, 997 (8th Cir. 2023).

Here, Plaintiffs bring a facial challenge to the Prediction Market Statute, "and that decision comes at a cost" because "the Court has made facial challenges hard to win." *Moody v. NetChoice*, 603 U.S. 707, 723 (2024). When a plaintiff challenges an entire statute on its face, rather than based on its as-applied enforcement, "a plaintiff cannot succeed . . . unless he establish[es] that no set of circumstances exists under which the [law] would be valid," or he shows that the law "lacks a 'plainly legitimate sweep.'" *Id.* (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

The *Salerno* standard for facial challenges applies in preemption cases like this one. *See, e.g.*, *Anderson v. Edwards*, 514 U.S. 143, 155 n.6 (1995) (applying *Salerno* in preemption case); *Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 588-89 (1987) (same); *Keller v. City of Fremont*, 719 F.3d 931, 944-45 (8th Cir. 2013) (rejecting facial preemption challenge). Under that standard, Plaintiffs must prove that the Commodity Exchange Act preempts every possible criminal prohibition falling within the scope of the Minnesota Prediction Market Statute against any potential target, not just Kalshi or Polymarket. If there is a way the Prediction Market Statute can be enforced lawfully against

21

anyone, the facial challenge fails. Plaintiffs cannot meet their burden because, at a minimum, federal law clearly authorizes states to preclude sports betting.

Plaintiffs cannot show that they are entitled to a preliminary injunction for other reasons as well. For one, the CFTC lacks standing to sue. And even if Kalshi and Polymarket have standing, the preemption claims and First Amendment claims are unlikely to succeed, they have failed to show irreparable harm, and the equities and public interest decisively favor Minnesota's lawful exercise of its authority to regulate matters impacting public safety and prevent a surge of predatory, addictive gambling. The motions should be denied.

## I. PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR PREEMPTION CLAIMS.

None of the Plaintiffs can show they are likely to prevail on the claim that federal law preempts Minnesota's Prediction Market Statute.[42]  First, the CFTC lacks standing. Second, the types of bets and wagers falling within the scope of Minnesota's Prediction Market Statute (sports betting, and betting on other cultural, political, and social events) are not subject to the Commodity Exchange Act at all, because those types of wagers are not "commodity futures" or "swaps" presenting the type of financial impact Congress intended to regulate. Accordingly, the "exclusive jurisdiction" language within the Commodity Exchange Act is as irrelevant to the Minnesota Prediction Market Statute as it

---

[42] In the Eighth Circuit, courts apply one of two standards when assessing likelihood of success on the merits. The first standard focuses on whether the plaintiff has a "fair chance of prevailing." *Planned Parenthood of Minn. v. Rounds*, 530 F.3d 724, 732-33 (8th Cir. 2008) (en banc). The second—and more rigorous—standard applies whenever a plaintiff seeks to enjoin the implementation of a state statute. *Id.* That standard, which applies here, requires that the plaintiff must show that it is likely to prevail. *Id.*

is to Minnesota's traffic laws. Third, even if the Commodity Exchange Act does apply, it does not preempt concurrent enforcement of a generally applicable state criminal law. Plaintiffs' motions should each be denied.

### A.   The CFTC Does Not Have Standing.

The CFTC has no business inserting itself into states' efforts to regulate gambling, particularly because it lacks standing to claim any direct harm arising from those state laws.

Specifically, the CFTC must meet Article III standing requirements by showing: "(1) an injury in fact, (2) a causal connection between the injury and the challenged conduct, and (3) a likelihood that a favorable decision will redress the injury." *Becker v. N.D. Univ. Sys.*, 112 F.4th 592, 595 (8th Cir. 2024).  And the standing inquiry is even more onerous here, at the preliminary injunction stage, where the CFTC "must make a 'clear showing' that [it] is 'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Winter*, 555 U.S. at 22). Nor can the CFTC simply rest on abstract theories about sovereign injury.  *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) (explaining Article III standing requires real and not abstract injury). Like any private litigant, the CFTC must have Article III standing to bring a claim to Court; it cannot expect exceptional treatment simply because it is a federal agency. *See United States v. Mattson*, 600 F.2d 1295, 1300 (9th Cir. 1979) (stating "the government must show that, like the private individual, it has such an interest in the relief sought") (quoting *United States v. San Jacinto Tin Co.*, 125 U.S. 273, 285 (1888)).

Most difficult here is the first of the three standing requirements—injury in fact— which requires the CFTC to show that Minnesota's Prediction Markets Statute creates an

injury that is concrete and particularized and actual or imminent as to the CFTC itself. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *Huyer v. Van de Voorde*, 847 F.3d 983, 986 (8th Cir. 2017). The CFTC cannot show any injury—concrete, particularized, or otherwise—because the wagering conduct Minnesota seeks to prohibit is wholly outside the purview of the CFTC, and at most, directly impacts third-party companies who are clearly able to assert their own rights and interests (as they have done by filing suits of their own.)

For the CFTC to show that Minnesota's Prediction Markets statute creates a concrete injury, it must show its claimed injury is real and not merely abstract. *Spokeo, Inc.*, 578 U.S. at 340. And even if the CFTC can manage that, it also must show the alleged injury is particularized, in other words that the CFTC is affected personally and individually. *Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1030 (8th Cir. 2014); *Harris v. Medtronic Inc.*, 729 F. Supp. 3d 869, 878 (D. Minn. 2024). Here, the standing theory advanced by CFTC is that Minnesota's statute presents an "injury" to its "sovereignty" and "impair[s]" the CFTC's interest in enforcing federal law, apparently by causing concern in third parties who turn to the CFTC for compliance guidance, or who may be "chilled" in their operations.[43] Those claims do not satisfy CFTC's burden to demonstrate standing.[44]

---

[43] 26-CV-2661, Dkt. 25 (CFTC Memorandum of Law) at 22, 25.

[44] Although not binding on this Court, a recent district court decision dismissing a lawsuit filed by the federal government for lack of standing is instructive. *United States v. Hawaii, et. al,* 25-179, Dkt. 43 (D. Hawaii, Apr. 15, 2026). There, the district court determined the alleged injury was too remote where the federal government's argument rested on "multiple layers of unpredictable future events," ultimately stemming from reactions by (Footnote Continued on Next Page)

### 1. The Supremacy Clause does not automatically create a concrete injury.

The CFTC claims it has standing because its regulatory authority is "disrupt[ed]" by the looming enforcement of Minnesota's Prediction Market Statute.[45] However, it fails to articulate how a state law prohibiting certain forms of gambling wagers threatens or disrupts CFTC's authority to regulate commodities and swaps, save for one singular claimed injury: the need for CFTC staff to field requests for guidance by third party companies.[46] A government agency receiving questions from private companies about a varied regulatory landscape is not an injury, and CFTC cannot point to a single case which stands for the proposition that an agency which would prefer to deregulate an industry is injured when states go further than the federal minimums.

To the contrary, the cases the CFTC cites to are cases where, unlike here, there was concrete harm to federal agency operations or direct violation of federal law. In other words, there was *more* than a sweeping gesture toward the Supremacy Clause; there was some other concrete and particularized injury to the federal government's sovereign authority. For example, in *United States v. Missouri*, the state of Missouri passed a state law that declared various federal gun laws ineffective in their state. 114 F.4th 980, 984 (8th Cir. 2024). Because the Missouri law purported to affirmatively invalidate federal law, the interference with federal law was sufficiently high to establish standing. *Id.* at 985.

---

third parties and private companies which the federal government alleged could ultimately negatively impact harm to the federal commerce and energy policies.

[45] Dkt. 25 at 25.

[46] *See* Declaration of Joshua Beale (Dkt. 25-1) at 3-4.

Similarly, in *United States v. Iowa*, Iowa passed a criminal statute which criminalized the presence of undocumented persons in the state, and which, among other restrictions, specifically forbade state judges from abating state prosecutions due to pending federal determinations of immigration status. 126 F.4th 1334, 1340-41 (8th Cir. 2025). The court found that the federal government established an injury in fact because it had detailed ways the state statute could interfere with the enforcement of federal immigration law. *Id.* at 1342.

And in *United States v. Florida*, the federal government sued Florida for injunctive relief after the state committed widespread violations of federal law—the Americans with Disabilities Act—by mismanaging Medicaid services to hundreds of low-income children with disabilities or medically complex conditions. 172 F.4th 1201 (11th Cir. 2026). There, the court determined that the injury to the United States, for standing purposes, was created by Florida's *violation* of federal law, not by preemption of Florida law—in other words, the injury did not spring, fully formed, from a general Supremacy Clause theory. *See Id.* at 1222-23. *But see KalshiEX LLC v. Johnson*, ---F.Supp.3d ----, 2026 WL 1223373, *3 (D. Ariz. May 5, 2026) (neglecting to do any Article III injury-in-fact analysis).

In sum: the CFTC relies on cases involving clear disruptions in federal agency operations or a violation of federal law that created the required Article III injury. Here, there is no disruption of CFTC operations or violations of federal law. Minnesota has exercised its sovereign power to restrict certain forms of betting that may be allowed in other jurisdictions but that is not an injury to sovereign powers, particularly where federal

26

law does not create an affirmative right or obligation to allow such betting to occur in all jurisdictions.

**2.    The injuries the CFTC describes are not particular to the CFTC.**

Because the CFTC will not personally and individually suffer injury from Minnesota's Prediction Markets Statute, it does the only thing it can do: invokes other parties' alleged injuries.    But when "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, much more is needed." *Lujan* at 562. (emphasis in original).

The CFTC claims it has standing because the law's looming enforcement has already disrupted "CFTC-regulated markets" and has "chill[ed] the operations of [Designated Contract Markets]." (Dkt. 25 at 23.) These claims are not repeated in Joshua Beale's declaration, nor are there any specifics provided on to what this purported "chilling" looks like. At most, what the CFTC is describing is alleged injuries to CFTC-regulated parties, not to the CFTC itself.    And when it claims that this type of market disruption makes regulating markets more difficult for the CFTC, it invites the question: how does Minnesota's law make the CFTC's job harder when the CFTC's own regulations have historically prohibited much, if not all, of what Minnesota's Prediction Markets Statute prohibits? The CFTC has, for decades, prohibited Designated Contract Markets from listing contracts or transactions involving or relating to "terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law," or that is otherwise determined "to be contrary to the public interest."  17 C.F.R. § 40.11.  Put plainly, when

27

the CFTC alleges that Minnesota's prohibition of certain prediction markets is its injury, it is doing a poor job hiding the water it carries for the companies it claims to regulate.

### 3. The CFTC fails to show it will suffer an actual or imminent injury.

Similarly, the CFTC has not shown that Minnesota's Prediction Market Statute will cause it an actual or imminent injury. The CFTC argues that its alleged injury is imminent because Minnesota's statute becomes effective August 1. (Dkt. 25 at 22.) But of course, this argument depends on the statute creating an injury to the CFTC in the first place. The CFTC is right that a threatened injury can satisfy the actual or imminent requirement if that injury is impending. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). But that is where the CFTC's argument falls short. Setting aside that the statute prohibits a subset of prediction market wagering and not all CFTC-regulated markets, the penalties under Minnesota's statute do not apply to the CFTC. The CFTC is a regulator, and as such, does not "for consideration and as part of a business" engage in any of the statute's prohibited conduct, nor does it "advertise[ ] or market[ ]" any of the statute's prohibited products. *See* S.F. 3432, art. 6, § 3 subds. 2, 3.

The CFTC claims that CFTC-regulated markets like Kalshi and Polymarket "plan on continuing to offer those contracts absent the law," and that this constitutes the CFTC's imminent injury.[47] (Dkt. 25 at 22.) The CFTC offers no support for its unusual argument

---

[47] The CFTC also claims that it has been, and will continue to be, injured because DCMs are asking it for guidance which diverts its resources away from its "core function" of supervising markets. (Dkt. 25 at 21-22; Beale Decl. ¶ 7.) Providing guidance to regulated parties is well understood to be a "core function" of regulatory agencies and not a cognizable injury.

that an alleged injury to a regulated party is a per se injury to the party's regulator. Put another way, the CFTC again attempts, unsuccessfully, to squeeze an injury from its amorphous Supremacy Clause theory. "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose." *Clapper*, at 409 (quoting *Lujan* at 564, n.2).

Because it erroneously collapses Article III standing requirements into what it packages as its protected interest in enforcing federal law, the CFTC conflates *its* limited regulatory authority over certain futures contracts with Minnesota's sovereign right to prohibit predatory prediction markets from operating within its borders. Thus, by virtue of it not having standing, the CFTC is not likely to succeed on the merits of its claims.

### B. Plaintiffs' Preemption Arguments Fail Because the Commodity Exchange Act Does Not Extend to All Gambling and Wagering Based on Future Events.

Plaintiffs' preemption claims are predicated on the premise that the wagers regulated by Minnesota's Prediction Market Statute are all "swaps" affecting commodity and financial markets and therefore governed by the Commodity Exchange Act. That is incorrect.

As a threshold matter, wherever the Government asserts that "it has 'discover[ed] in a long-extant statute an unheralded power to regulate a significant portion of the American economy'", that requires the Courts to "greet [that] announcement with a measure of skepticism." *Missouri v. Biden*, 112 F.4th 531, 537 (8th Cir. 2024) (citing *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). Here, because the CFTC claims that

provisions nestled within the Commodities Exchange Act should now be read to strip all states of their power to regulate gambling, skepticism is particularly warranted.

The Commodity Exchange Act grants the CFTC "exclusive jurisdiction" over just two types of transactions: (1) commodity futures, and (2) swaps. 7 U.S.C. § 2(a)(1)(A). This "exclusive jurisdiction" section of the Commodity Exchange Act does not use the term "event contracts" (which is how Plaintiffs prefer to self-define all categories of events betting offered on Kalshi and Polymarket's platforms.)

The analytical path that Plaintiffs urge this Court to follow is: first, define all forms of betting on a future outcome as an "event contract," then second, embrace a reading of the Commodities Exchange Act that includes all forms of "event contracts" as "swaps." With these two logical leaps, Plaintiffs encourage the Court to conclude that any wager placed on a thing that has not yet happened is subject to the Commodity Exchange Act and therefore subject to the exclusive jurisdiction of the CFTC. For the reasons that follow, that argument fails.[48]

### 1. Wagering on sporting events, political events, cultural events, or social events, are not commodity futures.

Plaintiffs' singular focus on "swaps" rather than "commodity futures" appears to be a concession that the types of transactions at issue are not "commodity futures." A

---

[48] Rulings from the Districts of Arizona, Nevada, New Jersey, and Tennessee, and the Third Circuit Court of Appeals, have embraced Plaintiffs' preemption arguments, but those rulings were wrongly decided, and in conflict with rulings by the Districts of Ohio, Maryland, Michigan, and Washington. *See* Middlecamp Decl., Ex. 1. The Sixth Circuit has also recently denied Kalshi an injunction enjoining Ohio state gambling laws, reasoning that Kalshi has shown certain preemption issues are "close," but not enough to enjoin the implementation of a duly enacted state statute." *KalshiEX, LLC v. Schuler, et. al.,* 26-3196, Dkt. 26-2 at 13-14 (6th Cir. April 24, 2026).

commodity future (a contract of sale of a commodity for future delivery) is expressly defined by the Commodity Exchange Act. It is an agreement to sell "a commodity" that can be delivered. *See* 7 U.S.C. § 1a(13). "Commodity" includes "goods," "articles," "services, rights, and interests … in which contracts for future delivery are presently or in the future dealt in." *Id.* § 1a (9).

Such commodity futures are the Commodity Exchange Act's core concern – "purchases and sales of contracts for delivery at some future date of certain quantities of specified commodities at fixed prices." S. Rep. No. 93-1131, 1974 U.S.C.C.A.N. 5843, 5856 (1974). Sports betting and other cultural/political/legal/social wagering clearly do not fit within this core concern or ordinary meaning of the text: the outcome of a game, concert, movie release, legislative action, lawsuit, or election are not a "good," "article," "service," "right," or "interest" that can be "delivered" by a contract.

Thus, Plaintiffs' motions hinge on whether they can convince this Court that the bets and wagers all qualify as "swaps."

      **2.**      **Wagering on sporting events, political events, cultural events, lawsuits, or social events, are not "swaps" because they are not associated with a "potential financial, economic, or commercial consequence" of the nature intended by Congress.**

The Commodity Exchange Act defines "swap" as an agreement, contract, or transaction, that "is dependent on the occurrence, nonoccurrence, or the extent of the

31

occurrence of an event or contingency associated with a *potential financial, economic, or commercial consequence.*" 7 U.S.C. § 1a(47)(A)(ii) (emphasis added).[49]

The definitional requirement that regulated transactions be associated with a threshold degree of financial, economic, or commercial consequence is consistent with the original "findings and purpose" language which has been part of the Commodities Exchange Act since the very beginning. The "findings and purpose" language, which dates back to 1922, contextualizes the statute as one focusing only on transactions that really matter to market forces, listing several examples of what Congress intended to regulate:

(a) The transactions subject to this chapter are entered into regularly in interstate and international commerce and are affected with a national public interest by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities.

(b) It is the purpose of this chapter to serve the public interests described in subsection (a)…[50]

Swaps were added to the CFTC's jurisdiction in the aftermath of the 2008 financial crisis because high-risk swaps by parties who ultimately lacked the credit to pay what they had agreed were perceived to be partially responsible for that crisis. As the Office of Government Accountability summarized the issue, the Dodd-Frank Act's regulations sought to minimize the risk of swaps destabilizing markets.[51]

---

[49] The Commodity Exchange Act includes several other definitions of "swap" but Plaintiffs appear to rely exclusively on this provision.

[50] 7 U.S.C. § 5(a) and (b)

[51] "Understanding Derivatives One Swap at a Time," U.S. Government Accountability Office, June 13, 2018 (available at https://perma.cc/W4CD-AFGA).

In contrast, financial and commodity market stability are not fundamentally affected by sporting events, pop culture events, or lawsuits or elections. And because those types of events are many steps removed from actual commodities or financial assets that are tradable or deliverable, they have not historically been associated with commercial hedging.

Kalshi agrees, in part. It has previously conceded that sporting events are not "associated with potential financial, economic, or commercial consequence." In its brief to the D.C. Circuit in a related manner, Kalshi acknowledged that "as the legislative history directly confirms, Congress did not want sports betting to be conducted on derivatives markets." Appellee's Br. at 41, *KalshiEX LLC v. CFTC*, No. 24-5205, 2024 WL 4802698 (D.C. Cir. Nov. 15, 2024). Kalshi further explained:

> The basic purpose of Designated Contract Markets is to allow "hedging" of economic risk. 156 Cong. Rec. S5907. Contracts that "serve[] no commercial purpose at all" may therefore not deserve to be traded on a regulated exchange. *Id*. at S5906. And, at least in general, contracts relating to games – again, activities conducted for diversion or amusement – are unlikely to serve any "commercial or hedging interest.'

*Id.* Kalshi's concession mirrors the plain meaning of the statute. *See Wis. Cent. Ltd v. United States*, 585 U.S. 274, 277 (2018) ("As usual, our job is to interpret the words consistent with their 'ordinary meaning'").

Yet Plaintiffs now argue that any type of betting the CFTC may choose to allow on a Designated Contract Market should enjoy the blanket label of a regulated "swap" falling within the Commodities Exchange Act, to include all sporting events and a range of social, political, legal, and cultural events. This position simply cannot be squared with the

purpose and meaning of the Commodities Exchange Act. How many points the Minnesota Lynx score in a given game, or whether the White House Press Secretary ends a briefing before an arbitrary time limit, are not "event[s] or contingenc[ies] associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Nor do these outcome-focused wagers serve any legitimate hedging purpose impacting markets tied to real commodities or financial products.[52]

### 3. Established principles of statutory construction all weigh against Plaintiffs' self-serving definition of "swap."

Because the term "financial, economic, or commercial consequence" is not defined within the Commodity Exchange Act, it is necessary for this Court to apply settled principles of statutory interpretation to give that language its appropriate meaning. Several canons weigh against the reading Plaintiffs urge this Court to adopt.

### a. The associated-words and surplusage canons weigh against Plaintiffs' reading.

Under the principle of *noscitur a sociis*—a word is known by the company it keeps—courts must avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus "giving unintended breadth to the Acts of Congress." *Yates v. United States*, 574 U.S. 528, 543 (2015) (plurality) (citation and quotation marks omitted). When "several items in a list share an attribute," the principle favors "interpreting the other items as possessing that attribute as well." *Beecham v. United States*, 511 U.S. 368, 371 (1994).

---

[52] Again, if even one application of the Minnesota Prediction Market is not preempted, the facial challenge fails.

Here, sub-clause (ii) defines a swap as "associated with a potential financial, economic, or commercial consequence." Similarly, subclause (i) defines a swap as an "option" that hinges on "1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind." And subclause (iii) defines a swap as an exchange of "1 or more payments based on the value or level of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind." 7 U.S.C. § 1a(47)(A)(i), (iii).

Applying the associated-words canon, it follows that "event or contingency associated with a potential financial, economic, or commercial consequence," as used in sub-clause (ii), refers to the company it keeps in sub-clauses (i) and (iii) – consequences that directly affect "rates, currencies, commodities, securities, instruments of indebtedness, indices, [or] quantitative measures." Final scores in sporting events, or which contestant wins the next season of Survivor, do not satisfy this requirement.

At least one court has recently denied Kalshi a preliminary injunction based on this very canon of statutory construction. The Southern District of Ohio looked at the examples of swaps provided in the Commodity Exchange Act, and it determined that sports betting falls outside of that reasonable reading:

> By enacting the [Commodity Exchange Act], Congress sought to serve the national public interest of "managing and assuming price risks, discovering prices, or disseminating pricing information" by establishing a system to deter market disruptions, ensure financial integrity, avoid systemic risk, protect market participants from fraud and abuse, and promote responsible

innovation. 7 U.S.C. § 5. These goals are better achieved when a "swap" is understood as a transaction involving financial instruments and measures that traditionally and directly affect commodity prices. Currency exchange rates, the weather, and energy costs all do that; the number of points scored in the Huskies-Bobcats game does not.

*KalshiEX, LLC v. Schuler*, No. 2:25-CV-1165, 2026 WL 657004, at *6 (S.D. Ohio Mar. 9, 2026).

That reasoning should not be limited to sports gambling. Wagering on which local chef may win a James Beard award, or whether a celebrity couple will divorce in 2026, simply don't belong in the category of consequential financial transactions. They have no direct connection to commodity prices or financial market stability, which is the whole point of federal regulation in this area. No one offering either side of those types of wagers has a direct hedging need tied to market pricing fluctuations. Yet, accepting Plaintiffs' reading, any of these types of wagers would be "swaps" within the scope of the Commodity Exchange Act.

Moreover, adopting Plaintiffs' broad definition of "swaps" would violate the canon against surplusage. Under this canon, Courts are obliged to "give effect, if possible, to every word Congress used," including by rejecting a reading which would "render an entire subparagraph meaningless." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 128–29, (2018). The section of the Commodities Exchange Act that defines "swap" includes multiple subparagraphs that would all be swallowed up by the expansive definition if "event or contingency associated with a potential financial, economic, or commercial consequence" were as broad as Plaintiffs argue. If every wager on a potential future outcome is a "swap," regardless of how significant or direct its financial consequence is,

36

the remainder of the definitions within the Commodity Exchange Act are entirely unnecessary, as they would all fall under the overinclusive umbrella.

>**b.**      **The statutory interpretation principle that the specific governs the general, and the canon against implied repeal, both preclude Plaintiffs' reading.**

The implied-repeal and the specific-general canons point in the same direction. If sports wagers were "swaps," the Dodd-Frank Act would have impliedly repealed several federal statutes. The Supreme Court has repeatedly held that implied repeals are disfavored. *See, e.g., Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (applying "the strong presumption that repeals by implication are disfavored and that Congress will specifically address preexisting law when it wishes to suspend its normal operations in a later statute") (cleaned up). However, including sports wagers in the Commodity Exchange Act's definition of "swaps" would impliedly repeal several other federal statutory schemes governing gaming, including, at a minimum, the Wire Act and the Indian Gaming Regulatory Act (IGRA).

The Wire Act criminalizes businesses engaged in "betting or wagering" that "use[] a wire communication facility" to transmit "bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest" if such wagering is illegal under state law. 18 U.S.C. § 1084(a)-(b). Sports betting on phone and computer applications easily falls within the conduct prohibited by the Wire Act, if the state also criminalizes it. If Congress had intended to repeal the Wire Act in passing Dodd-Frank, it would have done so explicitly.

37

In addition, IGRA designates sports gambling as "Class III" gaming and prohibits such activity on tribal lands unless the relevant Tribe and State where the tribal land is located both authorize sports gaming pursuant to a Tribal-State compact. *See* 25 U.S.C. § 2703(8); 25 C.F.R. § 502.4(c); 25 U.S.C. § 2710(d)(1). If this Court deems sports betting transactions to be "swaps" that Minnesota is not permitted to regulate in any fashion, it would be eviscerating the concept of Tribal-State compacts under IGRA as well.

Relatedly, the existence of specific statutes governing sports gambling governs over any general statute that Plaintiffs argue should be read to include sports betting. "The specific governs the general," especially when, as here, "a general permission or prohibition [*i.e.*, the Commodity Exchange Act's definition of 'swap'] is contradicted by a specific prohibition or permission [*i.e.*, the Wire Act's express prohibition against interstate gambling on sports or IGRA's express prohibition against Class III gaming on tribal lands absent compliance with the three requirements in 25 U.S.C. § 2710(d)(1)]." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (citation omitted).

Thus, this canon complements the canon against implied repeal. Congress cannot be understood to have repealed the Wire Act, IGRA, or other laws when it passed Dodd-Frank. Moreover, the specific, express prohibition against sports gaming in the Wire Act and IGRA governs over the broad, general definition of "swap."

At the bare minimum, then, in at least the context of sports betting, Minnesota's Prediction Market Statute is not preempted. Because Plaintiffs have brought this case as a facial challenge, the existence of at least one lawful application of Minnesota's law (sports betting) means the facial challenge fails overall. *See Salerno,* 481 U.S. at 745.

       **c.**       **Plaintiffs' interpretation runs contrary to the Major Question Doctrine and the canon against interpreting statutes in a manner that would presume an intent to "hide elephants in mouseholes."**

Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns., Inc.*, 531 U.S. 457, 468 (2001); *see also Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 583 U.S. 416, 431 (2018) ("Congress does not make 'radical – but entirely implicit – change[s]' through 'technical and conforming amendments.'"). Reading one of several possible definitions of "swap" to preempt the longstanding regime of leaving regulation of gambling to the States and Tribes would violate this precept.

When Congress passed the Dodd-Frank Act, it sought to remedy regulatory failures believed to be at the heart of the 2008 Financial Crisis. Sports betting was not at the heart of the financial crisis, and in fact, at the time Dodd-Frank passed, sports wagering was not only prohibited by the Wire Act and IGRA; it was also banned pursuant to the Professional and Amateur Sports Protection Act (PAPSA).[53] Dodd-Frank could not have contemplated its changes to be legalizing and centralizing sports betting under the authority of the CFTC and, in the process repealing in part or in whole the Wire Act, IGRA, and PASPA, and preempting numerous states' gaming laws. And, because there is no meaningful distinction between sports betting and betting on other pop culture events (other than the novelty of the latter), the clear absence of Congressional intent to invite the former should extend to the latter.

---

[53] PAPSA, passed in 1992, was later struck as an unconstitutional commandeering of states' lawmaking powers in 2018. *See Murphy v. NCAA*, 584 U.S. 453 (2018).

Indeed, the legislative history of the Dodd-Frank Act confirms that Congress did not intend to hide the sports gaming elephant in the mousehole of the "swaps" definition. *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, Title VII, Part II, § 722, 124 Stat. 1376, 1672; *DTCC Data Repository*, *supra,* 25 F. Supp. 3d at 9. Plaintiffs rely on the 1974 legislative history, when Congress added the "exclusive jurisdiction" language to Section 2(a)(1)(A) for the first time. (*See* Dkt. 25 at 25-26.) But the 1974 Act was concerned with commodity futures and did not use the term "swap." Regardless, even if the 1974 provisions' proponents were concerned about state regulation in futures markets, that would have no bearing on whether Congress intended to intrude on state regulatory authority over gambling.

Later, in enacting Dodd-Frank, Congress differentiated between legitimate commercial investments and "gambling" contracts that "served no commercial purpose at all." 156 Cong. Rec. S5902, S5906-7 (daily ed. July 15, 2010) (Sen. Feinstein) (expressing concern about "derivative contract[s]" being "used predominantly by speculators or participants not having a commercial or hedging interest"). There is no evidence in the legislative history that anyone in Congress intended for the addition of "swaps" to the CFTC's jurisdiction to displace States' or Tribes' authority over traditional forms of gambling or to override state gambling laws nationwide.

Dodd-Frank's "swap" definition was intended to cover transactions in the heartland of the CFTC's authority, like swaps pertaining to a farmer's crop yield or changes in corporate asset purchases. *See* Concept Release on the Appropriate Regulatory Treatment of Event Contracts, 73 Fed. Reg. 25,671 (May 7, 2008). The transactions falling under the

40

Minnesota Prediction Market Statute, however, concern the offer, purchase, and sale of wagers on the outcomes of sporting events (among other cultural and social events) and are not associated with a "potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii); *see supra* at §I.A(2)(a).

Dodd-Frank's legislative history also demonstrates that Congress anticipated but rejected the idea of bad actors attempting to stretch the reasonable meaning of regulated event contracts, with Senator Lincoln observing, "It would be quite easy to construct an 'event contract' around sporting events;" but "[t]hese types of contracts would not serve any real commercial purpose," and instead, "would be used solely for gambling." 156 Cong. Rec. S5902-01, S5907 (July 15, 2010) (statement of Senator Lincoln). Rather than evidencing an intent to grant the CFTC jurisdiction over sports gaming, legislative history indicates Congress did not intend to allow gambling wagers to get repackaged as "event contracts" or "swaps" eligible to exchange on designated markets.

The major questions doctrine calls for the same conclusion. That doctrine calls for cautious reading of the scope of an administrative agency's authority when the assertion of that authority has major "economic and political significance" and represents a marked shift from the "history and breadth" of authority previously exercised. *See Biden v. Nebraska*, 600 U.S. 477, 501 (2023). Here, the particular types of wagers offered by Kalshi, Polymarket, and other prediction markets are novel in comparison to other transactions previously asserted to fall under CFTC jurisdiction, and the economic and political significance is beyond question: market reporting indicates that prediction market monthly

41

trading volume grew from $5 billion to over $24 billion between September 2025 and April 2026.[54]

### C. Even if the Commodity Exchange Act Applies, it Does Not Preempt Generally Applicable Criminal Statutes Such as Minnesota's Prediction Market Statute.

Thankfully, this Court need not do a fact-intensive, wager-by-wager analysis into whether any of the wagers offered by Kalshi or Polymarket meet the requisite definition of a "swap" to deny Plaintiffs' motions for preliminary injunction, because even if the Commodity Exchange Act applies, it does not preempt Minnesota's Prediction Market Statute. Over a century has passed since the Supreme Court recognized that "the suppression of gambling is concededly within the police powers of a state." *Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905).[55] Reading the Commodities Exchange Act to functionally prohibit states from adopting and enforcing laws governing gambling is the type of "direct affront to state sovereignty" that the Constitution simply does not allow.

---

[54] Kaitlyn Radde, "Trading volume on prediction markets has soared in recent months," Pew Research Center, May 27, 2026 (available at https://perma.cc/Z5LF-8XEE).

[55] Congress recognized this in 1978 legislation regarding horserace wagers, writing "the States should have the primary responsibility for determining what forms of gambling may legally take place within their borders." 15 U.S. Code § 3001(a).

*See Murphy v. NCAA,* 584 U.S. 453 (2018).[56] More importantly for this Court's preemption analysis, it is not what Congress intended, and not what Congress did.

### 1.    The strong presumption against preemption applies here.

A strong presumption exists against preemption, particularly preemption of state police powers. *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 518 (1992).  Under the most basic norms of federalism, courts "begin 'with the assumption that the historic police powers of the States are not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *R. J. Reynolds Tobacco Co. v. City of Edina*, 60 F.4th 1170, 1176 (8th Cir. 2023) (citing *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) and *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). This presumption is even stronger when Congress has legislated in a field which the states have traditionally occupied." *In re Aurora Dairy Corp. Organic Milk Mktg. & Sales Pracs. Litig.*, 621 F.3d 781, 792 (8th Cir. 2010) (additional citations omitted.)

Under the presumption against preemption, "the mere fact that Congress has seen fit to circumscribe its regulation and to occupy a limited field" is insufficient to preempt state law. *Huron Portland Cement Co. v. City of Detroit,* 362 U.S. 440, 443 (1960). Instead, there must be an unambiguous indication in the federal statute that Congress intended to

---

[56] In *Murphy,* the Supreme Court struck down a federal law that purported to prohibit states' abilities to regulate gambling within their jurisdictions. Although the *Murphy* case involved a law that prohibited states from authorizing sports gambling, whereas this case involves the right to restrict sports gambling, the constitutional threat is the same. The *Murphy* Court recognized, "Congress can regulate sports gambling directly, but if it elects not to do so, each State is free to act on its own." *Id.* at 486. This decision, issued in 2018, and made no reference to CFTC authority to restrict state gambling laws.

deprive States of any role falling within their traditional police powers regarding the subject matter. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).

Consistent with the baseline presumption against preemption, courts must disfavor preemption when faced with multiple plausible readings of a statute and adopt a reading that disfavors preemption. *R. J. Reynolds Tobacco Co.,* 60 F.4th at 1176; *see also Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005).

### 2.     Plaintiffs cannot establish either express or implied preemption.

Federal courts recognize several ways a state law can be preempted by federal law: the express language of the federal statute may preempt state laws (express preemption), or preemption may be implied. *Pharm. Rsch. & Mfrs. Ass'n of Am. v. McClain*, 95 F.4th 1136, 1140 (8th Cir. 2024). A court may find preemption is implied either (1) where federal regulation dominantly occupies a field of subject matter (field preemption); or (2) where there is a conflict between state and federal law, either because (a) a state law poses an obstacle to the accomplishment of the full purposes and objectives of Congress (obstacle preemption) or (b) where compliance with both federal and state regulations is impossible (impossibility preemption). *Id.* at 1140. None of these types of preemption apply.

### a.     The Commodity Exchange Act does not expressly preempt Minnesota's Prediction Market Statute.

Congress knows how to expressly preempt state law and has enacted many federal statutes that unequivocally announce their clear intention to do so. The Commodities Exchange Act contains a separate set of provisions expressly setting forth narrow preemption of state laws against certain excluded or exempted transactions (*see* 7 U.S.C. § 16(e)(2)) which would be superfluous if Congress had intended the general "exclusive

jurisdiction" language to cover all state laws. When Congress adopted the Dodd-Frank amendments to the Commodities Exchange Act in 2010, they introduced additional express preemption sections: Congress directed that "swaps" should not be considered "insurance" and therefore could not be regulated as an insurance contract by state law. 7 U.S.C. under § 16(h). Congress also added banking regulations that included an express preemption clause regarding state consumer financial laws. *See* 12 U.S.C. § 25b(b). That provision, which expressly uses the phrase "preemption," explains that state consumer financial laws are preempted by the banking regulations "only if" certain conditions are met (such as a discriminatory effect on national banks, or interference with the national bank's exercise of powers.) *Id.*

In contrast, when Congress has adopted amendments to the Commodity Exchange Act, they did not include clear language defining when and how it should be ready to preempt state laws related to gambling. Instead, the 1974 amendments (which introduced the "exclusive jurisdiction" language Plaintiffs rely on) also included, within the same paragraph, a clause preserving parallel authorities arising under both federal and state laws:

> …except as hereinabove provided, nothing contained in this section shall (i) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (ii) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws. Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State.[57]

---

[57] Public Law 93-463, Title II, § 201 (full text of 1974 legislation available at https://perma.cc/BPK4-928E) is now codified at 7 U.S.C. § 6b-1

The legislative history also clarifies what Congress' intention was in granting "exclusive jurisdiction" over Designated Contract Markets to the newly-created CFTC. Before the amendments, the Secretary of Agriculture exerted significant control over commodities futures trading, and as the commodity market changed to include intangible products which could, arguably, fall under the SEC's jurisdiction, the potential for federal regulatory overlap was high. One proponent of the 1974 amendments explained, "[This language]…would prevent jurisdictional conflicts which might arise from the establishment of trading in commodities or instruments over which some other Federal agency might feel it had authority."[58] The Supreme Court seems to have embraced this interpretation, noting that this exclusive-jurisdiction provision was "intended only to consolidate federal regulation of commodity futures trading in the [CFTC]" and to "separate the functions of the [CFTC] from those of the [SEC] and other regulatory agencies." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386–87 (1982).[59]

---

[58] Hearings Before the Subcomm. on Special Small Business Problems of the House Permanent Select Comm. on Small Business, 93d Cong., 1st Sess. 145-55 (1973) at 141-142 (emphasis added.)

[59] The "exclusive jurisdiction" language has failed to fully prevent confusion and jurisdictional disputes because it still requires a highly fact-intensive inquiry into whether a particular transaction involves a commodity or a security. *See, e.g., Chi. Mercantile Exch. v. SEC*, 883 F.2d 537, 545 (7th Cir. 1989) (summarizing history of conflicts between CFTC and SEC jurisdiction.) But if anything, those cases reinforce the notion that the "exclusive jurisdiction" language was a response to the perceived risk of dueling federal agencies, rather than an express preemption of state law.

In 1982, additional amendments were enacted via the Futures Trading Act of 1982, Pub. L. No. 97-444, 96 Stat. 2294, § 229 (1982). These amendments introduced additional preemption guidance in provisions which are now codified within 7 U.S.C § 16. Neither these 1982 amendments, nor the 2010 Dodd-Frank amendments, expressly preempt state gambling regulations.

       **b.**       **The Minnesota Prediction Market Statute is neither field nor conflict preempted by the Commodities Exchange Act.**

"Field preemption occurs when federal law occupies a 'field' of regulation so comprehensively that it has left no room for supplementary state legislation." *WinRed, Inc. v. Ellison*, 59 F.4th 934, 945 (8th Cir. 2023) (citations omitted.) The Supreme Court has noted that it is a "rare" case where Congress has "implicitly ousted the States from regulating in a particular field." Conflict pre-emption exists where "compliance with both state and federal law is impossible," or where "the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Pharm. Rsch. & Mfrs. of Am. v. McClain,* 95 F.4th 1136, 1140 (8th Cir. 2024). Neither field nor conflict preemption applies here.

First, contrary to Plaintiffs' position, the appropriate "field" at issue here is the field of regulating betting and wagering (which historically belongs to the states), *not* the field of regulating commodities futures and swaps. Even if this Court adopts a definition of "swap" so broad as to include various forms of betting and wagering, that does not end the inquiry, because even where a field is subject to federal regulation (and in fact, even in some instances when express preemption has been written into a federal statute) courts have rejected preemption arguments aimed at generally applicable state laws.

For example: even though ERISA is a federal statute with an express preemption clause, federal courts have upheld state laws of general applicability that burden the employee benefit plans falling under ERISA (such as state laws involving garnishment, severance pay, and taxes). *See Boyle v. Anderson,* 68 F.3d 1093, 1099 (8th Cir. 1995) (collecting cases.) Similarly, even though Congress included express preemption language in the Federal Election Campaign Act (FECA) and created an administrative agency to oversee federal elections (the Federal Election Commission), the Eighth Circuit has ruled that FECA does not preempt Missouri's statute prohibiting police officers from donating to federal campaigns, or Minnesota consumer protection statute restricting deceptive practices. *Reeder v. Kansas City Bd. Of Police Com'rs,* 733 F.2d 543 (8th Cir. 1984); *WinRed, Inc. v. Ellison,* 59 F.4th 934 (8th Cir. 2023). In the latter context, the Court noted the absurdity of the alternative reading of FECA preemption urged by the plaintiff: "A [political action committee] "engag[ing] in federal fundraising-related activity" cannot remove it from all state regulation. That position would permit "requesting" donations at gunpoint—so long as the money went to a federal election—because FECA does not prohibit assault." *Id.* at 943.

Here, the Minnesota Prediction Market Statute is a generally applicable criminal law aimed at preventing predatory gambling practices within the state. That prohibition applies to the same predatory practices whether a local bar, a social media website, or a private individual launches their own prediction market system, or if the prediction market system is operated by a Designated Contract Market registered with the CFTC.

48

The alternative holding invites circular absurdity. If the types of transactions within the scope of the Minnesota Prediction Market statute are all CFTC-regulated "swaps," then every person or company that allows any such transactions is a "swap dealer" that must register with the CFTC.[60] In addition to sports betting apps which have previously been banned within the state, countless new "swap dealers" could launch websites or apps throughout the state of Minnesota, soliciting wagers on little league games, local elections, and the local music scene. Bars and restaurants could install "prediction market" terminals running their own local systems. All would be required to register with the CFTC, and the State of Minnesota could do nothing to curtail them, even if they openly facilitated wagers which the CFTC deemed contrary to public interest. The State would be at the mercy of a small, understaffed federal agency to decide whether it was worth its time to take enforcement action against swap dealers who, from a federal perspective, may be of little import, but as a public local nuisance could become ubiquitous. Nor could the states enforce any gambling rules against them. According to Plaintiffs, if a Designated Contract Market allows users to bid on wagers with virtual roulette wheels allowing a "yes" or "no" on whether a spin taking place at noon will land on "red," it would be exclusively up to the CFTC to decide whether that were permissible or not, and what enforcement action to take, if any. Any gambling, no matter the nature, would fall outside states' authority to regulate.

---

[60] Already, sports betting apps have anticipated this sea change and sought CFTC registration. For instance, DraftKings registered with the CFTC in December 2025. FanDuel's prediction market platform sought CFTC registration, and went live in December 2025. Both FanDuel and DraftKings have been prohibited from allowing real-money bets in Minnesota because the state has not legalized online sports betting.

This would be an absurd abandonment of the long-standing recognition that States hold a sovereign interest in regulating gambling within their jurisdictions.

But the preemption argument is not only troubling in the traditional gambling context. Taken to its logical extreme, Plaintiffs' preemption argument seems to be that even if Kalshi or Polymarket began falsely advertising their wagering as "100% guaranteed to make you a millionaire by Christmas," no state could enforce their consumer protection laws against the platforms, and it would be solely up to the CFTC to decide whether or not to restrict the consumer deception. Plaintiffs may insist that their own internal policies and CFTC's regulatory oversight will be sufficient to curtail bad behavior, but the logical extension of their "exclusive jurisdiction" field preemption position is that *none* of Minnesota's generally applicable laws can reach them.

Nor is conflict preemption an actual issue here. For as much as Kalshi and Polymarket insist it would be "impossible to comply with both state and federal law," the federal law merely sets minimum standards and registration procedures for transactions to be permissible on Designated Contract Markets. Nothing in the Commodities Exchange Act creates an affirmative right or obligation by Polymarket or Kalshi to engage in every type of wager they can dream up. Plaintiffs could easily satisfy federal requirements set forth under the Commodities Exchange Act without hosting sports betting, pop culture event betting, or other wagers prohibited under the Minnesota Prediction Market Statute. They simply do not want to, because facilitating gambling is wildly profitable. Nor is the overall purpose of the Commodities Exchange Act (protecting the public interest and ensuring financial and commodity market stability) thwarted by the Minnesota Prediction

50

Market Statute, which, if anything, supports the overall public interest in financial stability by limiting predatory gambling apps from preying on their user base.

## II.    PLAINTIFFS KALSHI AND POLYMARKET ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR 1ST AMENDMENT CLAIMS.

Kalshi and Polymarket are similarly unlikely to prevail on their First Amendment claims regarding the Minnesota Prediction Market Statute's advertising provisions. The Constitution "accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *1-800-411-Pain Referral Serv., LLC v. Otto*, 744 F.3d 1045, 1054 (8th Cir. 2014) (collecting cases.) Courts have recognized a legitimate governmental interest in protecting consumers from commercial harms, and accordingly, permit a greater degree of governmental regulation on commercial speech than noncommercial speech. *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 426 (1993).

Offers to engage in illegal transactions are "categorically excluded from First Amendment protection." *United States v. Williams*, 553 U.S. 285, 297 (2008) (citing *Pittsburgh Press Co. v. Hum. Rels. Comm'n*, 413 U.S. 376, 388 (1973) (upholding the right for the government to prohibit a newspaper from printing job advertisements in sex-designated columns, as sex discrimination was prohibited by city ordinance)).

In fact, the United States Supreme Court has specifically rejected a First Amendment challenge brought by a radio station challenging a statute which prohibited the station from broadcasting advertising for lotteries in states where lotteries are not legal under state law. *United States v. Edge Broad. Co.*, 509 U.S. 418, 421-35 (1993). In upholding the statute, the Supreme Court noted that, "the activity underlying the relevant

51

advertising—gambling—implicates no constitutionally protected right; rather, it falls into a category of 'vice' activity that could be, and frequently has been, banned altogether." *Id.* at 426. The Court also gave credit to the logical relationship between restricting advertising, and reducing demand for the regulated activity: "Within the bounds of the general protection provided by the Constitution to commercial speech, we allow room for legislative judgments . . . Here . . . the Government obviously legislated on the premise that the advertising of gambling serves to increase the demand for the advertised product." *Id.* at 434 (additional citations omitted).

The same is true here. Because governments may lawfully restrict commercial speech advertising illegal activity or otherwise regulated vice activities, Plaintiffs are not likely to prevail on their First Amendment claims. *See also Casbah, Inc. v. Thone*, 651 F.2d 551, 563-64 (8th Cir. 1981) (upholding Nebraska statute banning advertisements that promoted the sale of objects designed or intended for use as drug paraphernalia because advertising promoting the sale of drug paraphernalia encourages criminal activities.)[61]

---

[61] Rulings from other courts, though not binding, support this analysis. *W. Va. Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 300 (4th Cir. 2009) (upholding West Virginia's restrictions related to video lottery advertising); *see also Cocroft v. Graham,* 122 F.4th 176, 177-84 (5th Cir. 2024), cert. denied, 145 S. Ct. 2682 (2025) (upholding Mississippi's near-total restriction on the advertising of medical marijuana because federal law criminalizes medical marijuana in every state); *Coyote Pub., Inc. v. Miller*, 598 F.3d 592, 609-11 (9th Cir. 2010) (upholding Nevada's prohibition on advertising brothel services); *Fla. Businessmen for Free Enter. v. City of Hollywood*, 673 F.2d 1213, 1217 (11th Cir. 1982) (upholding Florida's restriction on advertisements that promote the sale of drug paraphernalia); *First Glob. Commc'ns, Inc. v. Bond*, (Footnote Continued on Next Page)

Kalshi or Polymarket cannot separately prevail on claims asserting the First Amendment rights of third parties who may be restricted by the Minnesota Prediction Market Statute, because they lack standing to assert those claims, and they cannot establish that any obstacles will hinder third parties' abilities to bring their own challenges if they believe their rights have been unduly abridged. As a general rule, a plaintiff may only assert his own injury in fact and "cannot rest his claim to relief on the legal rights or interests of third parties." *Hodak v. City of St. Peters*, 535 F.3d 899, 904 (8th Cir. 2008) (citing *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975)).

### III.   PLAINTIFFS HAVE NOT ESTABLISHED IRREPARABLE HARM.

To get a preliminary injunction, a plaintiff must demonstrate irreparable harm. *Hotchkiss*, 115 F.4th at 893. To establish irreparable harm, "a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 78 F.4th 1011, 1017 (8th Cir. 2023) (internal quotation marks omitted). The mere possibility of harm is insufficient; the asserted harm must be likely to occur without an injunction. *Id.* Lack of irreparable harm, standing alone, "is a sufficient ground to deny a preliminary injunction." *Ng*, 64 F.4th at 997 (internal quotation marks omitted).

For the reasons already addressed above, CFTC lacks standing to claim any injury is imminently threatening its federal interests. As for Kalshi and Polymarket, their claims to irreparable harm fall short of their burden.

---

413 F. Supp. 2d 1150, 1155 (W.D. Wash. 2006) (declining to issue preliminary injunction to prevent enforcement of Washington law that prohibits advancing prostitution).

First, their argument that they may lose their CTFC registration if they cannot uniformly offer gambling transactions to customers in all states with "impartial access" is disingenuous and unsupported by the record. CFTC has invested substantial resources advocating on behalf of these companies, and there is nothing before the Court indicating the CFTC intends to rescind designations if the companies lose any particular lawsuit. Moreover, Polymarket and Kalshi are already subject to injunctions limiting or preventing operations in Nevada, and active enforcement actions elsewhere,[62] and their designations remain intact.

Nor can Kalshi or Polymarket claim irreparable harm based on customers in other states' inability to bet against customers in Minnesota, or vague blows to "goodwill" associated with ceasing operations in Minnesota—those harms are far too speculative and belong, at most, to third parties.[63]

The only remaining harms asserted by Plaintiffs are financial costs associated with complying with Minnesota law. Polymarket has submitted a declaration from its CEO asserting an undefined scope of potential "lost profits" associated with ceasing operations in Minnesota, and an undefined risk of reduced liquidity on the platform. (Case No. 26-CV-2841, Dkt. 23.) Kalshi's declaration claims, without factual support, that it "may be" unable to compensate Minnesota traders for cancelled trades (without acknowledging that

---

[62] *See* Middlecamp Decl., Ex. 1.

[63] The separate argument—that Polymarket and Kalshi will suffer loss of goodwill if they are accused of committing a felony, is a harm that is completely avoidable if they comply with Minnesota's Prediction Market Statute.

54

Kalshi is contributing to this potential harm by continuing to allow, and even encourage, Minnesota users to enter into new bids on the platform every day, despite having notice of the August 1, 2026 enforcement date.)

Neither Kalshi nor Polymarket attempt to put a dollar figure on these speculative losses. But even if they did, harms that are economic in nature are generally not irreparable, even if Minnesota would be protected by sovereign immunity from subsequent claims for damages. Federal courts have cautioned against treating monetary damages as "irreparable" where sovereign immunity protects State defendants because it "stretches too far" and would "effectively eliminate the irreparable harm requirement." *Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012); *Coal. for Common Sense in Gov't Procurement v. United States*, 576 F. Supp. 2d 162, 169–70 n.3 (D.D.C. 2008). Instead, in the context of sovereign immunity, "the wiser formula" is that economic harm may constitute irreparable injury only if the moving party makes a strong showing that the economic loss is "significant." *Air Transp. Ass'n of Am.*, 840 F. Supp. 2d at 335–36. "Significant" means demonstrating "extreme hardship" or the "threaten[ed] destruction" of the business. *Id.* at 336. The moving party must also "adequately describe and quantify" the economic harm. *Id.*

Here, neither Polymarket nor Kalshi have done so. Nor can they: Kalshi and Polymarket both boast global reach and billions of dollars in trading volume. They are already banned in 30 countries and subject to enforcement actions in several states but still enjoy enormous profits. Courts have recognized that where a party fails to explain how a statute or rule change will impact their overall business model in a way that is particularly

55

severe, a district court does not abuse its discretion in denying a preliminary injunction. *See Morehouse Enters.*, 78 F.4th at 1018 (referring to the plaintiff businesses' failure to allege business model impacts requiring store closures as falling short of a showing of irreparable harm); *see also Coal. for Common Sense*, 576 F. Supp. 2d at 169–70, n.3 (concluding that lost profits for "two of the largest pharmaceutical companies in the world" that were not recoverable due to sovereign immunity did not constitute irreparable harm even "under the most charitable of standards").

## IV.   THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST DO NOT FAVOR AN INJUNCTION.

The third and fourth factors—balance of harms and public interest—merge when the government is the non-movant. *Morehouse Enters.*, 78 F.4th at 1018. When applying the balance-of-harms factor, "the key question is whether the movant's likely harm without a preliminary injunction exceeds the nonmovant's likely harm with a preliminary injunction in place." *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1347 (8th Cir. 2024). The purpose is not to determine the parties' rights, "but to balance the equities as the litigation moves forward." *Id.* (internal quotation marks omitted).

Here, the balance of equities and public interest weigh against an injunction. The public interest is "served by maintaining the ability to enforce the law adopted by the Minnesota Legislature." *Carson v. Simon*, 978 F.3d 1051, 1061 (8th Cir. 2020); *see also Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 191 (2022) (states have legitimate interest in enforcement of their own statutes). Particularly here, where the statute seeks to protect the state against predatory gambling practices that are already becoming ubiquitous and causing concerns among addiction professionals, the state's regulatory interest is far

56

higher than Plaintiffs' profit-driven interests. The Minnesota Legislature enacted a law because it was concerned that teenagers and adults alike may quickly become addicted to phone-based gambling platforms, while lawmakers, athletes, and other public figures may alter their own behaviors to meet perverse incentives undermining the integrity of basic institutions. Other states are entitled to reach different conclusions about the best way to regulate these types of harms, but the question of how and whether to regulate them goes to the heart of states' sovereign police powers. With pure financial frustrations on the one hand, and public safety and welfare on the other, the equities and public interest clearly weigh against an injunction.

## CONCLUSION

Plaintiffs have not met their burden to show they are entitled to an injunction that would block the State of Minnesota from implementing legislation it has a sovereign right to enact and enforce. The Court should deny Plaintiffs' motions for preliminary injunction.

Dated: June 18, 2026

Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota

*s/ Lindsey E. Middlecamp*
Lindsey E. Middlecamp (#0325089)
Special Counsel for the Rule of Law
ELIZABETH JOHNSTON (#0344722)
CORINNE WRIGHT (#0390353)
Assistant Attorneys General

445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2125
(651) 757-1010 (Voice)

*Attorneys for State Defendants*

57