**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

**UNITED STATES OF AMERICA and**
**COMMODITY FUTURES TRADING COMMISSION,**

Plaintiffs,

v.

**STATE OF MINNESOTA, et al.,**

Defendants.

Case No. 0:26-cv-02661-KMM-DTS

RECEIVED BY MAIL

AUG 0 5 2026

CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

---

**KALSHIEX LLC,**

Plaintiff,

v.

**KEITH ELLISON, in his official capacity as**
**Attorney General of Minnesota, et al.,**

Defendants.

Case No. 0:26-cv-02778-KMM-DTS

---

**QCX LLC, doing business as POLYMARKET US,**

Plaintiff,

v.

**KEITH ELLISON, in his official capacity as**
**Attorney General of Minnesota, et al.,**

Defendants.

SCANNED

AUG 0 5 2026

U.S. DISTRICT COURT MPLS

1

Case No. 0:26-cv-02841-KMM-DTS

**BRIEF OF BRANDON M. HAYES, PRESIDENT OF THE NATURAL LAW INSTITUTE, AS AMICUS CURIAE ADDRESSING THE THRESHOLD TRANSACTIONAL CLASSIFICATION GOVERNING FEDERAL PREEMPTION**

## INTRODUCTION

These related cases arrive before the Court as a dispute over regulatory authority. Plaintiffs contend that the Commodity Exchange Act assigns the Commodity Futures Trading Commission exclusive jurisdiction over the transactions offered through KalshiEX LLC and QCX LLC, doing business as Polymarket US. Minnesota maintains that the transactions prohibited by its Prediction Market Statute constitute wagers falling within the State's historic authority to regulate gambling, preserve public integrity, and protect its residents.

Each position rests upon a valid principle within its lawful domain. Congress has established exclusive federal authority over transactions properly governed by the Commodity Exchange Act. States retain substantial authority over gambling, public welfare, institutional integrity, and transactions falling outside the federally occupied field.

**The conflict cannot be resolved coherently until the transactions themselves are properly classified.**

Federal exclusivity governs transactions Congress placed within the Commodity Exchange Act. It does not establish that every transaction listed on a federally registered exchange belongs within that field. Nor does registration of an exchange answer whether each listed instrument possesses the statutory character necessary to trigger exclusive federal jurisdiction. The Court must first determine what the transaction is, what financial relation precedes it, what exposure it transfers, and from what cognizable economic object its asserted derivative character is derived.

The contracts at issue may not all operate in the same manner. Some event-linked instruments may transfer, offset, price, or manage an antecedent financial, commercial, or economic exposure. Others permit members of the public to create new monetary exposure to independently occurring events—such as elections, sporting contests, judicial proceedings, governmental decisions, public statements, military conflicts, catastrophes, deaths, awards, or cultural occurrences—without requiring ownership of affected property, operation of an exposed business, an existing obligation, or any independently compensable loss connected to the event.

The distinction between those transaction classes is dispositive.

2

A transaction that transfers or manages an existing economic risk may operate as a derivative. A transaction that creates the participant's risk solely so that money may be redistributed according to an external outcome operates as an outcome-contingent wager. Calling the transaction an "event contract," displaying a changing price, clearing it through an exchange, or generating an implied probability does not alone determine its operative legal character.

The Commodity Exchange Act itself supplies the relevant boundary. Its definition of "swap" reaches an agreement under which payment depends upon an event or contingency "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). The statutory inquiry therefore requires identification of a qualifying consequence associated with the referenced event, rather than reliance solely upon the monetary position created by the transaction.

As this Court has already recognized, it is insufficient that an event acquires a financial consequence merely because traders decide to place money upon it. *Order on Plaintiffs' Motions for Preliminary Injunction* at 27, ECF No. 48, Case No. 0:26-cv-02841-KMM-DTS.

That statutory limitation prevents the definition of "swap" from becoming self-generating. Without it, any worldly occurrence could be transformed into a federally regulated derivative through the act of placing opposing monetary positions upon it. The transaction would create the financial consequence needed to establish its own legal classification; that classification would confer exclusive federal jurisdiction; and the resulting jurisdiction would foreclose state inquiry into whether the transaction fell within the federal category in the first instance.

That sequence presents a problem of circular classification.

The consequences extend beyond statutory semantics. Markets that reward participants according to independently occurring public outcomes can create a structural convergence among prediction, wagering, and influence. A trader may possess information about the event, authority over the event, access to persons controlling the event, or the practical ability to alter the event. As the potential return rises, the transaction may create an increasing incentive to move from predicting the outcome to influencing it.

A market cannot be assessed solely as a neutral measure of future probability where participants may profit by making their purchased outcome occur. Prices may reflect collective expectation, but they may also reflect undisclosed control, planned intervention, insider access, strategic misinformation, coordinated activity, settlement manipulation, or confidence that another actor will alter the event. In such circumstances, the market no longer observes uncertainty entirely from outside. It enters the causal field it claims to measure.

Minnesota's statute addresses categories in which those concerns may be especially pronounced, including sports, elections, governmental decisions, legal proceedings, war, terrorism,

public-health crises, disasters, death, statements by identifiable persons, and other events concerning natural persons and public institutions. Minn. Stat. § 609.7615, subd. 1(e).

Plaintiffs, however, correctly emphasize that event-linked contracts may also serve legitimate financial, commercial, informational, or risk-management functions and that Congress established a nationally uniform regulatory system for transactions falling within the Commodity Exchange Act.

The Court therefore need not adopt either party's complete theory to resolve the statutory boundary. It may preserve federal exclusivity over qualifying event derivatives while preserving state authority over transactions whose financial exposure originates solely through the wager.

The Court's preliminary order did not finally resolve that boundary. It found that Plaintiffs had demonstrated likely success "at least in part," while acknowledging that some limiting connection must exist between the referenced event and a potential financial, economic, or commercial consequence. The Court further preserved the historical and interpretive questions for final adjudication.

That remaining inquiry should begin at origination.

Before determining which sovereign possesses authority over a challenged transaction, the Court should determine whether the transaction entered the federally occupied field and, if so, by what legally cognizable derivation.

---

## INTEREST OF AMICUS CURIAE

Brandon M. Hayes is President of the Natural Law Institute, an independent institution devoted to the study and development of lawful adjudicative architecture, institutional classification, public-interest resolution, and coherent relationships among individual rights, governmental authority, market structure, and public obligation.

Mr. Hayes submits this brief in his personal capacity and identifies his institutional position to disclose the perspective from which the analysis is offered. The Natural Law Institute is not a party to these proceedings. Mr. Hayes has no financial interest in KalshiEX LLC, QCX LLC, Polymarket US, any competing wagering platform, or the outcome of the transactions at issue.

Amicus supports neither party's complete regulatory position.

Amicus recognizes the federal interest in preserving a uniform national system governing transactions Congress placed within the Commodity Exchange Act. Amicus also recognizes the

States' historic authority over gambling, public welfare, institutional integrity, and transactions falling outside the federally occupied field.

Amicus's interest arises from the structural question preceding those competing claims of authority: whether federal exclusivity may be determined before the Court identifies the legal character of the transaction asserted to trigger that exclusivity.

The parties have substantially developed the dispute over federal preemption, the breadth of the Commodity Exchange Act's definition of "swap," the CFTC's authority over designated contract markets, and Minnesota's historic authority over gambling. Amicus offers a distinct analytical framework directed to the antecedent transaction.

That framework distinguishes between:

1. an instrument that transfers, offsets, prices, manages, or allocates a financial, economic, or commercial exposure existing independently of the instrument; and
2. an instrument that creates the participant's financial exposure through the purchase of a monetary position on an independently occurring event.

The distinction supplies a limiting principle for the statutory phrase "associated with a potential financial, economic, or commercial consequence." It preserves federal authority over legitimate commodity and commercial derivatives, preserves state authority over outcome-contingent wagering outside the federal field, and prevents the legal category of "swap" from becoming limitless or self-validating.

Amicus does not contend that every event-linked contract is a wager or that every prediction-market product falls outside the Commodity Exchange Act. Some event contracts may possess a direct and cognizable relationship to antecedent financial, economic, or commercial exposure. Others may create the participant's entire financial stake through the transaction itself.

The Court can preserve both lawful categories by adopting a threshold classification that examines:

- whether a qualifying exposure existed independently of the agreement;
- whether the agreement transfers, offsets, prices, manages, or allocates that exposure;
- whether the participant could suffer economic loss apart from the agreement;
- and whether the transaction instead creates a new monetary stake in an otherwise independent event.

Amicus also addresses the public-integrity consequences of markets whose participants may possess the means, information, authority, or access capable of altering the events upon which their financial returns depend. That inquiry bears upon the legal classification of the transactions, the proper scope of the CFTC's jurisdiction, Congress's special rule for gaming and other

5

sensitive event contracts, Minnesota's exercise of its police powers, and the limiting construction necessary to preserve each sovereign's lawful domain.

The proposed framework does not require the Court to accept Plaintiffs' claim of categorical federal occupation or Minnesota's characterization of every covered transaction as gambling. It instead supplies a method for distinguishing federally cognizable event derivatives from outcome-contingent wagers according to the originating financial relation and the operative function of the contract.

No party or party's counsel authored this brief in whole or in part. No party, party's counsel, or person other than amicus contributed money intended to fund the preparation or submission of this brief.

---

## QUESTIONS PRESENTED

**1.**

Whether an agreement qualifies as a "swap" under 7 U.S.C. § 1a(47)(A)(ii) when the referenced event has no financial, economic, or commercial consequence for the participant independent of the monetary exposure created by the agreement itself.

**2.**

Whether listing an outcome-contingent wager on a CFTC-registered designated contract market can establish the transaction's derivative character and thereby generate the exclusive federal jurisdiction asserted to preempt state examination of that same classification.

**3.**

Whether contracts offered indiscriminately to persons lacking antecedent economic exposure are properly classified as derivatives merely because they aggregate information, display implied probabilities, or employ the mechanics and terminology of an exchange.

**4.**

Whether Congress clearly displaced state authority over wagers concerning elections, sports, governmental acts, legal proceedings, war, terrorism, public-health crises, death, personal conduct, and other public events where the wagering transaction itself creates the participant's financial stake.

**5.**

Whether the public-interest analysis must account for the structural incentive created when a person may both purchase a position concerning an external outcome and possess information, influence, authority, or practical means capable of altering that outcome.

---

## SUMMARY OF ARGUMENT

### I. Preemption cannot precede classification.

Plaintiffs' preemption theory depends upon a premise that remains contested: that the transactions prohibited by Minnesota are "swaps" within the meaning of the Commodity Exchange Act. The CFTC possesses exclusive jurisdiction over transactions Congress lawfully assigned to it. Exclusive jurisdiction does not eliminate the Court's duty to determine whether the asserted transaction falls within the statutory class.

A designated contract market is a regulated forum. It is not a legislative body capable of converting every transaction it lists into a commodity derivative. CFTC oversight likewise cannot supply a statutory element that the transaction itself lacks. The legal character of the instrument establishes jurisdiction; jurisdiction cannot be used to manufacture the instrument's legal character.

The contrary approach produces an impermissible circle: the exchange labels the wager an event contract; the transaction is listed on a federally registered exchange; the listing is invoked to establish CFTC exclusivity; and that exclusivity is then invoked to prevent the State from contesting whether the transaction was a federally cognizable derivative at all.

The Supremacy Clause resolves conflicts between valid federal and state law. It does not confer upon a regulated exchange the power to define the boundary of the field that federal law occupies.

### II. The statutory definition requires an antecedent financial, economic, or commercial consequence.

Section 1a(47)(A)(ii) does not extend to every agreement whose payment depends upon every conceivable event. It reaches an agreement dependent upon an event "associated with a potential financial, economic, or commercial consequence."

Every part of that limiting language must perform work.

The required consequence must arise from the referenced event, not merely from the bettor's decision to stake money on its occurrence. Otherwise, the agreement creates the consequence that supposedly brings the agreement within the statute. Any occurrence—however personal,

political, tragic, trivial, or remote—would become a swap once two persons placed money on opposite sides of it.

This Court has already rejected that unlimited construction in principle. The preliminary order explains that "there must be a limit," that remote connections are insufficient, and that "it cannot be enough that any event has a potential financial consequence simply because people decide to make trades predicting the outcome." *Order* at 26–27. The remaining task is to state the limit in administrable form.

The appropriate limiting principle is an **antecedent-exposure nexus**:

> An event-linked agreement possesses derivative character where it transfers, offsets, prices, or manages a cognizable financial, economic, or commercial exposure existing independently of the agreement. Where the agreement creates the participant's exposure and resolves solely through contingent monetary redistribution according to an external event, the transaction is an outcome-contingent wager.

That construction honors the text, prevents statutory self-generation, preserves legitimate hedging, and supplies the boundary the preliminary order recognized as necessary.

### III. The challenged transactions commonly originate risk rather than transfer it.

A conventional derivative begins with an existing relation: ownership of a commodity, exposure to a price movement, a debt obligation, an interest-rate risk, a currency risk, a supply commitment, an insurable interest, or another commercial contingency capable of causing economic loss. The derivative modifies the allocation of that antecedent risk.

An unrestricted prediction-market wager proceeds differently. The event exists independently. The platform selects a proposition concerning that event. A participant with no prior economic relation to it purchases a binary position. The purchase creates a new possibility of gain or loss. Settlement then redistributes money according to the external outcome.

The participant does not hedge an existing exposure. The participant buys exposure.

That mechanical difference remains true whether the position is called a contract, trade, swap, option, share, "yes" position, or "no" position. Legal taxonomy follows operative substance rather than technological presentation.

### IV. Forecasting is a possible output, not a transaction class.

Plaintiffs emphasize that prediction markets aggregate information and produce forecasts. That observation does not establish derivative character.

Sportsbooks aggregate beliefs into odds. Pari-mutuel systems generate changing implied probabilities. Insurance markets, polls, auctions, securities markets, surveys, and informal wagering pools also produce information. An activity does not change legal categories merely because its operation produces a useful informational byproduct.

The relevant question is not whether market prices communicate expectations. It is how the financial exposure arises and what legal relation the transaction performs. A wager can inform. It remains a wager where the participant stakes money on an external outcome without transferring an antecedent commercial risk.

"Price discovery" likewise cannot become a universal solvent. A market does not discover the price of an election winner, a judicial ruling, a person's death, or whether a speaker will utter a selected phrase. It assigns a tradable price to opposing claims about whether the event will occur. That is probability pricing through wagering, not price discovery concerning an underlying asset exchanged in commerce.

## V. Outcome-contingent wagering carries an endogenous integrity defect.

The contracts at issue do more than permit passive observation of uncertain events. They create financial rewards linked to specified results. In many covered categories, participants may possess information, influence, authority, access, or control relevant to those results.

The same person may therefore occupy three positions:

1. predictor;
2. financial beneficiary; and
3. causal participant.

When those positions converge, the market's incentive structure changes. A participant may profit not merely by forecasting correctly, but by helping make the purchased outcome occur. The more improbable the outcome and the greater the possible return, the stronger the incentive may become to tilt the field.

This danger is not confined to direct criminal manipulation. Influence can include selective disclosure, delayed disclosure, strategic speech, misinformation, altered attendance, administrative discretion, litigation decisions, political expenditures, personnel choices, trading in a referenced asset, manipulation of settlement data, or coordinated activity intended to affect the event.

A market claiming legitimacy as an informational instrument becomes unreliable when its participants have financial reasons to intervene in the phenomenon being measured. Its quoted probability may incorporate undisclosed plans or control rather than detached collective judgment.

9

Minnesota is entitled to address that structural risk before corruption is consummated. The police power includes preservation of the conditions that prevent foreseeable corruption, protect public institutions, and maintain confidence in elections, courts, sports, emergency administration, and governmental decision-making.

**VI. The CEA's special rule does not eliminate the threshold inquiry.**

Plaintiffs invoke 7 U.S.C. § 7a-2(c)(5)(C), under which the CFTC may determine that certain event contracts involving gaming, war, terrorism, assassination, unlawful activity, or similar activity are contrary to the public interest.

That provision demonstrates congressional awareness that event-linked agreements may implicate gambling and grave public concerns. It does not establish that every wager relating to those subjects is necessarily a swap. The special rule applies to agreements already within the statutory structure. It does not erase the antecedent requirement that the agreement satisfy the definition Congress enacted.

Reading the special rule as a jurisdiction-creating provision would invert its operation. A statute authorizing the CFTC to exclude certain qualifying contracts from designated markets would become a mechanism for drawing all wagers concerning enumerated events into federal jurisdiction first. The exception would expand the field it was designed to constrain.

Congress's recognition that a qualifying derivative may involve gaming does not mean that all gaming becomes a derivative.

**VII. The asserted interpretation would erase legally necessary market boundaries.**

If every external event possessing any foreseeable economic consequence can support a swap offered to every person, the limiting terms "financial, economic, or commercial" cease to classify anything. Elections affect markets. Court decisions affect parties. Wars affect commerce. Deaths affect estates. Public statements affect reputations. Weather affects businesses. Sports affect advertising. Cultural events affect consumer demand.

Under Plaintiffs' broadest theory, nearly every occurrence can be connected to some economic consequence somewhere. A platform could then convert the occurrence into a swap by listing positions upon it, regardless of whether the trader bears any relation to that consequence.

Such a construction collapses derivatives, insurance, wagering, forecasting, securities, information markets, and public-event speculation into one federal category. Once those distinct activities become taxonomically interchangeable, judicial scrutiny becomes increasingly difficult because the governing classification no longer identifies the transaction's actual function.

Congress legislated against established categories. The Court should preserve the distinctions that allow those categories to remain intelligible.

## VIII. Minnesota's statute supplies a lawful and administrable boundary.

Minnesota's Prediction Market Statute does not prohibit all event-linked financial instruments. Its definition excludes consequences that are themselves financial, commercial, or economic and targets wagers concerning identified categories of independent public and personal events. Minn. Stat. § 609.7615, subd. 1(e).

The statute therefore tracks the same boundary the federal definition requires: a distinction between transactions grounded in genuine economic consequence and transactions that impose money upon an event whose operative character is nonfinancial.

Minnesota has further limited criminal liability to specified commercial conduct undertaken for consideration and as part of a business. Id. subd. 2. The law addresses the organized creation and facilitation of outcome-wagering systems, rather than incidental speech or private prediction standing alone.

At minimum, that structure defeats categorical preemption. The Court can preserve federal authority over event derivatives supported by an antecedent financial, economic, or commercial nexus while permitting Minnesota to regulate naked outcome wagers falling outside that class.

## IX. The Court should adopt the antecedent-exposure nexus and narrow the injunction accordingly.

The present injunction rests upon the likelihood that at least a sizeable portion of the contracts covered by Minnesota's statute may qualify as swaps. But a finding that some covered instruments may fall within federal jurisdiction does not establish that the entire statute is preempted in every application.

The proper merits inquiry is contract-specific and categorical:

1. What event controls settlement?
2. What financial, economic, or commercial consequence arises from that event independently of the challenged transaction?
3. Whose antecedent exposure is transferred, offset, priced, or managed?
4. Does the transaction alter an existing allocation of risk, or create a new risk solely through the wager?
5. Does the participant possess an interest related to the event apart from the prospect of winning the contract?

6. Does the instrument perform a commercial risk-management function, or contingent redistribution based upon an external outcome?

Applying those questions preserves every legitimate federal interest Plaintiffs identify. It also preserves the State's authority over transactions Congress did not clearly place within the exclusive federal field.

The Court should therefore reject any theory of categorical preemption that rests merely upon exchange registration, contract nomenclature, or the existence of some economic consequence somewhere in the world. It should hold that an event-linked instrument qualifies for federal derivative treatment only where the referenced event bears a legally cognizable connection to an antecedent financial, economic, or commercial exposure that the agreement transfers, offsets, prices, or manages.

Where the agreement itself creates the trader's stake in an otherwise independent worldly outcome, the transaction remains what its mechanics reveal:

**an outcome-contingent wager.**

## PROPOSED CORE HOLDING

For purposes of keeping the requested disposition visible from the beginning, the brief is building toward this rule:

> **An agreement does not qualify as a swap under 7 U.S.C. § 1a(47)(A)(ii) merely because payment depends upon an event that may have some financial, economic, or commercial consequence for some person. The asserted consequence must exist independently of the agreement and bear a cognizable relation to the exposure transferred, offset, priced, or managed by the transaction. Where the agreement creates the participant's financial exposure solely through a monetary position on an independently occurring event, the transaction is not transformed into a swap by its listing on a designated contract market.**

## ARGUMENT

# I. PREEMPTION CANNOT BE DETERMINED UNTIL THE COURT CLASSIFIES THE TRANSACTION THAT SUPPOSEDLY TRIGGERS EXCLUSIVE FEDERAL JURISDICTION

## A. Federal exclusivity attaches to transactions Congress placed within the Commodity Exchange Act; it does not determine which transactions belong there.

Plaintiffs begin with the Commodity Futures Trading Commission's exclusive jurisdiction over designated contract markets and proceed directly to preemption. That sequence omits the threshold issue upon which federal exclusivity depends.

The Commodity Exchange Act grants the Commission exclusive jurisdiction over specified transactions and market activity. See 7 U.S.C. § 2(a)(1)(A). It does not grant registered entities authority to enlarge the statutory categories Congress defined. A designated contract market remains subject to the Act precisely because its products must possess the legal characteristics required by the Act. Registration regulates the forum. It does not convert every agreement admitted to that forum into a federally cognizable derivative.

The distinction is elemental:

> The governing statute classifies the transaction; the exchange does not classify the statute.

Plaintiffs' contrary theory begins with the place of listing rather than the substance of the instrument. Because Kalshi and Polymarket operate through federally regulated structures, Plaintiffs treat the transactions offered there as necessarily federal. Because those transactions are treated as federal, Plaintiffs invoke exclusivity. Because exclusivity is invoked, Minnesota is said to lack authority to examine whether the transactions are wagers.

The resulting argument presumes the conclusion it is offered to establish.

The proper sequence is:

1. determine the operative character of the transaction;
2. determine whether that transaction satisfies a category defined by Congress;
3. identify the federal authority attached to that statutory category; and
4. measure the asserted conflict between valid federal and state law.

Preemption enters at the fourth step. Plaintiffs ask the Court to begin there.

## B. A regulated platform cannot manufacture federal jurisdiction through its own product designation.

13

Plaintiffs refer to the challenged instruments as "event contracts," "prediction contracts," "swaps," and "derivatives." Those descriptions may identify technological form, industry terminology, or commercial presentation. They do not independently establish statutory coverage.

Calling an agreement a "contract" establishes that promises have been arranged. Calling it a "market" establishes that positions may be exchanged. Calling its changing price a "probability" describes one possible interpretation of the quoted price. None of those features answers whether the transaction is a swap, future, option, gaming contract, wager, insurance arrangement, security, or another legal form.

The law has long looked past labels to operative substance where classification controls jurisdiction or regulation. The question is what rights, risks, duties, and exposures the transaction actually creates and transfers.

Here, the operative sequence is straightforward:

1. the platform identifies an independently occurring event;
2. it reduces that event to one or more settlement propositions;
3. participants purchase opposing contingent positions;
4. the participants' payment rights depend upon which proposition proves true; and
5. money is redistributed according to the event's resolution.

For traders lacking any preexisting relation to the referenced event, the transaction does not transfer an antecedent exposure. It creates the exposure at the moment the position is purchased.

The platform cannot alter that sequence by adopting the vocabulary of commodities trading. Nor can registration confer upon a private exchange the practical power to decide which state-law wagers become federally immunized products.

**C. Plaintiffs' theory creates classification capture.**

Plaintiffs' preemption theory produces a closed jurisdictional loop:

- a platform selects an external event;
- the platform lists monetary positions upon that event;
- the positions are denominated "event contracts";
- federal registration is invoked as proof that the contracts belong within the Commodity Exchange Act;
- exclusive federal jurisdiction is then invoked against state regulation; and
- the State is prevented from contesting the original classification because its inquiry is characterized as interference with an exclusively federal market.

14

Under that structure, the regulated platform and its regulator jointly control the premise that establishes the regulator's exclusive authority.

This is **classification capture**.

Classification capture occurs when an entity's designation of its own product supplies the jurisdictional fact that disables competing legal examination of that designation. The category becomes self-validating. The forum determines the product; the product determines jurisdiction; and jurisdiction insulates the forum's classification from external review.

The Supremacy Clause does not produce that result. It gives controlling effect to valid federal law within its lawful scope. It does not permit a regulated entity to expand that scope by placing nonfederal transactions inside a federally regulated venue.

The Supreme Court's field-preemption cases likewise require attention to the field Congress actually occupied. Even where Congress has established pervasive federal regulation, preemption follows the scope and purpose of the enacted scheme; it does not arise from an industry's unilateral expansion of the regulated subject. See, e.g., *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230–36 (1947).

The question therefore remains anterior to exclusivity:

> Did Congress place naked monetary wagers on independently occurring worldly events within the class of federally regulated swaps?

Unless the transaction satisfies the statutory definition, there is no federal field for Minnesota's law to invade.

### D. The CFTC has historically recognized that prediction contracts present an unsettled classification problem.

The Commission's own treatment of event contracts confirms that their status cannot be resolved merely by noting that they are traded on an exchange.

In its 2008 Concept Release, the Commission described prediction or information markets as offering agreements linked to eventualities or measures that may "neither derive from, nor correlate with, market prices or broad economic or commercial measures." The Commission expressly asked whether such instruments served hedging, price-basing, or information-aggregation functions and whether those differences affected their proper regulatory treatment. Concept Release on the Appropriate Regulatory Treatment of Event Contracts, 73 Fed. Reg. 25,669, 25,669–73 (May 7, 2008).

That inquiry is incompatible with the proposition that every contract concerning an external event is self-evidently a derivative. The Commission understood that instruments designed primarily as information-aggregation vehicles may differ fundamentally from conventional instruments serving commercial risk management or price discovery.

More recent Commission materials continue to recognize the distinction between event contracts designed for information aggregation and contracts used for commercial risk management or pricing.

Plaintiffs now ask the Court to convert that unresolved distinction into a jurisdictional certainty. The Court should instead resolve the distinction that federal exclusivity presupposes.

**E. The preliminary injunction preserves rather than forecloses the threshold issue.**

The Court's preliminary order correctly recognized that the phrase "associated with a potential financial, economic, or commercial consequence" must contain a limiting principle. It further recognized that an event cannot acquire the necessary consequence merely because persons choose to place money upon it.

That conclusion carries decisive force at the merits stage.

If the bettor's self-created stake were sufficient, the statutory definition would become circular:

1. the agreement creates a possibility of gain or loss;
2. that possibility is deemed a "financial consequence";
3. the agreement therefore qualifies as a swap because of the consequence the agreement itself created.

Congress did not need the limiting phrase "associated with a potential financial, economic, or commercial consequence" to describe the monetary consequence of the agreement. Every cash-settled wager already has one. The phrase must identify a consequence attached to the referenced event independently of the wager.

The Court should make that distinction express and controlling.

## II. SECTION 1a(47)(A)(ii) REQUIRES A FINANCIAL, ECONOMIC, OR COMMERCIAL CONSEQUENCE THAT EXISTS INDEPENDENTLY OF THE AGREEMENT

**A. The statutory text distinguishes external economic consequence from self-created wagering exposure.**

The Commodity Exchange Act defines "swap," in relevant part, as an agreement, contract, or transaction:

> "that provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence."

7 U.S.C. § 1a(47)(A)(ii).

The provision contains two distinct causal relationships.

First, the purchase, sale, payment, or delivery must depend upon the occurrence or nonoccurrence of an event.

Second, that event must itself be associated with a potential financial, economic, or commercial consequence.

The first relationship describes settlement. The second describes the qualifying character of the referenced event.

Collapsing the two would render the second requirement surplusage. Every contract involving money necessarily produces a financial consequence for its parties. Congress nevertheless required that the underlying event or contingency be associated with a specified kind of consequence. The statutory object is therefore not the financial result of entering the contract; it is the financial, economic, or commercial consequence associated with the event upon which the contract depends.

The distinction can be stated plainly:

> The wager's payoff is a consequence of the agreement. The statute requires a qualifying consequence of the event.

That is the missing derivation.

**B. "Associated with" requires a real and legally cognizable relation.**

The phrase "associated with" is broad enough to accommodate varied commercial risks. It is not infinitely elastic.

Text takes meaning from its statutory neighbors. Congress did not say "associated with any consequence," "capable of attracting monetary interest," or "concerning an event upon which persons may speculate." It selected three related limiting terms: "financial, economic, or commercial."

Those terms describe consequences arising within recognizable relations of finance, production, exchange, obligation, ownership, enterprise, or commerce. They encompass, among other things:

- price changes affecting owned or expected commodities;
- interest-rate movements affecting debt;
- currency fluctuations affecting cross-border obligations;
- weather conditions affecting agricultural production;
- energy conditions affecting supply or demand;
- credit events affecting indebtedness;
- regulatory events affecting existing commercial commitments; and
- measurable contingencies affecting business operations.

The terms do not naturally describe every human occurrence merely because some observer may profit by predicting it.

An election may influence the economy in a broad sense. A judicial ruling may affect a litigant. A person's death may affect an estate. A war may alter commodity prices. A sporting event may affect advertising revenue. But those general effects do not establish that every member of the public possesses a financial, economic, or commercial exposure to the event capable of being transferred through a derivative.

A legally meaningful association must connect the referenced event to the risk or exposure the agreement purports to allocate.

### C. The relevant consequence must precede the instrument.

The statutory structure requires temporal and causal priority.

A derivative is derivative because its value, payment obligation, or risk-allocation function arises from an antecedent object or relation. The instrument may refer to:

- property;
- a commodity;
- an enterprise;
- an obligation;
- an index;
- a rate;
- a measurable commercial condition; or
- a contingency capable of affecting an existing economic interest.

The underlying relation exists before the derivative is entered. The derivative then transfers, offsets, prices, or manages consequences arising from that relation.

Where the only financial exposure begins with the purchase of the contract, the sequence is reversed. The instrument is not derived from a preexisting financial relation. The instrument manufactures a stake in an otherwise independent event.

That distinction is not defeated by cash settlement. Many lawful derivatives settle in cash. The relevant question is whether the payment corresponds to an antecedent economic exposure or whether the transaction creates the entire exposure upon which payment depends.

### D. The adjacent statutory provisions confirm that swaps concern the transfer of existing financial risk.

Section 1a(47)(A)(iii) includes agreements that exchange payments based upon specified financial or economic interests and that transfer "the financial risk associated with a future change" in the value or level of those interests. 7 U.S.C. § 1a(47)(A)(iii). Congress then listed familiar instruments such as interest-rate, currency, equity, debt, credit, weather, energy, metal, agricultural, emissions, and commodity swaps.

Those examples share a functional center: the transfer or allocation of financial risk arising from an identifiable economic object, value, rate, property interest, commercial activity, or measurable condition.

Subparagraph (ii) broadens the definition to event-dependent transactions, but it retains the same center through the requirement of a "financial, economic, or commercial consequence." The Court should not read the event clause to abandon the economic character that defines the surrounding provisions.

The inclusion of weather swaps illustrates the distinction. Weather may be a worldly event, but a farmer, utility, insurer, venue operator, transportation company, or other business may bear a direct operational exposure to rainfall, temperature, snowfall, or storms. A weather-linked contract may transfer that existing commercial risk.

The existence of legitimate weather derivatives does not establish that any person may place money on any weather occurrence and thereby enter a federally preemptive derivatives market. One instrument manages an antecedent exposure. The other creates a wager.

### E. The antecedent-exposure nexus gives the statutory limit administrable content.

The Court can preserve the breadth of the event clause without allowing it to become unlimited by adopting an antecedent-exposure nexus.

Under that construction:

> An event-dependent agreement qualifies under § 1a(47)(A)(ii) when the event bears a cognizable relation to a financial, economic, or commercial exposure existing independently of the agreement, and the agreement transfers, offsets, prices, manages, or otherwise allocates that exposure.

The nexus requires more than a generalized assertion that an event may affect someone's finances somewhere. It asks whether the transaction is functionally connected to the qualifying consequence.

Relevant considerations include:

1. whether the participant bears an existing property, contractual, operational, financial, or commercial interest affected by the event;
2. whether the agreement reduces, reallocates, or prices a risk arising from that interest;
3. whether loss could occur apart from the participant's purchase of the contract;
4. whether the settlement measure reasonably corresponds to that antecedent risk;
5. whether the instrument is designed or used for commercial risk management or price basing; and
6. whether the participant's stake consists solely of the prospect of winning or losing the amount committed to the contract.

This inquiry is familiar in substance. Insurance law distinguishes an insurable interest from a wager on loss. Hedging distinguishes offsetting exposure from naked speculation. Securities and commodities law distinguish instruments by the rights and risks they embody. The proposed nexus applies that same coherence to event-linked transactions.

**F. The nexus protects legitimate derivatives without federalizing gambling.**

The antecedent-exposure rule preserves weather, agricultural, energy, credit, and commercial contingency products that serve real risk-management functions.

A farmer may hedge against drought because drought threatens production independently of the hedge. An airline may hedge against fuel-price or operational disruption because the business bears the exposure before purchasing the contract. A manufacturer may hedge a supply interruption because the interruption creates commercial consequences apart from the instrument.

By contrast, a person with no relation to a basketball game, judicial ruling, election certification, military operation, disease outbreak, or another person's death bears no financial exposure merely because the event may occur. The person acquires one by purchasing the position.

The rule therefore draws the boundary at the point of origination:

- **antecedent exposure transferred or managed:** derivative;
- **exposure created by staking money on the outcome:** wager.

That is a legal taxonomy capable of preserving both federal commodities regulation and state gambling authority.

---

## III. UNRESTRICTED PREDICTION-MARKET CONTRACTS COMMONLY ORIGINATE CONTINGENT RISK RATHER THAN TRANSFER ANTECEDENT ECONOMIC RISK

### A. The economic substance of the transaction controls.

The challenged platforms permit participants to purchase positions whose value depends upon whether a specified proposition resolves affirmatively or negatively. The participant pays an amount for the position and receives a settlement amount if the selected outcome occurs.

For a participant lacking any independent exposure, the transaction has four operative components:

1. a monetary stake;
2. an uncertain external event;
3. a selected outcome; and
4. contingent payment according to that outcome.

Those are the mechanics of wagering.

The addition of an exchange order book, clearing system, variable contract price, market maker, or federal registration may change how the wager is organized. It does not change the relation between the participant's stake and the external outcome.

A sportsbook may display changing odds. A pari-mutuel pool may aggregate participant beliefs. A betting exchange may allow persons to trade against one another. Each can generate information and facilitate secondary transactions. The underlying activity remains outcome-contingent wagering where the participant's financial risk originates in the stake.

### B. Conventional derivatives modify a risk already present in the world of the participant.

Consider a commodity producer who expects to sell wheat after harvest. The producer already faces price risk. A futures position changes the allocation of that existing exposure.

Consider a borrower with floating-rate debt. The borrower already faces interest-rate risk. A swap changes how that risk is borne.

Consider a company obligated to pay in a foreign currency. The company already faces exchange-rate risk. A currency derivative modifies that exposure.

The derivative is secondary to the underlying relation. It neither invents the crop, debt, obligation, nor exchange-rate exposure. It operates upon them.

The position can therefore be explained in a sentence that identifies the antecedent relation:

> Because the participant bears **X exposure**, the participant enters **Y instrument** to modify the consequences of **X**.

For a naked outcome wager, no comparable sentence exists. The explanation instead becomes:

> Because the participant wishes to profit from whether **X event** occurs, the participant purchases a position that creates a possibility of gain or loss.

That is not risk transfer. It is risk origination.

## C. Naked speculation does not become hedging because a market can imagine a hypothetical exposed participant.

Plaintiffs may identify persons who could possess legitimate economic exposure to some events listed on their platforms. That does not establish that all contracts on those events, offered indiscriminately to all persons, possess derivative character.

A business may face losses depending upon an election, court decision, weather condition, or regulatory action. A tailored instrument connected to that business's exposure may serve a hedging function. But the possibility that one participant could hedge does not transform every unrelated participant's position into a hedge.

The instrument's classification must account for its design, availability, operative use, and required connection to an underlying exposure.

Where the platform:

- requires no antecedent exposure;
- verifies no commercial interest;
- calibrates no position to a potential loss;
- permits the position to exceed any plausible exposure;
- markets the instrument as an opportunity to profit from being right; and

- offers the same contract to the general public,

the platform is not merely facilitating risk transfer. It is operating a wagering market in which incidental hedging may occur.

The tail cannot classify the animal.

### D. The creation of opposing positions does not itself create an underlying economic object.

Prediction platforms may characterize the "underlying" as the event, the proposition, the settlement index, or the market's collective probability estimate.

Each description identifies a reference mechanism. None identifies an economic object from which the participant's exposure is derived.

The event exists independently of the market, but the participant ordinarily holds no ownership interest in it. The proposition is language drafted by the platform. The settlement index determines who receives payment. The quoted probability reflects the prices at which participants are willing to exchange positions.

These elements organize the wager. They do not supply the missing antecedent economic relation.

The transaction therefore should not be classified by asking whether it has something that can be called an "underlying." Nearly every contingent agreement refers to something external. The proper question is:

> What legally cognizable exposure existed before the contract, and how does the contract alter it?

Where the answer is "none," the claimed derivation terminates at the participant's desire to wager.

### E. An outcome market is not transformed into a capital market by liquidity.

Liquidity makes positions easier to enter and exit. It may make prices more responsive. It may permit intermediaries to earn fees and traders to realize gains before settlement.

Liquidity does not alter the source of the position's value.

A liquid claim on the outcome of a football game remains a claim on the outcome of a football game. A secondary market in election wagers remains a market in election wagers. Repeated trading may increase volume and produce price signals, but it does not supply a productive asset, investment interest, commodity, debt obligation, or antecedent commercial exposure.

23

Liquidity improves the circulation of the instrument. It does not determine the instrument's legal species.

**F. The challenged transactions fit the taxonomy of outcome-contingent wagering.**

The Court should describe the relevant class according to its operative elements:

> An **outcome-contingent wagering transaction** is an agreement in which a participant stakes money upon the occurrence, nonoccurrence, or degree of occurrence of an independently existing event, where the transaction itself creates the participant's financial exposure and payment is determined by resolution of the selected outcome.

This definition separates the transaction from both conventional derivatives and nonmonetary forecasting.

It does not depend upon moral disapproval. It does not depend upon whether the participant studies the event carefully, uses sophisticated models, trades repeatedly, or earns a livelihood from the activity. Professional skill does not convert wagering into capital formation, insurance, or commercial risk transfer.

The classification follows mechanics.

---

## IV. INFORMATION AGGREGATION IS AN INCIDENTAL PRODUCT OF THE WAGERING MECHANISM, NOT A SUBSTITUTE FOR STATUTORY DERIVATION

**A. A transaction's informational output does not determine its legal character.**

Plaintiffs and prediction-market advocates emphasize that market prices aggregate dispersed information and can be read as estimates of future probability. That claim addresses a possible output of the system. It does not identify the legal relation through which participants gain and lose money.

Many activities produce information incidentally.

Sportsbooks produce odds. Auctions disclose willingness to pay. Insurance premiums reflect assessments of risk. Securities prices reflect competing expectations. Polls aggregate expressed beliefs. Lotteries reveal demand for low-probability payoffs. Pari-mutuel systems continually recalculate implied probabilities from participant stakes.

The presence of information does not collapse these activities into one legal category.

A court classifying the transaction must therefore distinguish:

- **what the system communicates**, from
- **what the parties legally and economically do.**

Prediction markets may communicate collective expectations. Their participants nevertheless stake money upon external outcomes. The second fact determines the operative transaction.

**B. "Price discovery" has no coherent object where the market prices only the wager.**

Traditional price discovery concerns the exchange value of an asset, commodity, security, service, credit relation, or other economic interest. Market activity helps identify the price at which that object may be bought, sold, financed, or delivered.

An election result has no exchange price. A judicial ruling has no market price. Whether a public official will speak selected words has no commercial price. The occurrence of war, death, indictment, resignation, conviction, or a sports victory is not property transferred between traders.

The quoted contract price therefore does not discover the price of the underlying event. It prices the contingent claim created by the platform.

That distinction is material. A price assigned to a wager is not transformed into the market price of the event merely because the amount can be converted into an implied probability.

The platform creates a claim, and the market prices that claim. It does not discover the exchange value of the worldly outcome.

**C. Market prices do not necessarily represent detached probabilities.**

Even as forecasting devices, prediction-market prices require scrutiny rather than categorical acceptance.

Prices may incorporate:

- transaction costs;
- liquidity constraints;
- position limits;
- risk preferences;
- hedging demand;
- strategic trading;
- capital constraints;
- publicity-seeking trades;

25

- platform design;
- settlement uncertainty;
- manipulation; and
- unequal access to information.

Recent research examining sports prediction markets reports systematic deviations between quoted prices and realized probabilities, including time-dependent calibration effects and overpricing in parlay-type products. That evidence reinforces the narrower legal point: a contract price is a price produced by a particular market mechanism, not a self-authenticating probability.

Other recent work finds that informed forecasting and trading profitability do not automatically coincide across market structures.

The Court need not resolve the empirical accuracy of prediction markets to classify them. It need only reject the proposition that informational utility supplies the statutory financial, economic, or commercial consequence that the underlying event lacks.

**D. Forecasting can be preserved without creating a federally immunized cash-wagering market.**

Information aggregation does not require the legal conclusion Plaintiffs seek.

Institutions may conduct:

- noncash prediction tournaments;
- surveys;
- polling;
- expert elicitation;
- forecasting competitions;
- research exchanges using points or reputation;
- internal corporate forecasting systems; and
- regulated commercial hedging tied to actual exposure.

The ability to aggregate beliefs therefore does not depend upon allowing unrestricted monetary wagers on every category of public event or treating those wagers as federally preemptive derivatives.

Plaintiffs' claimed social benefit can be preserved through numerous structures. Their requested classification would additionally displace state gambling law and attach federal protection to the monetary wagering mechanism itself.

Congress must speak clearly before informational usefulness becomes a means of converting state-regulated wagering into an exclusively federal market.

## V. OUTCOME-CONTINGENT WAGERING CREATES AN ENDOGENOUS THREAT TO THE INTEGRITY OF THE EVENTS IT PURPORTS MERELY TO PREDICT

### A. The market financially joins participants to the causal field of the referenced event.

A prediction market is often described as an observational device: participants study the world, form judgments, and trade according to their beliefs.

That description assumes a separation between the observer and the event.

The contracts themselves do not preserve that separation.

A participant may be:

- an employee of an affected institution;
- a government official;
- a campaign worker;
- a contractor;
- an athlete, coach, referee, or league employee;
- an attorney, witness, litigant, court employee, or investigator;
- a physician, researcher, regulator, or public-health official;
- a member of the military or intelligence community;
- a journalist, publisher, or social-media operator;
- a corporate officer or employee;
- a family member, associate, donor, adviser, or intermediary; or
- any person capable of influencing another person whose conduct controls settlement.

Once that participant purchases a position, the market no longer merely measures the person's belief. It gives the person a financial interest in the event resolving a selected way.

The participant becomes simultaneously:

1. an observer of the event;
2. a beneficiary of one outcome; and
3. a possible cause of that outcome.

That convergence is intrinsic to the market design.

### B. The incentive to influence may increase as the predicted outcome becomes less likely.

Prediction-market pricing creates a particularly acute incentive structure.

A contract representing an outcome regarded as unlikely may be purchased cheaply relative to its settlement value. The participant's potential return may therefore increase as the market regards the selected outcome as increasingly improbable.

Where the participant possesses the means to affect the event, the structure can reward the deliberate production of surprise.

The market thereby permits a person to:

1. identify an outcome the public regards as unlikely;
2. purchase a position at a correspondingly favorable price;
3. exercise undisclosed influence over the event; and
4. profit from producing the deviation the market failed to anticipate.

This is not an accidental misuse unrelated to the product. It is a foreseeable consequence of paying persons according to whether external reality conforms to their privately held positions.

**C. Influence includes lawful-looking conduct capable of degrading institutional integrity.**

The integrity concern extends beyond bribery, match-fixing, violence, or overtly criminal acts.

A participant may influence an event through conduct that is individually difficult to classify but collectively destructive of market and institutional reliability, including:

- selectively releasing or withholding information;
- altering the timing of an announcement;
- changing attendance or participation;
- shaping public messaging;
- exercising prosecutorial or administrative discretion;
- funding advocacy directed toward the outcome;
- encouraging or discouraging voter participation;
- initiating, settling, delaying, or abandoning litigation;
- modifying internal procedures;
- coordinating public statements;
- manipulating a settlement source;
- amplifying misinformation;
- pressuring a decision-maker; or
- exploiting informal access unavailable to the market.

A legal framework confined to completed criminal manipulation arrives after the integrity injury has occurred. Minnesota may act prophylactically where the business model creates financial incentives capable of distorting public events and institutions.

**D. A market cannot serve as a neutral probability measure when prices may encode undisclosed intervention.**

Prediction-market advocates treat price movements as evidence that new information has entered the market. But a trader's willingness to purchase a position may reflect more than information about what is likely to happen.

It may reflect knowledge of what the trader intends to make happen.

The quoted price may therefore incorporate:

- private plans;
- concealed control;
- coordinated future conduct;
- insider authority;
- access to settlement mechanisms;
- strategic misinformation; or
- confidence in another participant's intervention.

The market cannot distinguish ordinary informational advantage from causal control merely by observing the trade.

That produces an epistemic defect at the center of the asserted social justification. A system claiming to reveal collective beliefs may instead reveal a mixture of beliefs, private power, and undisclosed plans to alter the event.

The market's informational and corruptive functions become inseparable.

**E. Settlement mechanisms themselves may become targets.**

Manipulation need not alter the real-world event if a participant can alter the data source, timing rule, interpretation, or administrative determination used to settle the contract.

Recent empirical work concerning short-horizon prediction contracts tied to asset prices reports settlement-time trading patterns consistent with profitable manipulation of the referenced price, with losses concentrated among liquidity traders and retail participants.

Event markets involving public statements, vote counts, legal rulings, administrative data, measurements, or media reports may likewise depend upon settlement terms requiring interpretation or reliance upon selected sources.

Where the payoff exceeds the cost of influencing the settlement reference, the contract creates an incentive to attack the reference.

The integrity inquiry must therefore encompass both:

1. manipulation of the underlying event; and
2. manipulation of the mechanism declaring what occurred.

### F. Minnesota's covered categories correspond to heightened causal and institutional risk.

Minnesota's statute focuses upon categories in which wagering can burden public order, personal welfare, or institutional legitimacy. Those categories include elections, government decisions, legal proceedings, sports, war, terrorism, public-health events, disasters, death, and the actions or statements of natural persons.

These are not merely subjects that some residents find distasteful. They are areas in which:

- insiders may possess decisive information;
- participants may hold direct influence;
- public confidence is indispensable;
- intervention costs may be relatively low;
- consequences are borne by persons who never entered the market; and
- the State must absorb investigative, administrative, and institutional costs.

The platform collects fees from the transaction. Winning and losing traders redistribute money among themselves. The public bears the cost of defending the referenced institution from the incentives the market creates.

That asymmetry is a proper object of state police power.

---

### VI. SECTION 7a-2(c)(5)(C) CONSTRAINS QUALIFYING EVENT DERIVATIVES; IT DOES NOT CONVERT ALL GAMING INTO FEDERALLY PROTECTED SWAPS

### A. The Special Rule presupposes a qualifying contract; it does not independently create one.

Plaintiffs rely heavily upon the Commodity Exchange Act's "Special Rule" for event contracts. That provision authorizes the Commission to determine that agreements, contracts, or transactions involving specified activities are contrary to the public interest and therefore may not be listed or made available for clearing through a registered entity. 7 U.S.C. § 7a-2(c)(5)(C). The enumerated subjects include unlawful activity, terrorism, assassination, war, gaming, and other similar activity determined by the Commission to be contrary to the public interest.

The provision is important. It is not jurisdictionally self-executing.

Section 7a-2 governs contracts and instruments presented through registered entities. Its Special Rule supplies an additional layer of review for sensitive products that otherwise fall within the Commission's statutory domain. It does not declare that every transaction touching gaming, war, terrorism, assassination, or another enumerated activity becomes a swap merely because a registered entity lists it.

The sequence remains:

1. the agreement must satisfy an independently defined category governed by the Commodity Exchange Act;
2. the registered entity must possess authority to list or clear it;
3. the Special Rule then permits the Commission to determine whether the qualifying instrument involves an enumerated activity and is contrary to the public interest.

Plaintiffs reverse that sequence. They reason that because Congress authorized the Commission to exclude some event contracts involving gaming, Congress necessarily federalized every wager capable of being styled as an event contract.

The text does not support that inversion.

A provision authorizing the Commission to prohibit a qualifying product does not grant exchanges authority to convert nonqualifying activity into a federal product. The Special Rule constrains jurisdiction already established elsewhere. It does not generate the jurisdiction needed to activate itself.

## B. "Involves gaming" cannot mean "all gaming is a swap."

The Special Rule's reference to gaming reflects Congress's recognition that some instruments otherwise cognizable under the Act may implicate gaming concerns. It does not erase the distinction between:

- a qualifying derivative that involves gaming; and
- gaming that lacks the antecedent financial, economic, or commercial relation required of a derivative.

31

Those categories may overlap without becoming identical.

A commercial instrument can involve weather without making every weather wager a derivative. An instrument can involve war without making every bet on a military outcome a swap. A transaction can involve an unlawful activity without drawing all monetary wagers concerning crime into exclusive federal jurisdiction.

The same reasoning applies to gaming.

Congress's use of "involves" confirms that the enumerated activity is a feature of the contract under review—not the source of its initial statutory character. The Special Rule assumes a contract subject to Commission review and asks whether its subject or operation presents an additional public-interest problem.

It does not say:

> Any agreement that involves gaming shall be deemed a swap subject to exclusive Commission jurisdiction.

The Court should decline to place that sentence into the Act.

### C. Treating the Special Rule as jurisdiction-creating converts a statutory safeguard into a jurisdictional expansion device.

The Special Rule was enacted to preserve public-interest scrutiny over sensitive event contracts. Plaintiffs would transform it into a means of enlarging federal jurisdiction over the very conduct Congress identified as dangerous.

Under that interpretation:

1. a platform creates a wager concerning gaming, war, terrorism, assassination, or another sensitive event;
2. the product's sensitive subject is invoked to bring it within the Special Rule;
3. the Special Rule is treated as proof that Congress intended exclusive federal regulation;
4. state authority is preempted; and
5. unless the Commission affirmatively prohibits the product, the wager proceeds under federal protection.

The safeguard thereby becomes a ratchet.

The more closely a transaction resembles the dangerous subjects Congress singled out, the stronger the platform's claim to exclusive federal immunity becomes. State authority recedes at the precise point where the public-integrity interest intensifies.

That reading defeats the rule's protective purpose.

The more coherent construction is that the Special Rule applies after the transaction independently qualifies under the Act and preserves authority to exclude that qualifying product where its subject or operation threatens the public interest.

## D. The Special Rule confirms that Congress regarded public integrity as distinct from market efficiency.

The enumerated subjects do not share a single market characteristic. War, terrorism, assassination, unlawful activity, and gaming are grouped because contracts involving them may create public consequences beyond ordinary commercial risk allocation.

Those consequences can include:

- incentives to influence or facilitate harmful events;
- reputational and institutional degradation;
- insider participation;
- exploitation of tragedy;
- corruption of public decision-making;
- manipulation of settlement sources;
- increased investigative and enforcement costs; and
- erosion of public confidence.

Congress therefore did not treat exchange liquidity or informational utility as dispositive. It preserved a separate inquiry into whether the contract is contrary to the public interest.

That structure supports Minnesota's position rather than defeating it. Minnesota has identified categories in which organized outcome wagering creates heightened dangers to residents and institutions. Its judgment may coexist with federal derivatives regulation where the challenged activity falls outside the statutory class upon which federal exclusivity depends.

## E. Commission inaction cannot supply the missing statutory element.

Plaintiffs may contend that because the Commission has permitted, reviewed, or declined to prohibit particular event contracts, those contracts necessarily belong within the federal field.

That conclusion does not follow.

An agency's decision not to prohibit a product under the Special Rule addresses the exercise of an exclusionary power. It does not conclusively establish that every statutory prerequisite to

jurisdiction was satisfied. Nor can agency inaction resolve the judicial question whether the product falls within the governing definition of "swap."

The Special Rule uses Commission review to police sensitive products. It does not assign the Commission unreviewable authority to enlarge the statutory meaning of the transactions Congress defined.

Courts remain responsible for determining the scope of federal law, especially where an agency's jurisdictional interpretation would displace traditional state authority.

## VII. AN UNBOUNDED INTERPRETATION ERASES THE BOUNDARIES NECESSARY FOR LEGAL SCRUTINY

### A. A legal category that encompasses every monetizable event ceases to classify.

Plaintiffs' construction begins with an undeniably broad premise: nearly every significant event may produce some financial, economic, or commercial consequence for someone.

Elections affect industries. Wars affect prices. Judicial decisions affect litigants. Public-health announcements affect markets. Weather affects businesses. Athletic contests affect media revenue. Awards affect careers. Death affects estates. Statements affect reputations and securities. Governmental decisions affect taxpayers, contractors, and regulated parties.

From that premise, Plaintiffs seek a far broader conclusion: because the event may have an economic consequence somewhere, a platform may offer monetary positions upon it to anyone and treat the resulting transaction as a federally regulated swap.

That conclusion eliminates the limiting function of the statute.

If a generalized economic effect upon some unidentified person is enough, every socially consequential event satisfies the definition. The statutory terms "financial, economic, or commercial" no longer separate included transactions from excluded ones. They become a universal description of modern life.

A statutory category that includes everything capable of attracting money no longer performs classification. It merely authorizes monetization.

### B. Market categories preserve distinct legal relations and public obligations.

34

The law distinguishes among markets because different transactions create different rights, risks, duties, and externalities.

- A capital market directs resources into enterprises or assets.
- A commodity market facilitates exchange, delivery, and risk management concerning goods or measurable commercial interests.
- An insurance market pools and transfers exposure to loss, ordinarily requiring an insurable interest.
- A securities market concerns investment interests and claims upon enterprises, assets, income, or governance.
- A wagering market redistributes stakes according to uncertain outcomes.
- A forecasting system elicits and aggregates judgments.
- A derivative market alters exposure to an antecedent economic object, rate, obligation, asset, or commercial contingency.

These categories may overlap at their boundaries. Their overlap does not make them interchangeable.

Classification determines:

- which sovereign regulates;
- which disclosures are required;
- which parties may participate;
- what interest must exist;
- whether leverage is lawful;
- whether the product serves hedging or speculative purposes;
- what manipulation rules apply;
- what public harms are cognizable;
- what remedies are available; and
- whether the transaction may be prohibited altogether.

Collapsing these categories into the single word "market" makes the underlying economic choice less visible and the legal consequence less scrutinizable.

## C. Exchange mechanics do not alter the transaction's originating function.

Plaintiffs emphasize institutional features that distinguish their platforms from conventional sportsbooks:

- participants trade against other participants;
- prices may move continuously;
- positions may be sold before settlement;

- a clearing mechanism stands between counterparties;
- the platform may not take a direct position against the customer;
- market makers may supply liquidity; and
- the exchange is federally regulated.

Those features describe market organization. They do not answer what is being organized.

A wagering exchange may allow bettors to trade with one another. A secondary market may allow a wager to change hands. A clearing system may reduce counterparty risk. Variable prices may reveal changing demand. Sophisticated terminology may make the interface resemble a securities or commodities platform.

The originating relation remains unchanged where the participant commits money to an uncertain external outcome and has no preexisting exposure to that event.

Form can affect regulatory treatment. It cannot erase substance.

## D. Financial sophistication does not transform contingent redistribution into productive finance.

Prediction-market participation may involve research, modeling, statistical inference, rapid information processing, and disciplined capital management. Those skills can be substantial.

Skill does not settle taxonomy.

Professional poker involves skill. Sports betting may involve sophisticated analysis. Insurance underwriting requires forecasting. Arbitrage may exploit pricing differences across wagering venues. None of those facts independently determines whether the underlying transaction is a derivative, investment, insurance contract, or wager.

The legal question concerns the relation created between money and event.

Where the market rewards a participant because an independently occurring outcome conforms to the purchased position, and the participant's financial stake originates solely from that purchase, the transaction remains contingent redistribution.

Its sophistication may affect participant behavior. It does not supply the missing antecedent exposure.

## E. The derivatives label obscures the social choice being made.

The expansion of event markets is not merely a technical extension of existing finance. It makes a substantive social choice:

Whether private platforms may create tradable monetary interests in elections, judicial decisions, wars, public-health crises, deaths, crimes, disasters, official statements, and other events constituting the shared environment of civil society.

Calling those interests derivatives can conceal that choice beneath established financial terminology.

The Court should require the choice to appear in its own legal form.

If Congress intends to establish a national market for unrestricted wagering upon public events, displace state gambling laws, and place the resulting integrity consequences under exclusive federal administration, Congress may legislate expressly.

The choice should not arise indirectly from the semantic expansion of "swap."

## F. Unbounded classification impairs lawful regulation in every direction.

When event wagers are treated as derivatives merely because they appear on a designated contract market, several distortions follow.

First, gambling law loses authority over transactions that satisfy the ordinary mechanics of wagering.

Second, derivatives law is expanded beyond transactions grounded in transferable economic exposure.

Third, insurance principles concerning insurable interest are bypassed even where the event concerns loss, injury, death, or catastrophe.

Fourth, public-corruption law is forced to respond only after influence becomes sufficiently concrete to satisfy a separate offense.

Fifth, election, sports, judicial, military, and administrative integrity regimes must absorb financial incentives created outside their institutional design.

Sixth, states bear protective costs while the platform and traders capture the financial return.

The result is not a neutral jurisdictional adjustment. It is redistribution of authority, profit, and public risk.

## VIII. CONGRESS DID NOT CLEARLY DISPLACE STATE POLICE AUTHORITY OVER NAKED OUTCOME WAGERING

### A. Gambling and public-integrity regulation lie near the center of traditional state police power.

States have long regulated gambling as an exercise of their authority to protect public welfare, prevent fraud, address addiction, preserve the integrity of contests and institutions, and define which forms of wagering may operate within their borders.

The same police authority supports regulation of:

- lotteries;
- sportsbooks;
- casinos;
- pari-mutuel wagering;
- gaming devices;
- promotional contests;
- betting intermediaries;
- unlicensed wagering businesses; and
- persons facilitating prohibited gambling.

Minnesota's statute operates within that historic domain. It identifies organized systems that permit consumers to stake money upon future outcomes and prohibits specified business conduct supporting those systems. The enacted measure expressly addresses prediction markets through Minnesota's criminal and gambling laws.

Plaintiffs' theory would displace that authority not because Congress enacted a national prediction-market code, but because an exchange places the wager inside a commodities-regulatory structure.

That is an extraordinary jurisdictional consequence requiring a clear statutory foundation.

### B. Federal exclusivity should not be extended beyond the field Congress actually defined.

The Commodity Exchange Act establishes broad federal authority over commodity futures, options, swaps, and transactions falling within its defined classes. See 7 U.S.C. § 2(a)(1)(A).

That exclusivity is substantial. Its strength makes accurate boundary identification more important.

A court should not reason that because Congress occupies a field comprehensively, the field therefore includes every adjacent transaction a federally regulated entity chooses to offer. Field preemption cannot define its own subject matter.

The inquiry must remain tied to the statutory field Congress created:

- federally cognizable commodity transactions;
- swaps satisfying the enacted definition;
- futures and options within the Act;
- market conduct Congress assigned to the Commission; and
- related activities necessary to administer those markets.

Outcome wagering lacking the required financial, economic, or commercial relation does not enter that field through proximity or resemblance.

## C. The presumption against displacing historic state authority reinforces the antecedent-exposure boundary.

Where federal law is invoked to displace state regulation in an area historically occupied by the states, courts require a clear indication that Congress intended that result.

The principle does not defeat express statutory exclusivity. It informs the antecedent question concerning the scope of the regulated field.

Here, the competing readings are materially different.

Under Plaintiffs' reading, Congress silently authorized registered exchanges to:

- offer wagers concerning elections and sports nationwide;
- displace state licensing and prohibition regimes;
- create tradable interests in public decisions and personal events;
- determine which state gambling rules survive;
- and place all such matters under exclusive CFTC supervision.

Under Minnesota's reading, the Commodity Exchange Act governs legitimate derivatives connected to financial, economic, or commercial consequences, while states retain authority over wagers whose financial exposure is created by the wager itself.

The second reading preserves both statutory domains and gives operative meaning to the limiting text.

## D. Congress knows how to regulate gambling expressly.

Congress has enacted direct federal legislation concerning gambling, lotteries, sports wagering, unlawful internet gambling, transmission of wagering information, and related financial transactions.

When Congress regulates wagering, it speaks in the vocabulary of bets, wagers, gambling businesses, unlawful gambling, and gaming activity. It specifies prohibited conduct, jurisdictional predicates, exceptions, enforcement authority, and relationships to state law.

The statutory definition of "swap" contains no comparable national authorization for unrestricted public-event wagering.

Plaintiffs ask the Court to infer that authorization from:

1. a broad event-dependent clause limited by financial, economic, or commercial consequence;
2. a Special Rule authorizing exclusion of certain qualifying contracts; and
3. the Commission's exclusive jurisdiction over transactions already governed by the Act.

That inferential chain is insufficient to reorganize the federal-state balance over gambling.

**E. The asserted power carries major institutional and political consequences.**

The interpretation advanced here would permit a commodities regulator and registered exchanges to establish nationwide markets involving:

- elections;
- legislative outcomes;
- judicial decisions;
- criminal prosecutions;
- military operations;
- diplomatic events;
- public-health emergencies;
- natural disasters;
- deaths and injuries;
- official conduct;
- and the speech or behavior of identifiable persons.

It would simultaneously curtail state authority over those markets.

That power carries consequences far beyond conventional derivatives regulation. It changes the financial relationship between private actors and public institutions. It creates new incentives

surrounding events whose integrity states are obligated to protect. It subjects political and social life to monetization through standardized contingent claims.

A power of that breadth should rest upon unmistakable congressional authorization.

The required clarity is absent where the asserted authority depends upon treating the wager's self-created payoff as the financial consequence needed to qualify the wager as a swap.

### F. Federalism does not require fragmentation of genuine derivatives markets.

Plaintiffs may argue that permitting state enforcement would fragment national derivatives markets and subject registered entities to conflicting obligations.

That concern has force where the product is genuinely a federally regulated derivative.

The antecedent-exposure nexus protects that national uniformity. States could not relabel a bona fide interest-rate swap, commodity hedge, weather derivative, credit instrument, or commercial contingency contract as gambling merely because it involves uncertainty.

The rule instead distinguishes instruments at the threshold:

- legitimate derivatives remain within the nationally uniform federal system;
- naked outcome wagers remain subject to state gambling and public-integrity authority.

Uniformity does not require conceptual overreach. It requires a stable boundary.

---

## IX. MINNESOTA'S STATUTE TRACKS THE LAWFUL DISTINCTION BETWEEN ECONOMIC EXPOSURE AND CREATED WAGERING EXPOSURE

### A. Minnesota regulates systems built to accept monetary positions on external outcomes.

Minnesota defines a prediction market by reference to a system or platform that allows consumers to place wagers on future outcomes. The statute identifies prohibited categories and reaches business conduct involving the operation, hosting, promotion, facilitation, and support of those systems.

The State has therefore classified the activity according to its operative mechanics:

- a consumer supplies consideration;
- the consumer selects a contingent outcome;
- the system accepts or facilitates the position;

- and payment depends upon resolution of the event.

That classification is neither arbitrary nor nominal. It corresponds to the originating transaction.

## B. The statute does not purport to occupy conventional commodity and commercial derivatives markets.

Minnesota's law targets identified outcome-wagering activity. It does not establish a parallel regulatory system for futures exchanges, interest-rate swaps, currency derivatives, agricultural hedges, energy contracts, credit swaps, or other conventional instruments tied to cognizable economic interests.

Its exclusions and covered subjects preserve the distinction between:

- events that constitute financial, commercial, or economic objects of legitimate risk management; and
- external public or personal events converted into subjects of monetary wagering.

The statute consequently does not claim general authority over the Commission's established field. It contests whether the challenged transactions entered that field.

That is a classification dispute before it is a preemption dispute.

## C. Minnesota's category-based approach responds to foreseeable integrity costs.

The legislature identified subjects for which wagering creates heightened dangers to individuals and public institutions.

The covered categories include matters such as:

- athletic contests;
- elections;
- governmental action;
- legal proceedings;
- armed conflict;
- terrorism;
- public-health events;
- disasters;
- death;
- and conduct or statements of natural persons.

42

Those events often involve identifiable actors with the ability to influence outcomes. They also implicate public confidence, institutional legitimacy, vulnerable persons, and state enforcement responsibilities.

Minnesota need not wait for each market to produce a completed act of bribery, insider abuse, event manipulation, or settlement interference before recognizing the common incentive structure.

Legislation may address a class of transactions where the class predictably creates risks the State is competent to prevent.

### D. The law addresses the commercial infrastructure of wagering.

Minnesota's statute does not merely prohibit residents from thinking about, forecasting, or discussing uncertain events. It targets the organized commercial infrastructure through which wagers are offered, accepted, promoted, or facilitated.

That distinction matters.

The statute regulates a business model that:

1. selects events;
2. creates standardized positions;
3. supplies trading infrastructure;
4. solicits consumer participation;
5. resolves contracts;
6. redistributes stakes; and
7. derives revenue from transactional activity.

The platform's role is not incidental. It creates and maintains the access point through which worldly uncertainty becomes a monetized product.

Minnesota may regulate that access point where the product falls outside the federal statutory category asserted by Plaintiffs.

### E. Any overlap should be resolved through contract-specific classification rather than categorical invalidation.

Some event-linked instruments may possess legitimate derivative character. Some contracts prohibited by a broad reading of Minnesota's law may therefore implicate federal exclusivity.

That possibility does not establish facial preemption across every application.

The Court has several narrower paths:

1. construe the state statute consistently with the federal definition;
2. preserve its operation as applied to contracts lacking an antecedent-exposure nexus;
3. identify specific federally cognizable products for which state enforcement is preempted;
4. require product-by-product or category-by-category adjudication;
5. narrow the injunction to contracts for which Plaintiffs have demonstrated statutory coverage; or
6. certify unresolved questions of state-law construction where appropriate.

Each path preserves federal supremacy without converting disputed classification into categorical immunity.

## F. Facial preemption is not established by identifying selected qualifying contracts.

Plaintiffs may identify contracts involving weather, economic indicators, commodity conditions, or governmental events with measurable market consequences. Those examples may show that some platform products can satisfy the federal definition.

They do not establish that all platform products do.

A contract concerning inflation may bear a direct economic relation. A contract concerning whether an identifiable person will utter a word does not acquire the same character merely because it is offered through the same interface.

A weather hedge connected to agricultural loss differs from a general-public wager on snowfall. A commercial contract tied to regulatory approval differs from a public wager on how a judge will rule. A political-risk instrument protecting an existing investment differs from a bet on who will win an election.

The platform is a venue containing multiple products. The legal status of one product does not classify every other product listed beside it.

Categorical preemption cannot be built from selective examples.

## X. THE COURT SHOULD ADOPT THE ANTECEDENT-EXPOSURE NEXUS, NARROW THE INJUNCTION, AND PRESERVE CONTRACT-SPECIFIC ADJUDICATION

### A. The Court has already identified the need for a limiting principle.

At the preliminary-injunction stage, the Court recognized that an event's connection to financial, economic, or commercial consequence cannot be unlimited and that the wager itself cannot create the consequence needed to justify its statutory classification.

That recognition supplies the proper foundation for merits adjudication.

The question is no longer whether a limit exists. It is how the limit should be stated.

The antecedent-exposure nexus gives the Court a rule rooted in:

- statutory text;
- derivative mechanics;
- surrounding provisions;
- established market distinctions;
- federalism;
- public integrity; and
- administrable factual inquiry.

## B. The Court should adopt a two-stage classification test.

The Court should determine statutory coverage through two stages.

### Stage One: Independent Consequence

The Court should ask:

> Does the referenced event possess a cognizable financial, economic, or commercial consequence independent of the participant's purchase of the challenged contract?

A generalized effect upon someone somewhere is insufficient. The consequence must exist apart from the wager and be identifiable as a financial, economic, or commercial exposure.

### Stage Two: Transactional Nexus

The Court should then ask:

> Does the agreement transfer, offset, price, manage, or allocate that independently existing exposure?

The contract's settlement terms, participant eligibility, marketing, position limits, practical use, and relationship to actual loss may inform that inquiry.

Where both stages are satisfied, derivative classification may be appropriate.

Where the participant's entire exposure originates in the purchase of the position, the transaction is an outcome-contingent wager.

## C. The Court should examine substance through a defined set of factors.

Relevant factors include:

1. **Independent loss:** Could the participant suffer financial, economic, or commercial loss from the event without purchasing the contract?
2. **Preexisting relation:** Does the participant own property, conduct business, owe an obligation, hold an investment, or possess another legally cognizable interest affected by the event?
3. **Risk correspondence:** Does the contract's payout reasonably correspond to the participant's independent exposure?
4. **Risk reduction:** Does the position reduce or reallocate an existing risk, or create a new possibility of gain and loss?
5. **Participant eligibility:** Must the participant demonstrate any relation to the referenced economic consequence?
6. **Position scale:** Is the position limited by reference to actual or plausible exposure?
7. **Product design:** Is the instrument structured for commercial risk management, generalized speculation, or outcome wagering?
8. **Marketing:** Is the product presented as a hedge against loss or as an opportunity to profit by correctly predicting an event?
9. **Underlying object:** Does the transaction refer to property, value, rate, obligation, productive activity, or another identifiable economic relation?
10. **Public-event integrity:** Can participants possess influence over the event or its settlement mechanism?

No single factor must control every case. Together they identify whether the contract operates upon antecedent economic risk or originates wagering exposure.

## D. Exchange registration should carry no conclusive classification effect.

Registration may establish that the exchange is subject to federal oversight. It may demonstrate compliance with applicable structural requirements. It may bear upon remedies and equitable considerations.

It should not conclusively establish the legal character of every listed product.

The Court should hold that:

46

*Listing upon a designated contract market neither supplies an absent statutory element nor prevents judicial examination of whether the listed transaction falls within the Commodity Exchange Act.*

That holding preserves federal regulation without surrendering classification to the regulated venue.

### E. The injunction should correspond to the contracts Plaintiffs have actually shown to be federally cognizable.

Preliminary relief must be no broader than necessary to prevent the established injury.

If Plaintiffs demonstrate that particular products qualify as swaps because they possess an antecedent financial, economic, or commercial nexus, the Court may preserve those products from conflicting state enforcement while the litigation proceeds.

The same reasoning does not justify immunizing every contract offered by Plaintiffs, including contracts concerning subjects whose only financial consequence to the participant arises from the wager.

The injunction may be narrowed by:

- product;
- event category;
- participant relation;
- contract design;
- economic nexus; or
- identified applications of Minnesota law.

A tailored order would protect federal authority while preserving Minnesota's lawful authority over transactions outside the federal class.

### F. Minnesota's authority over naked outcome wagers remains intact.

Where a contract permits any member of the public to purchase exposure to an independently occurring event, requires no antecedent interest, transfers no existing risk, and settles solely according to whether the selected outcome occurs, the transaction falls on the wagering side of the boundary.

Minnesota may regulate that transaction through its police power.

The State's authority is particularly strong where the referenced event concerns:

47

- elections;
- sports;
- legal proceedings;
- governmental conduct;
- war;
- terrorism;
- public health;
- disaster;
- death;
- or the actions of identifiable persons.

Those categories combine wagering mechanics with heightened risks of influence, insider participation, exploitation, and externalized public cost.

## G. The Court should reject self-originating federal jurisdiction.

The core jurisdictional rule should remain simple:

> A transaction cannot create the financial consequence needed to classify itself as a swap, use that classification to invoke exclusive federal jurisdiction, and then use that jurisdiction to prevent examination of the original classification.

That loop has no stable limiting principle.

It would allow exchanges to federalize any uncertain event by:

1. drafting a proposition;
2. accepting opposing monetary positions;
3. calling the product a contract;
4. listing it on a designated market; and
5. invoking federal exclusivity.

The Commodity Exchange Act regulates derivatives. It does not authorize private exchanges to manufacture derivative status by manufacturing wagers.

## H. The requested holding preserves every legitimate governmental interest.

The antecedent-exposure nexus preserves:

- federal uniformity for genuine derivatives;
- Commission authority over qualifying swaps;
- innovation in commercial risk-management products;

- lawful forecasting systems;
- state authority over gambling;
- public-integrity safeguards;
- judicial review of statutory boundaries; and
- contract-specific adjudication where categories overlap.

Plaintiffs' categorical theory forces a false choice between federal commodities regulation and state gambling authority.

The Court can preserve both by beginning where the transaction begins.

## CONCLUSION

These cases should not be resolved by asking first which sovereign regulates a product whose legal character remains disputed.

The antecedent question is what the product is.

A derivative operates upon a financial, economic, or commercial exposure that exists before the derivative. It transfers, offsets, prices, manages, or reallocates that exposure.

An unrestricted outcome wager operates differently. It selects an independently occurring event, permits a participant with no prior economic relation to purchase a contingent position, and thereby creates the participant's entire possibility of gain or loss. The wager does not manage an antecedent risk. It originates the risk and redistributes money according to the result.

The distinction cannot be erased by exchange architecture, liquidity, informational output, clearing, federal registration, or financial terminology.

Nor can the transaction's own payoff supply the statutory "financial, economic, or commercial consequence" needed to make the transaction a swap. That construction would permit the agreement to create the element establishing its classification, the classification to generate exclusive federal jurisdiction, and the resulting jurisdiction to preempt state inquiry into the agreement's actual character.

Congress did not establish so circular a regime.

The Court should hold that an event-dependent agreement qualifies as a swap under 7 U.S.C. § 1a(47)(A)(ii) when the referenced event bears a cognizable relation to a financial, economic, or commercial exposure existing independently of the agreement and the agreement transfers, offsets, prices, manages, or allocates that exposure.

49

Where the agreement itself creates the participant's financial stake in an otherwise independent worldly outcome, the transaction remains an outcome-contingent wager.

The Court should accordingly:

1. reject categorical preemption based solely upon exchange registration or product nomenclature;
2. adopt the antecedent-exposure nexus as the limiting construction of § 1a(47)(A)(ii);
3. distinguish qualifying commercial event derivatives from naked public outcome wagers;
4. narrow the preliminary injunction to transactions Plaintiffs have demonstrated fall within the federally occupied field;
5. preserve Minnesota's authority over transactions whose financial exposure originates solely from the wager; and
6. permit contract-specific and category-specific adjudication as the record develops.

Respectfully submitted,

**BRANDON M. HAYES**
President, Natural Law Institute
Amicus Curiae, Pro Se
West Newbury, Massachusetts
159 Indian Hill St.
617-438-2049
NLIstaff@naturallawinstitute.org

Dated: August 3, 2026